UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

Towaki Komatsu,

                      Plaintiff,                                    **<u>Complaint</u>**

         -vs-                                             **JURY DEMAND**

The City of New York, NYPD Inspector Howard Redmond,
former NYPD Lieutenant Ralph Nieves, NYPD Officer Karl
Pfeffer (Officer ID #: 48458), NYPD Officer Andrew Berkowitz
(badge #: 7141), NYPD Officer Cruz (badge #: 751), NYPD
Officer Hansen (badge #: 4028), NYPD Officer Christopher
Fowler (badge #: 3185), NYPD Officer Lance (badge #: 245),
NYPD Officer John Doe8-30-17a, NYPD Officer Juanita
Holmes, Bill de Blasio, former NYPD Commissioner James
O'Neill

- All of the defendants listed above who are people are being
  sued in their individual and official capacities,

                        Defendants.

    ------------------------------------------------------- X

## **<u>TABLE OF CONTENTS</u>**

I.    Preliminary Remarks .......................................................................................... 3

II.   Jurisdiction ......................................................................................................... 6

III.  Parties ................................................................................................................. 7

IV.   Legal Standards ................................................................................................ 10

V.    Background Facts .............................................................................................. 14

VI.   Statement of Facts ............................................................................................ 48

VII.  Causes of Action .............................................................................................. 56

VIII. Jury Demand ..................................................................................................... 69

IX.   Prayer for Relief ............................................................................................... 69

Plaintiff Towaki Komatsu (hereinafter referred to in the first-person as "I", "me", and "my"), proceeding pro se in this action, does hereby state and allege all that follows in this pleading.

## PRELIMINARY REMARKS

1.   The following applies throughout this complaint in the interests of brevity:

   a.   Acronyms and aliases in the second column of the following table will be used throughout this pleading instead of the entries in the third column to which they correspond:

| # | Abbreviation | Corresponds To |
|---|---|---|
| 1 | CCRB | New York City Civilian Complaint Review Board |
| 2 | City Council | New York City Council |
| 3 | Defendant City | Defendant City of New York |
| 4 | DOE | New York City Department of Education |
| 5 | DOE's 4/27/17 video | The video recording that was recorded between 6:30 pm and 11 pm on 4/27/17 by a video security camera controlled by DOE that was installed by doors marked "Exit 13" by an entrance to the school that hosted the Mayor's 4/27/17 town hall that I received in response to a FOIL demand. That video recording is available on the Internet at https://drive.google.com/open?id=1MbzBrn2ERdkYajn4MVJy3N6AB5ZA5hFu |
| 6 | FOIL | Freedom of Information Law |
| 7 | FRCP | Federal Rule of Civil Procedure |
| 8 | HRA | New York City Human Resources Administration |
| 9 | The Mayor | New York City Mayor Bill de Blasio |
| 10 | Mayor's 4/27/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a mostly traditional public forum on 4/27/17 in Long Island City in Queens that was subject to New York State's Open Meetings Law and was used a campaign event to support the Mayor's re-election interests that I was illegally barred from attending while I had active litigation against HRA. |

| 11 | Mayor's 5/23/17 resource fair | The public resource fair meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a mostly traditional public forum on 5/23/17 inside of the Veterans Memorial Chamber within the Bronx Supreme Court during the U.S. Navy's annual "Fleet Week" event in New York City while I continued to be a U.S. Navy veteran and was upholding my military enlistment oath to protect and defend the U.S. Constitution against all enemies. That public forum was also used as a campaign event to support the Mayor's re-election interests and I was illegally barred from attending it as I continued to have active litigation against HRA. |
| 12 | Mayor's 6/8/17 town hall | The public town hall meeting that the Mayor conducted as a public forum on 6/8/17 at 93-29 Queens Boulevard in Rego Park in Queens inside of a building named Lost Battalion Hall Recreation Center |
| 13 | Mayor's 7/25/17 publicity stunt | The public stunt that the Mayor illegally conducted on 7/25/17 in an area of a subway station located next to a staircase, below Broadway, and by Warren Street in Manhattan in a manner and location that was in violation of the MTA's Rules as Defendant Redmond illegally assaulted me in that subway station in front of Defendant Fowler while I was conducting myself lawfully and while that was recorded on video. |
| 14 | Mayor's 8/30/17 town hall | The public town hall meeting that the Mayor conducted as a public forum on 8/30/17 at 195 Graham Avenue in Brooklyn. |
| 15 | Mayor's CAU | The Mayor's Community Affairs Unit |
| 16 | Mr. Banks | HRA Commissioner Steven Banks |
| 17 | My HRA lawsuit | The hybrid lawsuit that I commenced against HRA in January of 2017 that corresponds to *Komatsu v. New York City Human Resources Administration*, No. 100054/2017 (Sup. Ct., New York Cty.) and is pending appeal. I asserted claims in that case that my claims in this case related back to and amplify. |
| 18 | My X1 lawsuit | The lawsuit that I commenced against the City of New York, Defendant Redmond, and others in April of 2018 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) and is about matters that my claims in this case relate back to and amplify. |
| 19 | OCA | New York State Office of Court Administration |
| 20 | Second Circuit | United States Court of Appeals for the Second Circuit |
| 21 | Urban | Urban Pathways, Inc. It is the slumlord for the building in which I reside. |

2.      Every reference that I make in this pleading that concerns my efforts to have attended the Mayor's 8/30/17 town hall concerns those that I made to have lawfully attended it from within the room in which it was conducted as it was conducted, shortly before it began, and shortly after it ended.

3.      The Mayor' office arranged to have the Mayor's 8/30/17 town hall recorded on video. That video recording is available on the Internet at

https://www.youtube.com/watch?v=Ia4C4NnrSDo.

4.      References to HRA, DHS, and DSS will be used interchangeably in this pleading for simplicity.

5.      The illegal acts and omissions that were committed against me on 8/30/17 at the site of the Mayor's 8/30/17 town hall were committed in relation to my efforts to have exercised my legal right to have done the following:

    a.  Attended the Mayor's 8/30/17 town hall from within the room in which it was conducted shortly before it began, as it was conducted, and shortly after it ended.

    b.  Exercised the full extent of my rights while attending that town hall partly by engaging in protected whistleblowing about a broad array of matters of public concern and private matters.

6.      This is a civil rights action to vindicate my rights in response to illegal acts and omissions that were committed against me on 8/30/17 at the site of the Mayor's 8/30/17 town hall in relation to my efforts to have lawfully attended that town hall while Defendant Redmond was then the primary defendant in *Sherrard v. City of New York*, No. 15-cv-7318 (MB) (S.D.N.Y. Jun. 13, 2018) and I was aware of his status in that case for months prior to 8/30/17.

    a.  Those who committed such illegal acts and omissions against me on 8/30/17 did so as

part of a conspiracy in retaliation mainly for protected whistleblowing activities that I engaged in against Defendant Redmond and other members of the Mayor's NYPD security detail as I was lawfully sitting and otherwise conducting myself on 8/30/17 in the gym in which the Mayor's 8/30/17 town hall was conducted shortly before it began and as I was talking calmly with members of the public who sat near me mostly about the following:

  i.  Defendant Redmond's status as the primary defendant in *Sherrard v. City of New York*, No. 15-cv-7318 (MB) (S.D.N.Y. Jun. 13, 2018).

  ii.  Members of the Mayor's NYPD security detail illegally seized literature from people on 6/21/17 at the site of the town hall meeting that the Mayor conducted on that date in Chinatown in Manhattan as members of the public tried to attend that event with such literature.

  iii.  The fact that members of the Mayor's NYPD security detail and Mayor's staff I had previously illegally prevented me from attending town hall and public resource fair meetings that the Mayor conducted.

**JURISDICTION AND VENUE**

1.   This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§1331 and 1343. This action is brought pursuant to 42 U.S.C. §§1983, 1985, 1988 and the First, Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution.

2.   Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§2201 and 2202, FRCP Rules 57 and 65, and the general legal and equitable powers of this Court.

3.   Venue is proper pursuant to 28 U.S.C. § 1391(b) because I reside in the Bronx and New York City Hall's principal place of business is in Manhattan.

4.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

5.      Consistent with the requirements of New York General Municipal Law § 50-e, I filed a timely Notice of Claim with the New York City Comptroller within 90 days of the accrual of my claims under New York law. This Court therefore has supplemental jurisdiction over my claims under New York law because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

6.      My claims have not been adjusted by the New York City Comptroller's Office.

## PARTIES

1.      I am, and was at all times relevant to this action, a resident of Bronx County in the State of New York. I am also a U.S. Navy veteran, who swore to defend the U.S. Constitution against all of its enemies indefinitely and without exceptions. I have honored that oath and continue to do so.

2.      Bill de Blasio is the Mayor of the City of New York.

3.      Defendant City of New York is a municipal corporation duly incorporated and authorized under the laws of the State of New York pursuant to §431 of its Charter. The City of New York is authorized under the laws of the State of New York to maintain a police department, the NYPD, which is supposed to act as its agent in the area of law-enforcement and for which it and the Mayor are ultimately responsible. The City and the Mayor both assume the risks incidental to the maintenance of a police force and the employment of police officers.

4.      Defendants NYPD Inspector Howard Redmond, former NYPD Lieutenant Ralph Nieves, NYPD Officer Karl Pfeffer (Officer ID #: 48458), NYPD Officer Andrew Berkowitz (badge #: 7141), NYPD Officer Cruz (badge #: 751), NYPD Officer Hansen (badge #: 4028), NYPD

Officer Christopher Fowler (badge #: 3185), NYPD Officer Lance (badge #: 245), NYPD

Officer John Doe8-30-17a, NYPD Officer Juanita Holmes, former NYPD Commissioner James

O'Neill were at all times relevant herein officers, employees, and agents of the NYPD and the

City of New York.

5.      Defendant NYPD Officer John Doe8-30-17a is the man wearing a suit and tie on the far-

left in the next screenshot that is from a video recording that I recorded on 8/30/17 at 7:22 pm. I

do not know his name.



6.      Defendant Redmond helps to direct the Mayor's NYPD security detail and holds the rank

of Inspector in the NYPD.

7.      Defendants Nieves, Pfeffer, Berkowitz, and Fowler, were at all times relevant herein

members of the NYPD security detail for New York City Mayor Bill de Blasio that Defendant

Redmond directs.

8.      On 8/30/17, both Defendant Bill de Blasio and Defendant James O'Neill were responsible for how the NYPD operated. Prior to that date, I had face-to-face conversations with both of them in June and July or 2017 that were recorded on audio and video about illegal acts and omissions that Defendant Redmond and other members of the NYPD committed against me since 4/27/17 at public forums that the Mayor had conducted. Mr. de Blasio also stood within roughly 20 feet from me as Defendant Redmond was recorded on video on 7/25/17 as he illegally assaulted me in front of many whistleblower news censors in journalism and Defendant Fowler inside of a subway station below Broadway by Murray Street in Manhattan as Mr. Redmond continued to flagrantly violate my constitutional rights at a time and in a location in which the Mayor was illegally conducting a publicity stunt in violation of the MTA's Rules that authorized me to have conducted myself in the manner in which I did so at the time that Mr. Redmond began assaulting me and violating my constitutional rights then.

9.      The individual defendants are being sued herein in their individual and official capacities.

10.     At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD and City of New York. They were acting for and on behalf of the NYPD and Mayor at all times relevant herein. While doing so, the defendants in this action who are members of the NYPD did so with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

11.     The individual defendants' acts hereafter complained of were carried out intentionally, recklessly, and oppressively with malice and egregious, callous, and wanton disregard of

plaintiff's rights.

12.     At all relevant times, the individual defendants were engaged in joint ventures, assisting

each other in performing the various actions described herein and lending their physical presence

and support and the authority of their offices to one another.

## LEGAL STANDARDS

1.     I incorporate by reference the allegations set forth in all preceding paragraphs as if fully

set forth herein.

2.     The following is a relevant excerpt from _Doe v. City of New York_, No. 18-cv-670

(ARR)(JO) (E.D.N.Y. Jan. 9, 2020) that confirms that I had a right to criticize every member of

the NYPD who I interacted with on 8/30/17 in the gym that hosted the Mayor's 8/30/17 town

hall and not be retaliated against for doing so:

> ""[t]he right to criticize public officials is at the heart of the First Amendment's right of
> free speech." _Kaluczky v. City of White Plains,_ 57 F.3d 202, 210 (2d Cir. 1995) (citing
> _N.Y. Times Co. v. Sullivan,_ 376 U.S. 254, 282 (1964)). Indeed, the "right to criticize the
> police without reprisal" is "clearly" an "interest protected by the First Amendment,"
> _Kerman v. City of New York,_ 261 F.3d 229, 241-42 (2d Cir. 2001), as "[t]he First
> Amendment protects a significant amount of verbal criticism and challenge directed at
> police officers[,]" _id._ at 242 (quoting _City of Houston v. Hill,_ 482 U.S. 451, 461 (1987)).
> Thus, on summary judgment, the Second Circuit has held that a plaintiff established a
> First Amendment retaliation claim when he proffered facts showing that police officers
> retaliated against him for making derogatory comments to the officers and for threatening
> to sue them. _Kerman,_ 261 F.3d at 241-42.[3]"

3.     The following is a relevant excerpt from _Doe v. City of New York_, No. 18-cv-670

(ARR)(JO) (E.D.N.Y. Jan. 9, 2020) that confirms that I had a right to criticize every member of

the NYPD who I interacted with on 8/30/17 in the gym that hosted the Mayor's 8/30/17 town

hall and not be retaliated against for doing so:

4.     _Elrod v Burns,_ 427 US 347 (1976) includes the following finding about First Amendment

rights that include the right to lawfully assemble in a public forum that includes a public resource

fair meeting:

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

5. _Hansen v. Harris_, 619 F.2d 942 (2d Cir. 1980) includes the following relevant findings

about estoppel:

"The Government may sometimes be estopped from enforcing its rules, based on the conduct of its agents."

6. _Barboza v. D'Agata,_ 151 F. Supp. 3d 363 (S.D.N.Y. 2015) includes the following

relevant findings that confirms that people are permitted to use crude and offensive speech in the

context of complaining about government activity:

"The Court of Appeals found this was in the scope of protected speech because defendant's messages were crude and offensive but made in the context of complaining about government action on a telephone answering machine set up for the purpose, among others, of receiving complaints from the public. Mangano 571. That decision is on all fours with this case. It dealt with offensive language used to express to government employees dissatisfaction with government action"

7. The <u>following</u> excerpt from _Hopper v. City of Pasco_, 241 F.3d 1067 (9th Cir. 2001)

addresses standardless discretion at public forums:

"Courts have also been reluctant to accept policies based on subjective or overly general criteria. "`[S]tandards for inclusion and exclusion' in a limited public forum `must be unambiguous and definite' if the `concept of a designated public forum is to retain any vitality whatever.'" _Christ's Bride,_ 148 F.3d at 251 (quoting _Gregoire v. Centennial Sch. Distr.,_ 907 F.2d 1366, 1375 (3d Cir.1990)). Absent objective standards, government officials may use their discretion to interpret the policy as a pretext for censorship. _See Board of Educ. v. Mergens,_ 496 U.S. 226, 244-45, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (generalized definition of permissible content poses risk of arbitrary application); _Putnam Pit, Inc. v. City of Cookeville,_ 221 F.3d 834, 845-46 (6th Cir.2000) ("broad discretion [given] to city officials [raises] possibility of discriminatory application of the policy based on viewpoint"); _Cinevision Corp. v. City of Burbank,_ 745 F.2d at 560 (9th Cir.1984) (vague standard has "potential for abuse"); _Gregoire,_ 907 F.2d at 1374-75 ("virtually unlimited discretion" granted to city officials raises danger of arbitrary application); _see also City of Lakewood v. Plain Dealer Publ. Co.,_ 486 U.S. 750, 758-59, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (absence of express standards in licensing context raises dual threat of biased administration of policy and self-censorship by licensees). Therefore, "the more subjective the standard used, the more likely that the category will not meet the requirements of the first amendment." _Cinevision,_ 745 F.2d at 575; _see also Christ's Bride,_ 148 F.3d at 251 (suppression of speech under defective

standard requires closer scrutiny)."

8.     The long excerpt shown next from *Hershey v. Kansas City Kansas Community College,*
*No. 2: 16-cv-2251-JTM (D. Kan. Feb. 17, 2017)* addresses both standardless discretion and
municipal liability really well. What is particularly noteworthy about its findings is that it
indicates that instance in which people are denied access to a public forum due to standardless
discretion of government officials, a plaintiff doesn't need to show that he was discriminated
against based on the content of his First Amendment expression.

> As plaintiff points out, he has alleged that he was denied access to a public forum "for
> unstated reasons, in accordance with no policy, and at the absolute discretion of College
> officials." Dkt. 1, ¶ 50. He alleges that the College "has no policy to specify any
> standards by which College officials approve or deny requests," and that the College
> "vests absolute, standardless discretion in College officials" to allow or deny requests to
> use facilities for expressive activities. *Id.* ¶¶ 41, 42. Additionally, he alleges that the
> Board of Trustees and defendants Long and Wynn were acting as policymakers for the
> College at all relevant times. Finally, plaintiff has spelled out how a municipal policy or
> custom — in this instance, the *absence* of any standards governing exercise of discretion
> on requests to use College facilities — caused the deprivation of First Amendment rights
> alleged in the complaint.
>
> Because plaintiff has alleged that access to the public forum is based on "standardless
> discretion" of College officials, he need not show that he was discriminated against based
> on the content of his materials. "A government regulation that allows arbitrary
> application is `inherently inconsistent with a valid time, place, and manner regulation
> because such discretion has the potential for becoming a means of suppressing a
> particular point of view.'" *Forsyth Cty., Ga. v. Nationalist Movement,* 505 U.S. 123, 130
> (1992) (cite omitted). Government regulation of access to a public forum must have
> definite standards because "if the permit scheme involves appraisal of facts, the exercise
> of judgment, and the formation of an opinion by the licensing authority, the danger of
> censorship and of abridgment of ... First Amendment freedoms is too great to be
> permitted." *Id.* at 131 (internal quotation marks and citations omitted); *Heffron v. Int'l
> Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 649 (1981) (awarding space on a
> first-come, first-served basis "is not open to the kind of arbitrary application that this
> Court has condemned as inherently inconsistent with a valid time, place, and manner
> regulation because such discretion has the potential for becoming a means of suppressing
> a particular point of view.")
>
> Plaintiff has also adequately alleged the existence of a municipal policy or custom giving
> rise to liability under 42 U.S.C. § 1983. A municipal policy may be shown by an informal
> custom amounting to a widespread practice that is so permanent and well settled as to

constitute a custom or usage. *See Bryson v. City of Okla. City,* 627 F.3d 784, 788 (10th Cir. 2010). To withstand a motion to dismiss on such a theory, a plaintiff must allege: 1) the existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the municipality's employees; 2) deliberate indifference to or tacit approval of such misconduct by the municipality's policymaking officials after notice to the officials of that particular misconduct; and 3) that the plaintiff was injured by virtue of the unconstitutional acts pursuant to the custom, with the custom being the "moving force" behind the acts. *Gates v. Unif. Sch. Dist. No. 449,* 996 F.2d 1035, 1041 (10th Cir. 1993). Viewed in the light most favorable to plaintiff, the complaint alleges the existence of a persistent custom of vesting absolute discretion in College officials to grant or deny access to the public forum, knowledge of and tacit approval of the impermissible practice by College policymakers, and injury to plaintiff caused by the custom. Defendants' motion to dismiss the claim against the College is therefore denied.

9.   *Regional Economic Community v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002)

includes the following finding that concerns proving discriminatory intent:

> "Discriminatory intent may be inferred from the totality of the circumstances, including ... the historical background of the decision ...; the specific sequence of events leading up to the challenged decision ...; [and] contemporary statements by members of the decisionmaking body"

10.   *Hammock v. Pierce*, No. 15-CV-09052 (NSR) (S.D.N.Y. May 7, 2018) contains the

following findings that addresses proving a retaliatory motive and is from a case that involved

seizure of personal property:

> "retaliatory motive may be inferred from a number of circumstantial factors, including, *inter alia, "(i)* the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter, and (iv) statements by the defendant concerning his motivation." *Burton v. Lynch,* 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)"

11.   According to *Jovanovic v. City of New York*, 04 Civ. 8437 (PAC) (S.D.N.Y. Aug. 17,

2006), "malice may be inferred from the lack of probable cause."

12.   In *Knight First Amendment Inst. Columbia v. Trump*, 928 F.3d 226 (2d Cir. 2019),  the

Second Circuit confirmed that government personnel may not bar people from public forums by

engaging in viewpoint discrimination.

13.     In _Matal v. Tam_, 137 S. Ct. 1744, 582 U.S., 198 L. Ed. 2d 366 (2017), the U.S. Supreme

Court issued the following critically relevant findings:

> "Giving offense is a viewpoint. The "public expression of ideas may not be prohibited
> merely because the ideas are themselves offensive to some of their hearers."

14.     The following is a pertinent excerpt from _Frain v. Baron_, 307 F. Supp. 27 (E.D.N.Y.

1969):

> "Fear of disorder, which the City cites to justify its policy, has been ruled out as a ground
> for limiting peaceful exercise of First Amendment rights. Edwards v. South Carolina, 372
> U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963)."

15.     The following is a relevant excerpt from _Capitol Records, Inc. v. Thomas-Rasset_, 692

F.3d 899 (8th Cir. 2012) that concerns having a court issue an order that restrains acts that may

otherwise be lawful due to a propensity and proclivity to commit unlawful conduct:

> "a district court has authority to issue a broad injunction in cases where "a proclivity for
> unlawful conduct has been shown." _See McComb v. Jacksonville Paper Co.,_ 336 U.S.
> 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949). The district court is even permitted to
> "enjoin certain otherwise lawful conduct" where "the defendant's conduct has
> demonstrated that prohibiting only unlawful conduct would not effectively protect the
> plaintiff's rights against future encroachment." _Russian Media Grp., LLC v. Cable
> America, Inc.,_ 598 F.3d 302, 307 (7th Cir.2010) (citing authorities). If a party has
> violated the governing statute, then a court may in appropriate circumstances enjoin
> conduct that allowed the prohibited actions to occur, even if that conduct "standing alone,
> would have been unassailable." _EEOC v. Wilson Metal Casket Co.,_ 24 F.3d 836, 842 (6th
> Cir.1994) (internal quotation omitted)."

## BACKGROUND FACTS

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

    forth herein.

2.      On 6/26/17, I talked with Defendant O'Neill at the New York City Bar Association in the

presence of various whistleblower news censors in journalism during a meeting in which he was

the primary speaker. Information about that meeting is available from the New York City Bar Association's web site at http://www.nycbar.org/media-listing/media/detail/a-conversation-with-new-york-city-police-commissioner-james-p-oneill. The audio recording of that meeting that the New York City Bar Association arranged to be recorded is available on the Internet at http://dts.podtrac.com/redirect.mp3/www2.nycbar.org/mp3/Podcasts/media/police_commissioner_audio_2017-06-26.mp3.

3.      The next screenshot is from a video recording that I recorded on 6/26/17 at 8:35 am at the New York City Bar Association that shows Defendant O'Neill in it as he stood at a podium with microphones that had the names of various New York City news outlets on them.



4.      The fact that no one reported anything in the news about what I discussed with Mr. O'Neill on 6/26/17 confirms that journalism and freedom of the press in New York City just doesn't exist and claims to the contrary are utter lies. That video that I recorded during that meeting confirms that the following so-called news outlets had some of their personnel present at that 6/26/17 meeting:

PIX11News, 1010 WINS, NBC, CBS New York, WCBS 880, and ABC News

5.     The video recording that I recorded of Mr. O'Neill during that meeting that I just

discussed is available on the Internet at the following address:

https://drive.google.com/file/d/1sofOzQmsQy_1_lkIglBTn9iZiGNwGNpL/view?usp=sha
ring

6.     During that meeting on 6/26/17, I had two face-to-face conversations with Mr. O'Neill.

My first conversation with him during that it extends from the elapsed time of **a)** 32 minutes and

38 seconds from the beginning of the audio recording that the New York City Bar Association

recorded of that meeting to **b)** 33 minutes and 36 seconds in that recording. My second

conversation with him during that meeting extends from the elapsed time of **a)** 47 minutes and 4

seconds from the beginning of that recording to **b)** 49 minutes and 14 seconds.

7.     The following is entirely true and accurate about what Mr. O'Neill and I discussed during

that meeting:

   a. I told him that I was a military veteran and reminded him that he used the comment of

      "a free and open society" in a speech that he gave during that meeting. I then

      pointedly asked him why members of the NYPD who were inside of the Bronx

      Supreme Court on 5/23/17 illegally directed court officers assigned to that courthouse

      to prevent me from attending the public resource fair meeting that the Mayor

      conducted in that courthouse on that date inside of the Veteran's Memorial Hall

      chamber within it and while members of the NYPD have no jurisdiction in

      courthouses because jurisdiction for law-enforcement in New York State courthouses

      belongs to New York State court officers instead of the NYPD. When he responded

      to that by claiming that he wasn't aware of that situation, I told him that I had a video

      recording that confirmed what I had just apprised him about had occurred and that I

was willing to share that video recording with him if he so desired.

b.   I asked him when members of the NYPD would stop violating civil rights by shoving military veterans as such veterans stood legally on empty public sidewalks while Mr. Redmond illegally discriminated against them by preventing them from attending public town hall meetings that the Mayor held. While asking him that question, I was referring to myself as such a military veteran who was illegally shoved and discriminated against as I referred to the public town hall meeting that the Mayor held on 4/27/17 in Long Island City in Queens. In response, Mr. O'Neill was blatantly evasive and deceitful by claiming that different issues applied to that question. When he asked what I was talking about in particular in regards to my question, I told him that I was talking about public meetings, New York State's Open Meetings Law, the U.S. Supreme Court decision that was issued in _Wood v. Moss_, 134 S. Ct. 2056, 572 U.S., 188 L. Ed. 2d 1039 (2014) that concerns viewpoint discrimination, and what was then Mr. Redmond's ongoing status as the primary defendant in _Sherrard v. City of New York_, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018).

c.   I also asked Mr. O'Neill about why Mr. Redmond was still being allowed to be a member of the NYPD since he was violating my civil rights after he had violated Mr. Sherrard's civil rights. Sherrard v. City of New York concerns an incident that occurred on 9/17/12 in which Mr. Redmond flagrantly violated Mr. Sherrard's constitutional rights on video before Mr. Redmond blatantly lied about that during a deposition on 5/19/17 and as he testified in that case in June of 2018. When Mr. O'Neill told me during that meeting that he would need to talk with Mr. Redmond about what I discussed with him (Mr. O'Neill) during it and that he wasn't aware of

_Sherrard v. City of New York_, as he left that meeting, I offered to give him a printout

that I had with me and that contained information shown on its docket sheet that

listed the case number for _Sherrard v. City of New York_ and other information about

that case. I believe that I handed that information instead to NYPD Detective James

Byrne as he escorted Mr. O'Neill out of that meeting and gave me his business card

then that appears as follows:



8.      A critically significant point about my conversation with Mr. O'Neill on 6/26/17 is that I

clearly put him on notice then that members of the Mayor's NYPD security detail were violating

my civil rights at public forums that the Mayor had been conducting and that Mr. O'Neill told

me in response that he would need to talk with Mr. Redmond about what I then discussed with

him about Mr. Redmond. As the NYPD's Commissioner, he certainly had the authority to issue a

standing order to Mr. Redmond to make certain that he and the rest of the Mayor's NYPD

security detail immediately stop violating the civil rights of New Yorkers at public forums.

Hindsight clearly confirms that Mr. O'Neill either didn't issue such an order or that such an

order was violated at my expense repeatedly and flagrantly thereafter by Mr. Redmond and other

members of the Mayor's NYPD security detail and others. On 4/27/17, Mr. Redmond told me at the site of the Mayor's town hall then that he reported to Mr. O'Neill. The preceding discussion is sufficient to establish that this Court's determinations about claims that I am asserting against Mr. O'Neill in this pleading for supervisory liability must be in my favor because additional illegal acts and omissions were committed against me in violation of my civil rights by Mr. Redmond and other members of the Mayor's NYPD security detail after 6/26/17 at public forums that Mr. O'Neill certainly had a realistic opportunity to prevent from occurring.

9.      The following relevant facts apply to what I discussed with Mr. O'Neill during that meeting:

        a.   I later discovered from a written transcript and video recording that the New York City Law Department provided to me that concerned *Sherrard v. City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018) that Mr. Redmond committed perjury on 5/19/17 during a sworn deposition that he gave as he lied about a critically significant fact. The next screenshot shows the questions that were asked and the responses to them that were given that appear between lines 11 and 17 that appear on page 20 within the written transcript that was prepared from the deposition that Defendant Redmond gave on 5/19/17 in connection with *Sherrard v. City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018). That transcript was provided to me by the New York City Law Department in response to a FOIL demand that I submitted to it and is available on the Internet at https://drive.google.com/open?id=12ATFhN0RVkrvlTjpINTPet57K1D4poiz. The answers shown on lines 13, 14, and 17 in that screenshot were answers that Defendant Redmond gave to the questions that are shown in it.

```
11        Q        The question is, why did you stop at

12    that location?

13        A        Because I was blocked by

14    bicyclists.

15        Q        And was Mr. Sherrard any of those

16    bicyclists that were blocking you?

17        A        Yes.
```

b.  The New York City Law Department also provided me a critically significant video

recording that is available on the Internet at

https://drive.google.com/open?id=13dteIym5B27WAHrR2b_vrb68X8IDT_Ye in

response to a FOIL demand that I submitted to it that was recorded on 9/17/12 in

Manhattan on Lafayette Street by Leonard Street as Mr. Redmond recklessly drove a

black car with just one hand on its steering wheel in the middle of the roadway in the

direction of New York City Hall by the New York City Civil Court and New York

City Family Court. That video recording was presumably recorded by a member of

the NYPD who with Mr. Redmond and other members of the NYPD were stalking

Kalan Sherrard and other bicyclists. Kalan Sherrard was the plaintiff in *Sherrard v.

City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018). The next

screenshot corresponds to what appears in the video that I just discussed at the

elapsed time of 10 seconds and confirms that **a)** Mr. Redmond was reckless driving a

black car with left hand off of its steering wheel in **the middle** of a roadway and **b)**

Mr. Sherrard was lawfully riding a bicycle on the **far-left** side of that roadway ahead

of 4 other bicyclists shown on the left as he appears in the top-left corner in that

screenshot. At that point, the distance between Mr. Redmond's car and the back of

Mr. Sherrard's bicycle clearly exceeded the lengths of 2 cars that appear on the right

side of that road as Mr. Sherrard rode his bike directly next to the right of an area in

which construction or renovation work was being done and may have endangered his

safety as a bicyclists because of debris that may have possibly been in a bicycle lane

that he was not required by law to use then. The fact that the sidewalk next to that

bicycle lane was closed then because of construction or renovation work suggests that

Mr. Sherrard was being courteous to pedestrians by letting them use that bicycle lane

to offset the closure of that sidewalk.



   c.   The next screenshot is from that same video and corresponds to the elapsed time of

      18 seconds. The following is shown in it:

         i.   Mr. Redmond is shown in the lower-right area as he exited his car with a radio

            in his left hand.

        ii.   Mr. Sherrard is shown sitting on his bicycle while illegally stopped by 2

members of the NYPD on scooters or motorcycles in violation of his

constitutional rights. The tires on those scooters or motorcycles were clearly

wider than the tires on Mr. Sherrard's bicycle. This is relevant because thin

tires on bicycles don't withstand coming in contact with debris on roadways

as well as wider and thicker tires. One of the members of the NYPD who

illegally stopped Mr. Sherrard drove through the bicycle lane on wide and

thick tires to reach him. Also, this screenshot more clearly confirms by the

existence of orange netting and barriers next to that bicycle lane that

construction or renovation work was then taking place near it.



d.   The next screenshot is from having enlarged the playback of DOE's 4/27/17 video

and corresponds to what appears in it at 7:26:43.072 pm on 4/27/17 that corresponds

to the elapsed time of 56 minutes and 56 seconds. Defendant Redmond is shown

using his right hand to illegally make physical contact with the left side of my body in

that video to add insult to injury to the fact that he was then already illegally preventing me from attending the Mayor's 4/27/17 town hall.



10.     While then working for the Mayor's office on 6/28/17 and engaging in a criminal cover-up of illegal acts and omissions that were committed against me on and after 4/27/17 at public town hall and public resource fair meetings that the Mayor conducted with other government personnel and the public, New York State Senator referred to Defendant Redmond in the next screenshot that shows an e-mail message that she sent about me and town hall meetings on 6/28/17 at 3:27 pm to a whistleblower news censor in journalism named Erin Durkin. Ms. Ramos committed defamation against me in that e-mail message as she lied to Ms. Durkin about me by

fraudulently claiming that I **a)** never RSVP'd to a town hall (totally false), **b)** threatened New York City Human Resources Administration Commissioner Steven Banks (totally false), **c)** made a physical threat (totally false), **d)** made several threats against other members of the Mayor's NYPD security detail (totally false). Ms. Ramos, however, wasn't a complete liar in her remarks about me in that e-mail message because she confirmed that Defendant Redmond touched my arm while talking with me. That occurred on 4/27/17 as I just discussed and showed above. There was absolutely no legal justification for that physical contact and since the NYPD is as trashy as Ms. Ramos, I understandably hate being touched by members of the NYPD.

---

**From:** Ramos, Jessica
**Sent:** Wednesday, June 28, 2017 3:27 PM
**To:** Erin Durkin
**Cc:** Phillips, Eric
**Subject:** RE: town halls

Hi Erin,

Mr. Komatsu has never RSVP'd to a town hall. He is allowed to enter the overflow room.

Security detail first learned he's threatened Commissioner Steve Banks at the LIC town hall. When approached, Mr. Komatsu made a physical threat against a member of the security detail after one of them lightly touched his arm while speaking. This threat was officially investigated by the NYPD. He has also made several threats against other members of the security detail.

Jessica

---

11.     The following are relevant excerpts from _Wright v. Musanti_, No. 14-cv-8976 (KBF) (S.D.N.Y. Jan. 20, 2017) that confirm that **a)** an initial aggressor between two people is responsible for all subsequent hostilities that occur between them and **b)** physical contact that is regarded as offensive by the person against whom it is made by another person constitutes assault under New York law:

a.   "defendant served as the initial aggressor at the outset of the encounter, rendering her liable to plaintiff for all ensuing assaults and batteries. Cf. People v. Grady, 838 N.Y.S.2d 207, 212 (3d Dep't 2007)"

b.   "whether the altercation is viewed as one or several encounters, the Court finds the evidence overwhelming that defendant served as the initial aggressor."

c.   "Under New York law, "`[a]n `assault' is an intentional placing of another person in fear of imminent or offensive contact.'""

d.   "The plaintiff must show that the defendant intended `either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact.'"

e.   "Although a plaintiff "need not prove actual contact, she must allege some physical menace against her body.""

12. On 7/2/16, I was viciously assaulted by my former roommate where I reside by being

punched on my head more than 15 times in the area of my left temple. That occurred

following an attempted assault by him on 5/12/16 in the same exact location where he

assaulted me on 7/2/16. That attempted assault and actual assault would never have happened

if not for HRA and the slumlord of the building in which I reside having not subjected me to

an illegal bait-and-switch fraud and forgery concerning a binding and fully-enforceable

apartment lease agreement that I signed on 2/16/16 in HRA's offices located at 33 Beaver

Street in Manhattan to be issued sole possession of apartment 4C in the building in which I

reside without any roommate and in a fully-furnished condition shortly thereafter. HRA

thereafter illegally altered my lease within 2 days after I signed it and Urban acted in concert

with HRA in doing so. As a result, I was issued a shared apartment on or about 3/7/16 in the

building in which with a mentally unstable roommate that I knew was a time bomb on

5/12/16 and exploded at me on 7/2/16 after I had demanded his immediate eviction on

5/12/16 in response to him having tried to assault me on that date in our apartment. My

demand for his eviction was refused and I was served his punches instead with a concussion

that sprung from it. This discussion is relevant because I fully intended to engage in protected whistleblowing about this subject during the Mayor's 8/30/17 town hall at the expense of HRA, Urban Pathways, Inc. (the slumlord of the building in which I reside), NYPD, and others as well as whistleblowing about a large array of other subjects that were also of public concern and protected speech. The NYPD unconscionably released my former roommate on the same date (7/11/16) that it arrested him for having assaulted me in spite of the fact that a member of the NYPD's 48th precinct told me on 7/2/16 and less than 30 minutes after that assault ended that she saw a visible head injury that I sustained from that assault. The following excerpts from *Piesco v. City of New York, Dept. of Personnel*, 933 F.2d 1149 (2d Cir. 1991) confirm that the sum and substance of whistleblowing that I sought to lawfully engage in while attending the Mayor's 8/30/17 town hall were of public concern and protected speech partly because it would have otherwise been about the competency of members of the NYPD:

   a. "Since the police officer represents the most basic unit of government, one which arguably most affects the day-to-day lives of the citizenry, Dr. Piesco's testimony concerning the competency required to become a police officer clearly is a matter of public concern."

   b. "The Supreme Court has recognized that one of the critical purposes of the first amendment is to provide society with a basis to make informed decisions about the government. *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964).

       "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated*, and all such matters relating to political processes."

   c. "the first amendment guarantees that debate on public issues is "`uninhibited, robust, and wide open'""

   d. "speech on matters of public concern is that speech which lies `at the heart of the First

Amendment's protection"

13.     The following is a link to a video recording that I recorded at 7:27 pm on 4/27/17 at the site of the Mayor's 4/27/17 town hall by the entrance to the school that hosted it and shows Defendant Redmond as he was illegally preventing me from entering that school by using a metal barricade and the positioning of his body for that purpose:

https://drive.google.com/open?id=1rcpbI2ePp7r2k2fzFgp-zAHBGq8nE_J9

14.     The following screenshot is from that video that lasts just 2 seconds and clearly confirms what I just stated as Defendant Redmond demonstrated his incompetency a police officer and those who were near him then did the same by illegally doing nothing to intervene on my behalf against him to enable me to exercise my constitutional right to attend the Mayor's 4/27/17 town hall:



15.     The next screenshot is from DOE's 4/27/17 video and corresponds to what appears in it

at 7:27:24.922 pm on 4/27/17 that corresponds to the elapsed time of 57 minutes and 39 seconds. Defendant Redmond is shown illegally preventing me from entering that school by continuing to use a metal barricade and the positioning of his body for that purpose. What is even more alarming is the number of law-enforcement personnel who were then in that immediate vicinity who certainly aware that was occurring and illegally did nothing to try to intervene on my behalf against Mr. Redmond in violation of their Fourteenth Amendment affirmative legal duty to intervene on my behalf in response to violations of my constitutional rights occurring in their presence. Defendants Berkowitz, Cruz, and Lance are among the law-enforcement personnel shown in that screenshot.



16.     To add insult to injury, NYPD Officer Rafael Beato criminally assaulted me on that same

date roughly 3 hours after I talked with Mr. Redmond as Mr. Beato committed assault and

battery against me by shoving me without cause on my chest 3 times as I lawfully stood on an

nearly empty public sidewalk that is adjacent to the school in which that town hall was

conducted. He did so toward the end of that town hall and after I saw Defendant Nieves appear

to direct him to approach where I stood as Mr. Nieves stood by an exit to that school located in

its rear. No legal justification existed for me to comply with coercion by Mr. Beato that was

designed to have me move from where I then stood on that nearly empty public sidewalk that is a

traditional public forum. However, Mr. Beato criminally assaulted me then anyway. Mr. Nieves

quickly came to where Mr. Beato and I were then with another member of the Mayor's NYPD

security detail named Raymond Gerola as they joined with Mr. Beato and another member of the

NYPD named Yu Li. As all of us were then on that public sidewalk, the 4 of them illegally

positioned their bodies very closely around me to form a blockade that illegally prevented me

from moving back to where I originally stood on that public sidewalk before Mr. Beato shoved

me. Their actions against me then also illegally prevented me from having a line of sight to the

Mayor as he left that town hall and crossed that sidewalk to allow me to lawfully call out to him

from a sufficient distance away and try to have a conversation with him about the fact that I had

been and otherwise continued to be illegally **a)** assaulted on that sidewalk by Mr. Beato, **b)**

subjected to illegal detention by Mr. Beato, Mr. Li, Mr. Nieves, and Mr. Gerola by virtue of their

blockade, and **c)** illegally prevented from attending his 4/27/17 town hall in flagrant violation

partly of my constitutional right of access to a public forum.

17.    On a related note, I received critically significant information about a related matter that I

discussed with Defendant O'Neill on 6/26/17 on at 9:32 am on 8/28/20 from an attorney named

Shawn Kerby. She works for OCA in a role that involves responding to FOIL demands that are

submitted to OCA. The e-mail message that I received from her then was in response to a FOIL

demand that I submitted to OCA on 8/26/20 to obtain copies of all "Unusual Occurrence

Reports" that were completed by New York State court officers in response to my presence on

5/23/17 inside of the Bronx Supreme Court. The following is the text that appears in the

"Details" section of the Unusual Occurrence Report that was assigned the identification number

of 75089:

> "AT ABOVE T/P/O, THE ABOVE UNKNOWN **SUBJECT WAS DENIED
> ENTRY INTO A CITY HALL EVENT BEING HELD IN THE ROTUNDA BY
> CITY HALL STAFF AND MAYOR DEBLASIO'S NYPD DETAIL**. SUBJECT
> WAS ASKED TO VACATE THE AREA HE WAS STANDING IN BECAUSE HE
> WAS BLOCKING PEDESTRIAN TRAFFIC TO BOTH THE EVENT IN THE
> ROTUNDA AND ACCESS TO THE PUBLIC ELEVATORS. AFTER SOME
> RESISTANCE TO THIS REQUEST, SUBJECT DID COMPLY BUT MOVED
> INTO A MAGNETOMETER PROCESSING AREA. SUBJECT WAS ASKED TO
> MOVE FROM THIS AREA, AND ONCE AGAIN COMPLIED AFTER SOME
> INITIAL RESISTANCE."

(boldface formatting added for emphasis)

18.     That report was submitted on 5/24/17 by New York State court officer Anthony Manzi

(shield # 182) to New York State court officer Ostacio Negron and indicated that New York

State court officers Ramon Dominguez (shield # 508) and Matthew Brunner (shield # 478) were

witnesses about the information it contained. Mr. Manzi holds the rank of "captain" as a court

officer and Mr. Negron holds the rank of "major" as a court officer. Mr. Dominguez and Mr.

Brunner both hold the ranks of "sergeant" as court officers.

19.     The next screenshot from that report is from the top of it and confirms that the nature of

the unusual occurrence that prompted Mr. Manzi to submit that report was because I was

illegally denied access to the Mayor's 5/23/17 resource fair meeting by members of the Mayor's

NYPD security detail on 5/23/17 inside of the Bronx Supreme Court after I had registered in

advance to attend that public forum. The members of the Mayor's NYPD security detail who

were personally involved in having illegally denied me access to the Mayor's 5/23/17 resource

fair included Defendants Nieves and Berkowitz as they conspired and maliciously acted in

concert with Mr. Manzi, Mr Brunner, Mr. Dominguez, NYPD Detective Raymond Gerola, and

Rachel Atcheson to do so.

| DATE OF OCCUR. | TIME | COURT/FACILITY | PLACE OF OCCURRENCE | UNUSUAL NUMBER | | |
|---|---|---|---|---|---|---|
| | | | | LOC. CODE | REP. NO | YEAR |
| 05/23/2017 | 0950 | BRONX SUPREME COURT - GRAND CONCOURSE | MAGNETOMETER POST D | G | 75089 | 2017 |

| NATURE OF UNUSUAL OCCURRENCE | | |
|---|---|---|
| ☐ ARREST | ☐ ATTEMPTED ESCAPE | ☐ BOMB THREAT |
| ☐ DISRUPTIVE PRISONER | ☐ DISRUPTIVE SPECTATOR | ☐ JUDICIAL THREAT |
| ☐ PRISONER ESCAPE | ☐ PROPERTY DAMAGE | ☐ PROPERTY THEFT |
| ☐ REPORT OF CRIME | ☐ SUMMONS | ☒ OTHER (SPECIFY BELOW) |
| | | *DENIED ENTRY* |

20.     The next screenshot is from a video recording that is available on the Internet at

https://drive.google.com/open?id=18oedUwVNFHKhTASxTFeUDm0HFGPO7ztB that I

recorded with my cell phone on 5/23/17 at 9:40 am of Mr. Nieves, Mr. Gerola, Mr. Berkowitz,

Mr. Brunner, and Mr. Dominguez as Mr. Dominguez left a meeting that they were conducting in

front of Room 105 inside of the Bronx Supreme Court near where I had talked with a

whistleblower news censor in journalism named Michael Gartland about the fact that I was being

illegally prevented from attending the Mayor's 5/23/17 resource fair at the same time that I had

ongoing litigation against HRA. Mr. Dominguez, Mr. Nieves, Mr. Berkowitz, Mr. Gerola, and

Mr. Brunner appear from left to right in this screenshot.



21.     The next screenshot is from the elapsed time of 16 seconds in that same video and how

Mr. Nieves, Mr. Gerola, Mr. Brunner, and Mr. Berkowitz from left to right..



22.     The next screenshot is from a video recording that is available on the Internet at

https://drive.google.com/open?id=18oedUwVNFHKhTASxTFeUDm0HFGPO7ztB that I

recorded with my cell phone on 5/23/17 at 9:40 am of Mr. Nieves, Mr. Gerola, Mr. Berkowitz,

Mr. Brunner, and Mr. Dominguez as Mr. Dominguez left a meeting that they were conducting in

front of Room 105 inside of the Bronx Supreme Court near where I had talked with a

whistleblower news censor in journalism named Michael Gartland about the fact that I was being

illegally prevented from attending the Mayor's 5/23/17 resource fair at the same time that I had

ongoing litigation against HRA. Mr. Dominguez, Mr. Nieves, Mr. Berkowitz, Mr. Gerola, and

Mr. Brunner appear from left to right in this screenshot.

23.     The following is a link to a video recording that was recorded on 5/23/17 by a video

security camera OCA controls that was then installed above Room 105 on the first floor of the

Bronx Supreme Court:

https://drive.google.com/open?id=1FgV971te1pEeMq41KaBNw27slVTiOeYJ

24.     I received that video from OCA in response to a FOIL demand that I submitted to it.

25.     The next screenshot reflects what appears in that video at 9:49:11.163 am and the elapsed

time of 49 minutes and 14 seconds. Mr. Manzi, Jeff Lynch of the Mayor's Office, Mr.

Dominguez, and Mr. Brunner are shown in this screenshot with an unknown female member of

the NYPD (shown on the right and wearing a blue shirt) along with me.



26.     The preceding screenshot shows me as I lawfully and assertively used my right hand to

seize back from Mr. Manzi a large white bag that belonged to me and contained legal filings of

mine from what was then a sealed and ongoing lawsuit against HRA in which I was the plaintiff.

I had to do so after Mr. Manzi illegally seized that bag from me like an ordinary street thug in

plain view of Mr. Brunner, Mr. Dominguez, and the unknown female member of the NYPD. All

of them had a legal duty to immediately intervene on my behalf against Mr. Manzi and instead

illegally made no effort to do so. Mr. Manzi was clearly then working with the Mayor's NYPD

security detail in furtherance of an illegal scheme to try to coerce me to be further away from the

entrance to the chamber in that courthouse that hosted the Mayor's 5/23/17 resource fair than I

was in flagrant violation of my constitutional rights. That was particularly atrocious because I

was then in that courthouse to try to talk with HRA Commissioner Steven Banks and engage in

protected whistleblowing against HRA while doing so while attending the Mayor's 5/23/17

resource fair. I sought for that conversation to be partly about my lawsuit against HRA after New

York State Supreme Court Judge Nancy Bannon signed an order to show cause application on

5/22/17 that I filed in it on 5/19/17.  I also intended to attend the Mayor's 5/23/17 resource fair

meeting to engage in protected whistleblowing against Defendants Redmond, Nieves, and others

in response to the crimes (such as 18 U.S.C. §245(b)(5)) and civil rights abuse that they and

others illegally committed and condoned against me on 4/27/17 at the site of the Mayor's

4/27/17 town hall and were committing against me on 5/23/17 inside of that courthouse.

27.     The next screenshot reflects what appears in the video recording that I just discussed and

received from OCA at 9:37:31.553 am and the elapsed time of 37 minutes and 34 seconds. In

that screenshot, Defendant Nieves is shown violating the Handschu Agreement by briefly spying

on the interactions that I was then having with Mr. Gartland as a whistleblower against Mr.

Nieves and other members of the Mayor's NYPD security detail, HRA, members of the Mayor's

CAU, and more. There is no other plausible reason for why Mr. Nieves turned his head so

sharply to his left to have then looked in my direction than the fact that he was then spying on me

in conjunction with illegally subjecting me to an abuse of process and selective-enforcement that

were in flagrant violation of my due process rights and designed to illegally prevent me from

attending the Mayor's 5/23/17 resource fair and otherwise closely monitor my movements and

other lawful activities in that courthouse as I was being illegally prevented from attending that public forum.



28.    On 6/21/17, Defendant Nieves was recorded on video as he stood in front of the building that hosted the town hall meeting that the Mayor conducted in Chinatown in Manhattan and illegally harassed an Asian woman as she was trying to lawfully attend that town hall with literature that she had. That video recording clearly shows Defendant Nieves illegally confiscating literature from her in violation of her First Amendment and Fifth Amendment rights. That video is available on the Internet at https://www.youtube.com/watch?v=KRur-_QvbC0. What follows are a few screenshots from it. The next screenshot shows Mr. Nieves giving that woman a hand signal to have her step toward him at the elapsed time of 32 seconds.



29.    The next screenshot shows that Asian woman standing near Mr. Nieves at the elapsed

time of 35 seconds as what clearly appears to be a press credential hung from her neck.



30.     The next screenshot shows that Asian woman standing near Mr. Nieves at the elapsed time of 1 minute and 6 seconds as she held papers that she had been carrying prior to meeting Mr. Nieves as he also then had his hands on those papers after she met him. She is shown standing next to Jane Meyer of the Mayor's office who was then looking at those papers.



31.     The next screenshot shows Mr. Nieves at the elapsed time of 1 minute and 9 seconds as he carried that Asian woman's papers after she left his wretched company



32.     On 6/23/17, a news organization named DNAInfo published a news article on the Internet

at https://www.dnainfo.com/new-york/20170623/lower-east-side/mayor-de-blasio-town-

hallmargaret- chin-aaron-foldenauer that is entitled "Security Swiped Political Pamphlets at

Mayor's Town Hall, Attendees Say" and was written by a journalist named Allegra Hobbs. That

article addressed the fact that multiple people who tried to attend the town hall meeting that the

Mayor conducted on 6/21/17 in Chinatown in Manhattan had literature illegally confiscated by

members of the NYPD as they underwent a security screening process to enter the building that

hosted that town hall.

33.     On 7/18/17, I was recorded on video during the public resource fair meeting that the

Mayor conducted in Kew Gardens in Queens with other government officials as I talked with the

Mayor face-to-face. That conversation occurred as I stood near Mr. Banks, Jessica Ramos, and

front of a whistleblower news censor in journalism named Gloria Pazmino as well as Mr.

Gartland. Although the Mayor's office arranged to have a video recording to be recorded of that

public resource fair and that video recording certainly is a public record, the Mayor's office has

illegally concealed that video recording. It was only because I submitted a FOIL demand to the

Mayor's office that it provided me a link to that video recording on the Internet prior to illegally

removing that video recording from the Internet or otherwise disabling access to it. Prior to doing

so, I downloaded a short clip from that video. The following is a link to that video clip on the

Internet:

        https://drive.google.com/open?id=1-ZUN22r8q4qARLEbMk8FVg4KuLqfTtcc

34.     Everything that I talked with the Mayor and Mr. Banks during that meeting were matters

about which I intended to engage in protected whistleblowing against them and others about. The

next screenshot is from the elapsed time of 1 minute and 31 seconds in that video and pertains to

a discussion that I had with the Mayor that was about having him cancel the City of New York's business that taxpayers pay for that is with a company named NTT Data, Inc. ("NTT") that still subjects me to illegal wage-theft, fraud, and retaliatory employment blacklisting that dates back to 2012. Instead of cancelling that business, the Mayor's administration has unconscionably opted to extend it that keeps too much money in the wrong hands as people are now mightily struggling to make ends meet in New York City due to the Coronavirus pandemic and shouldn't have to support businesses that commit wage-theft. HRA has contracts with NTT.



35.     The next screenshot from that video corresponds to the elapsed time of 1 minute and 4 seconds in it as I asked the Mayor a question in a poorly phrased way as I meant to ask him if her could direct Mr. Banks to resolve my litigation against HRA in some way that was fair. The Mayor instead stonewalled me as he told me that his administration has a lot of litigation and "that is how we do things". That answer confirmed to me that he and his administration needed to be fired immediately.



36.     The next screenshot from that video corresponds to the elapsed time of 1 minute and 57 seconds in it as I apprised the Mayor that Defendant Redmond illegally prevented me from attending his 4/27/17 town hall meeting and that he was also then defending a federal civil rights lawsuit.  In response, he claimed that he didn't' know anything about that and that he wouldn't talk with me further about lawsuits. That response further confirmed to me that he and his

administration needed to be fired immediately. I was then referring to *Sherrard v. City of New York*. Also, Defendant Juanita Holmes stood nearby in an area to my left as I talked with the Mayor about that.



37.     The next screenshot from that video corresponds to the elapsed time of 2 minute and 10 seconds and clearly shows both the Mayor and an unknown Black male member of his NYPD security detail harassing me and subjecting me to what is known as "simple assault" under applicable law. It shows this as a result of it showing that the Mayor tried to illegally reach over toward me and touch me near my right shoulder as the Black male member of his NYPD security detail put his right hand on my backpack before illegally pushing me away. That push was

assault. Neither of them gave me a reasonable opportunity to first leave their wretched company without being illegally coerced by them to do so. The Mayor's illegal acts against me then confirmed that he supports and condones illegal acts by the NYPD. During that meeting, I also handed him a report again that I previously handed to him on 7/16/17 in Clement Clarke Moore Park in the Chelsea district in Manhattan in front of Mr. Gartland and other whistleblower news censors in journalism. That report contained screenshots from video recordings that summarized illegal acts and omissions that were committed against me partly by members of his NYPD security detail since 4/27/17 at public forums that he conducted. The Mayor lied to my face on 7/16/17 in that park by fraudulently telling me that he supports civil rights and military veterans in response to questions that I then asked him about that to put him on the spot in front of whistleblower news censors in journalism.



38.     The following is a link to the video recording on the Internet that the Mayor's office arranged to be recorded of the Mayor's 7/25/17 publicity stunt publicity stunt that the Mayor

illegally conducted next to a staircase on 7/25/17 inside of the MTA subway station located in

Manhattan below Broadway near City Hall by Warren Street:

 https://www.youtube.com/watch?v=Hq2Q4tPrN2A

39.     On 7/25/17, Mr. Redmond flagrantly and illegally violated my rights pursuant to the First

Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment in retaliation for

my having lawfully engaged in protected whistleblowing activity in the immediate vicinity of a large

group of whistleblower news censors in journalists, the Mayor, members of the Mayor's staff, and

members of the public inside of the subway station that I have discussed above.

40.     The next screenshot was created from what is shown at the elapsed time of 10 minutes and 18

seconds in the video that I just discussed.



41.     The preceding screenshot shows Mr. Redmond flagrantly assaulting me behind a metal

partition near the Mayor and Eric Phillips while Mr. Phillips worked a mouthpiece for the Mayor.

Mr. Redmond assaulted me then by illegally grabbing my left arm and dragging me by it along the subway platform where I had been standing as I was lawfully conducting myself while engaging in whistleblowing near and against the Mayor, his administration, and its business partners. I did so then within earshot of many whistleblower news censors in journalism that quite fittingly were assembled together like rats and snakes. Mr. Redmond's assault against me then occurred behind the vertical metal partition shown in that screenshot. By deliberately making physical contact with me and dragging me in that subway station on 7/25/17, Mr. Redmond violated 18 U.S.C. 245(b)(5), NYPL §240.26, NYPL §240.20, and NYPL §195.00 in the process of causing irreparable harm to my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and the MTA's Rules of Conduct to continue to lawfully engage in protected whistleblowing near the Mayor from where I had been standing on that subway platform. The MTA's Rules clearly prohibited the Mayor from conducting his publicity stunt in that subway station because it was conducted next to a staircase, involved the use of a microphone, and impeded the movements of those in that subway station. Those same MTA Rules authorize public speaking in subway stations however and that is exactly what I was doing when Defendant Redmond illegally seized my left arm and criminally assaulted me by doing so. By doing so then and so publicly, he caused me enormous embarrassment and justifiable rage. Upon leaving that subway station, I received an unexpected telephone call from a civil rights attorney named Norman Siegel. He immediately told me during that call that I had a legal right to scream and shout in that subway station. In response, I told him that I hadn't done so and had instead merely projected my voice with my lungs in that subway station. I did so then to compete against the Mayor's use of a microphone during his illegal publicity stunt and noise from subway trains.

42.     It stands to reason that if I had been permitted to attend the Mayor's 8/30/17 town hall for its duration from within the room in which it was conducted, I could have possibly beaten a

leader named David Rem to the punch by properly pointing out to the Mayor during that 8/30/17

town hall while in full view of everyone who attended it and watched the video recording that

the Mayor's office arranged to be recorded of it that was broadcast live over the Internet that Bill

de Blasio was New York City's worst Mayor ever prior to immediately exercising the full extent

of my legal self-defense rights if someone initiated physical contact with me that I wouldn't like

in response to and retaliation for that truthful remark.

43.    Mr. Rem brilliantly told the Mayor that he was New York City's worst Mayor ever on

2/19/20 during the town hall meeting that the Mayor conducted in Forest Hills in Queens while

that public forum was recorded on video as a result of arrangements that the Mayor's office

made. That video is available on the Internet at

https://www.youtube.com/watch?v=5le6DCaxiG8. Mr. Rem certainly demonstrated leadership

by assassinating the Mayor's character that is an entirely lawful activity. He did so by reminding

the Mayor that he was the worst Mayor ever at the elapsed time of 1 hour, 37 minutes, and 55

seconds in that video. The next screenshot is from the elapsed time of 1 hour, 37 minutes, and 58

seconds in that video and shows Mr. Rem as he pointed at the Mayor while he finished that

particular outstanding criticism and received well-deserved applause from someone who stood

up from his seat to pay respect to Mr. Rem for his leadership and outspokenness by taking off the

gloves and showing the Mayor up in such a refreshing way during that public forum. This proves

that the finding in _Cohen v. California_, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) that

states that "it is nevertheless often true that one man's vulgarity is another's lyric" is true during

public forums that the Mayor conducts.



44.    The next screenshot is from the elapsed time of 1 hour, 38 minutes, and 25 seconds in that video and shows Defendant Redmond near the center as he exhibited an irritated facial expression and was about to illegally coerce Mr. Rem with others to leave that town hall in retaliation for Mr. Rem's protected First Amendment speech against the Mayor for the sake of optics and protecting the Mayor's reputation.



45.     How vocal Mr. Rem was in his remarks to the Mayor during that 2/19/20 town hall

confirms that I had a Fourteenth Amendment due process and equal protection right that is

applicable to similarly-circumstanced people to be just as vocal and perhaps offensive to some

that could possibly be welcome by others as him on 8/30/17 while I attending the Mayor's

8/30/17 town hall and interacted with government personnel while doing so.


**STATEMENT OF FACTS**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

    forth herein.

2.     The following shows an e-mail message that I sent on 8/27/17 at 9:40 pm to RSVP for

the Mayor's 8/30/17 town hall:

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** RSVP for 8/30/17 public Town Hall meeting with New York City's Mayor
> **Date:** August 27, 2017 at 9:40:17 PM EDT
> **To:** townhallrsvp@cityhall.nyc.gov
>
> My name is Towaki Komatsu
>
> This e-mail serves as my RSVP for the 8/30/17 public Town Hall meeting New York
> City's Mayor will hold.
>
> Pursuant to New York State's Open Meetings Law, I have a legal right to attend that
> public town hall meeting.
>
> Any attempt to hinder my ability to attend it will constitute a violation of both that law
> and the federal criminal statute that concerns obstruction of justice, specifically 18 U.S.C.
> 1512.
>
> Any such attempt to hinder my ability to attend that public meeting will be severely dealt
> with from a legal standpoint.

3.     Prior to trying to attend the Mayor's 8/30/17 town hall in Brooklyn, I attended a public

meeting that the Mayor conducted in Manhattan on 8/30/17 that was about reforms for tenants. Defendant Pfeffer was at that meeting and no problem occurred that involved me during that meeting. I recorded video recordings during that meeting that confirm my presence at that meeting. This is important because it establishes that I proved that I was in relatively close proximity to the Mayor on that date without causing a disruption. In fact, I mostly ignored the Mayor during that meeting.

4.      Long after the Mayor's 8/30/17 town hall, I sent an e-mail message to Mr. Banks, HRA's General Counsel (Martha Calhoun), and HRA's Deputy General Counsel (Ann Marie Scalia) on 8/3/20 at 1:27 pm on behalf of a disabled and elderly military veteran named Robert Vargas who was then living in the building in which I reside. Prior to that date, I had a conversation with Mr. Vargas on 8/2/20 that I recorded part of on audio as he told me that he urgently needed to have an air conditioner to be installed in his apartment and that he was gravely concerned about how his health would continue to suffer if he continued to be deprived of an air conditioner in his apartment. The building in which I reside is publicly-subsidized housing for military veterans. A contract exists between HRA and Urban that allows Urban to be that landlord. HRA provided me that contract in response to a FOIL demand that I submitted to it. That contract allows HRA to fire Urban as the landlord of the building in which I reside in less than 90 days and charge Urban for additional costs that the City of New York incurs to do so. The following shows the e-mail message that I sent to Mr. Banks and others on 8/3/20 at 1:27 pm:

> **From:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Question about helping a disabled military veteran in my building
> **Date:** August 3, 2020 at 1:27:32 PM EDT
> **To:** "Scalia, Ann Marie" <scaliaa@dss.nyc.gov>
> **Cc:** "banksst@dss.nyc.gov" <banksst@dss.nyc.gov>, "Calhoun, Martha" <calhounm@dss.nyc.gov>
>
> Ms. Scalia,

I'm sending you this to find out what you, Mr. Banks, and HRA is willing to do to help the disabled military veteran who lives in apartment 1D in the building in which I reside who needs an air conditioner to be installed in his living room.

He told me yesterday that Urban Pathways, Inc.'s personnel told him that though it has an air conditioner to install that is located in the basement of that building, it will take 2 weeks from when he was told last week for bars to be cut outside of his living room window to install that air conditioner.

I previously talked with you and Mr. Banks on his behalf and i also testified on his behalf during a City Council public hearing.

The person I'm talking about has had several strokes and can barely move.

It is unconscionable for HRA to allow him to have to sweat in his apartment only because Urban's personnel, its contractors, and HRA won't get off of their fat ass to abide by applicable health and safety laws in the middle of Summer.

I'm not anticipating a response to this e-mail and will likely use it in my federal lawsuit to further establish that HRA is blatantly disregarding its legal duties with its business partners.

From,

Towaki Komatsu

5.     Mr. Vargas never received an air conditioner for his apartment due to criminal negligence by both HRA's personnel and those of Urban. He instead received a stretcher and a body-bag on and in which his body was rolled out of the building in which I reside on 8/11/20 by workers for the New York City Chief Medical Examiner's office. That happened as I watched that occur after I had earlier watched as members of the New York City Fire Department broke open the front door to Mr. Vargas' apartment on that date because he was no longer responding to people who periodically checked-up on him to see how he was doing.

6.     What I just discussed is relevant partly because I sought to attend the Mayor's 8/30/17 town hall largely to try to engage in word-of-mouth advertising through whistleblowing against

the Mayor's administration and its business partners that I hoped would spread quickly, widely, and sufficiently enough as I hoped its sum and substance would persuade enough people to fire the Mayor in the 2017 New York City government elections that would give New Yorkers leadership instead all that the Mayor and his administration represent that terrorism by the NYPD in recent months against protesters confirms. By having New Yorkers throw out Bill de Blasio and his administration like a disease by the power of their votes, I hoped that new management at the Mayor's office would clean house across New York City's government and with its business partners to usher in proper governance. This would require Urban's contract with HRA to be cancelled.

7.      On 8/30/17, I was initially given an admission ticket that allowed me to enter the building and gym that hosted the Mayor's 8/30/17 town hall after I arrived early to the site of that town hall to lawfully line up next to that building and wait for that to be issued an admission ticket for that purpose. Upon entering that gym, I took a seat in the lower-left area in the second screenshot that follows that is from the video recording of that meeting and corresponds to the elapsed time of 4 seconds. In particular, the area where I sat was slightly to the left of the woman who has this shown over the back of her shirt:





8.      After taking my seat in that gym, I talked with the woman to whom I just referred as well

as the woman who is shown standing in the preceding screenshot on the right as she then wore

what appears to be a purple or pink dress and had long brown hair. Matters that I talked with

them and another woman who sat near us and behind me partly concerned the following matters:

    a.   Mr. Redmond's status as the Defendant in Sherrard v. City of New York.

    b.   Illegal acts that members of the NYPD and members of the Mayor's staff committed

       against me at earlier public forums that the Mayor conducted.

    c.   Literature that was illegally confiscated by members of the NYPD at the Mayor's

       6/21/17 town hall as I discussed earlier. A woman who sat behind me at the Mayor's

8/30/17 town hall brought literature with her that I believe she intended to distribute
during it. This is why my remark to her about what happened at the Mayor's 6/21/17
town hall was relevant.

9.      In the preceding screenshot, Defendant Redmond is clearly shown smiling. That could
quite possibly because he was pleased with himself for having illegally caused me to have been
ejected from that public forum a short time earlier after he and Defendant Nieves assaulted me in
that gym while I was seated and conducting myself in a lawful manner in contrast to them.
Juanita Holmes also appears in the preceding screenshot. After I was illegally ejected from that
gym by multiple members of the NYPD who illegally coerced me to exit it through a side exit
that led to an area near a sidewalk, I briefly talked with Ms. Holmes on that sidewalk and
apprised her that I had just been illegally ejected from that gym. In response, she suggested that I
try to re-enter that building to attend that town hall. I replied to her by telling her that I knew that
it would be futile for me to try that. Although she had a Fourteenth Amendment legal duty to
have intervened on my behalf to try to cause me to be granted access to that town hall, she didn't
make any effort to do so other than giving me that suggestion.

10.      When I first encountered Mr. Redmond in that gym on 8/30/17, he was about to walk past
where I was calmly sitting as I teased him about his status as the defendant in *Sherrard* that I had
a First Amendment right to do. In response, he cut his stride short and approached me while
promptly initiating and making physical contact with my body that I immediately and
vociferously objected to while I pointed out to him that he had no legal justification to touch me
that would serve to only escalate matters between him and I. In response, he lied to me by
fraudulently claiming that he could touch me without my consent in instances in which no legal
justification existed for such contact. He further lied to me by claiming that touching me was part

of having a social interaction with me. His stubbornness and arrogance fueled my justifiable

anger as I promptly ordered him to leave me alone, get away from me, and continue to go about

his business. However, he continued to hover over me instead allowing matters to cool down by

having him quickly depart. That led me to clearly explain to him that he should have realized by

then that I hated him because of the illegal acts that he had been committing against me as I

pointed out that he really needed to leave me alone. Mr. Pfeffer was in Mr. Redmond's company

at that time. I also believe that I appropriately likened Mr. Redmond's behavior toward me at

public forums to behavior that has been exhibited by members of the KKK that have a tradition

of discriminating against people as well.

11.     Eventually, Mr. Redmond walked away from me after urging me to calm down.

Following his departure, I quickly calmed down and resumed conversations that I was having

with the three women who were seated near me about and against Mr. Redmond.

12.     Shortly thereafter, Mr. Nieves came up to me as I continued to lawfully conduct myself

as I remained seated. He told me then that he would like to have a word with me outside and

asked me to join him. I responded to him that he and I could instead have whatever conversation

he wanted to have with me right where we then were in front of everyone else. That would

certainly have been in the public's interest of government transparency and accountability. Since

I knew what he intended to do next, I refused to get up from my seat and instead lawfully

exercised my right to remain seated in a public forum where I had a clear legal First Amendment,

Fifth Amendment, and Fourteenth Amendment right, to remain without interference by him and

other members of the NYPD. As a result, Mr. Nieves quickly made contact with my body as he

illegally seized my backpack from the ground that caused me to seize it back from him as he then

proceeded with other members of the NYPD to illegally coerce me to leave that gym through a

side exit. When I exited that gym, it was still mostly empty of people.

13.       Members of the NYPD who were personally involved in coercing me to leave that gym

include Mr. Nieves, Mr. Fowler, Mr. Pfeffer, and roughly 2 others that I believe were Mr.

Hansen, and Mr. Cruz. I can't say for certain because a few people walked behind me and

pushed me from behind in a way that didn't let me get a clear look at them then.

14.       Immediately after I was out of that gym, I met Mr. Redmond again and he told me that he

had ordered other people to cause me to be ejected from that gym. Although I pointed out to him

that I complied with his order to calm down and asked why he caused me to be ejected from that

town hall, he refused to answer my question. His refusal to answer that sufficiently established

that he illegally retaliated against me for engaging in whistleblowing against him while I was

inside of that gym.  I thereafter briefly talked with Mr. Pfeffer on that night to try to get

clarification about that by reminding him that I had attended a public meeting that the Mayor

conducted earlier that day that he also attended and that there was no issue then with my

attendance at that earlier meeting.  However, Mr. Pfeffer didn't' have any explanation for me.

15.       I thereafter apprised other members of the NYPD that I had been illegally ejected from

that town hall to have them perform their legal duty to intervene on my behalf to allow me to

again attend that town hall from within that gym. I also otherwise have reason to believe that

other members of the NYPD were aware that I had been ejected from that town hall and didn't

bother to intervene on my behalf. Those who I apprised about having been ejected from that

town hall or who I have reason to believe were aware of it and didn't try to intervene on my

behalf include the following defendants:

Defendants Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, and
Holmes

16.    \Also, both before and after I was illegally ejected from the Mayor's 8/30/17 town hall, I distributed literature that I prepared that contained protected whistleblowing information about a variety of subjects to members of the public who attended it as they waited in line to be granted access to that town hall. I came prepared in this regard because of how I was illegally treated at earlier public forums that the Mayor conducted.

## CAUSES OF ACTION

**CLAIM #1:    Violations of the First Amendment right of access to a public forum, to protest in a public forum, to record audio and video recordings in a public forum, to take photographs in a public forum, to receive information in a public forum, to have the opportunity to talk with journalists in a public forum, to distribute whistleblowing literature in a public forum, to engage in lawful assembly in a public forum, to engage in freedom of expression in a public forum, to otherwise engage in whistleblowing and criticism of government officials in a public forum, to engage in expressive association, and to petition government officials in a public forum for redress of grievances**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes)**

1.    I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.    I also incorporate by reference as though fully set forth herein the decision that was issued on 5/19/20 in *Dunn v. City of Fort Valley,* No. 19-cv-287(TES) (M.D. Ga. May 19, 2020) due to relevant findings it contains about First Amendment rights in public forums, supervisory liability, and other pertinent things.

3.    By not trying to intervene on my behalf to allow me to again attend the Mayor's 8/30/17 town hall from within the gym in which it was conducted after I was illegally ejected from it, the defendants listed above are as liable as those who caused me to be ejected from it.

4.      More importantly, my right to lawfully protest in a public forum in a manner that doesn't disrupt how that public forum is conducted while valid time, place, and manner restrictions do not exist to prohibit such protest in a public forum was confirmed by the following excerpt from *Occupy Nashville v. Haslam*, 949 F. Supp. 2d 777 (M.D. Tenn. 2013):

> "a state may not restrict First Amendment rights, absent valid time, place, or manner restriction. *See Dean,* 354 F.3d at 551; *Galvin v. Hay,* 374 F.3d 739, 751 (9th Cir.2004) (**"As speakers may generally control the presentation of their message by choosing a location for its importance to the meaning of their speech, speakers may ordinarily— absent a valid time, place and manner restriction—do so in a public forum."**); ***Childs v. Dekalb Cnty., Ga.,*** **286 Fed.Appx. 687, 693-94 (11th Cir.2008)** (denying qualified immunity and stating that, based on Supreme Court precedent, "police officers have known for decades that protestors present on public property have a First Amendment right to peacefully express their view, in the absence of narrowly tailored ordinances restricting the time, place, or manner of the speech")."

> (boldface formatting added for emphasis)

5.      Through the facts and circumstances that I have sufficiently presented in this complaint, I have established that the Defendants identified above were personally involved in having willfully, callously, oppressively, wantonly, and illegally violating my First Amendment rights in relation to my efforts to have attended the Mayor's 8/30/17 town hall.

6.      Due to the violations of my First Amendment rights on 8/30/17 that occurred inside and outside of the building that hosted the Mayor's 8/30/17 town hall in close proximity to it, the Defendants' illegal acts and omissions against me that caused those violations to occur and maintained those acts and omissions against me caused me irreparable harm, chilled my speech, and imposed illegal prior restraints on the entirety of what my First Amendment rights were while I was in the building in which that town hall was conducted on 8/30/17.

7.      The illegal acts and omissions that prevented me from being able to attend the Mayor's 8/30/17 town hall were driven by a desire to subject me to illegal viewpoint discrimination based upon an invidious discriminatory animus for the reasons that I have discussed in this complaint.

8. Defendants Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, and John Doe8-30-17a are also liable for this cause of action due to their role as co-conspirators in a conspiracy as they condoned and otherwise actively participated in the illegal acts that caused me to be ejected from the Mayor's 8/30/17 town hall. Relevant findings that support this assertion exist in the decisions that were issued in *US v. Blackmon*, 839 F.2d 900 (2d Cir. 1988), *Escalera v. Samaritan Village Men's Shelter*, No. 17-cv-4691 (CM) (S.D.N.Y. Sept. 27, 2019), *US v. Basey*, 816 F.2d 980 (5th Cir. 1987), *Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995), *Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999), and *Dunn v. City of Fort Valley*, No. 19-cv-287(TES) (M.D. Ga. May 19, 2020).

## CLAIM #2:   First Amendment Retaliation and Viewpoint Discrimination

### (Against Defendants City of New York, Redmond, Nieves, Pfeffer)

1. I incorporate by reference the information presented in the preceding paragraphs and attached exhibits as though fully set forth herein.

2. The defendants that I have identified above for this claim are liable for it for the reasons that I have stated in this complaint.

## CLAIM #3:   Violations of the Fourth Amendment

### (Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a)

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that I have identified above for this claim are liable for it for the reasons that I have stated in this complaint. Through their acts and omissions against me on 8/30/17 at the site of the Mayor's 8/30/17 town hall, they either illegally seized me, seized property of

mine, directed that to occur, and impeded my movements by a show of authority toward me,

and condoned that and extended that condition by not allowing me to again attend the

Mayor's 8/30/17 town hall from within the room in which it was conducted.

3.  What I just discussed is supported by findings in *Dotson v. Farrugia*, No. Civ. 1126 (PAE)

    (S.D.N.Y. Mar. 26, 2012) and *People v. Alba*, 81 A.D.2d 345, 440 N.Y.S.2d 230 (App. Div.

    1981).


**CLAIM #4:**              <u>**Violations of the Fifth Amendment**</u>

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

    forth herein.

2.  What I just discussed in claim #4 also applies to this claim.


**CLAIM #5:**              <u>**Violations of the Fourteenth Amendment**</u>
                          <u>**Substantive Due Process Rights**</u>

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

    forth herein.

2.  By having illegally committed acts and omissions that caused and otherwise enabled me to

    have been prevented me from attending the Mayor's 8/30/17 town hall, the defendants that I

    identified for this claim violated my Fourteenth Amendment substantive due process rights

    that are discussed in *Calicchio v. Sachem Central School District*, No. 14-cv-5958

    (DRH)(SIL) (E.D.N.Y. Jan. 17, 2020).

**CLAIM #6:** <u>Violations of Procedural Due Process</u>

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. What I just discussed in claim #5 also applies to this claim.

**CLAIM #7:** <u>Violations of the Fourteenth Amendment</u>
<u>Equal Protection Rights</u>

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The information that I have presented in this complaint confirms that the defendants this claim concerns are liable for the violations of my Fourteenth Amendment equal protection rights that apply to similarly-circumstanced members of the general public who:

   a. Attended the Mayor's 8/30/17 town hall.

   b. Attended the Mayor's 2/19/20 town hall from within the room in which it was conducted as it was conducted, shortly before it began, and shortly after it ended.

   c. Criticized and otherwise booed the Mayor and Melinda Katz during the Mayor's 2/19/20 town hall from within the room in which it was conducted.

   d. Were cheered and applauded during the Mayor's 2/19/20 hall by members of the public who were in the same room as those who criticized and booed the Mayor and Ms. Katz during that 2/19/20 hall.

**CLAIM #8:** <u>Violations of the Fourteenth Amendment</u>

## Prohibitions Against Selective-Enforcement

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The information that I have discussed in this pleading confirms that the defendants that I have identified that this claim concerns are liable for illegal acts and omissions that were committed against me in relation to my efforts to have attended the Mayor's 8/30/17 town hall that violated my Fourteenth Amendment right to not be subjected to selective-enforcement that corresponds to the class-of-one legal theory and is based upon an illegitimate animus.

**CLAIM #9:**        **Failure to Intervene in Violation of the Fourteenth Amendment**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. Since the illegal acts and omissions by defendant Redmond and other defendants were both foreseeable and preventable following my conversations with Mr. O'Neill in June of 2017 and with the Mayor on 7/16/17 and 7/18/17, they're liable with the other defendants that this claim concerns for having failed to intervene on my behalf to prevent the illegal acts and omissions that were committed against me on 8/30/17 at the site of the Mayor's town hall from occurring.

**CLAIM #10:**        **Failure to Train and Supervise**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. What I just discussed in claim #10 also applies to this claim.

3. Section 435 of the New York City Charter states the following about some of the legal duties that members of the NYPD have:

> "a. **The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages** and assemblages **which obstruct the free passage of public** streets, sidewalks, parks and **places; protect the rights of persons and property**, guard the public health, **preserve order at** elections and **all public meetings and assemblages**; subject to the provisions of law and the rules and regulations of the commissioner of traffic,* regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; **remove all nuisances in the public** streets, parks and **places**; arrest all street mendicants and beggars; provide proper police attendance at fires; inspect and observe all places of public amusement, all places of business having excise or other licenses to carry on any business; **enforce and prevent the violation of all laws and ordinances in force in the city**; and for these purposes to **arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses**."

> (boldface formatting added for emphasis)

**CLAIM #11:        Violation of the New York State's Open Meetings Law**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The next screenshot is from the video that was recorded of the Mayor's 8/30/17 town hall as the Mayor was making remarks to inform the audience that they could walk up to the heads

and other senior officials of the various New York City government agencies that comprise his administration to talk with them about whatever was on their (the public's) mind at the end of that town hall. That screenshot is from the elapsed time of 18 minutes and 8 seconds in that video. Those remarks by the Mayor sufficiently confirm that town hall was subject to New York State's Open Meetings Law.



**CLAIM #12:**                    <u>**Abuse of Process**</u>

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  Through their acts and omissions against me on 8/30/17 at the site of the Mayor's 8/30/17 town hall, the defendants that this claim applies to are liable for having subjected me to an illegal abuse of process in relation to my efforts to have lawfully attended that town hall.

**CLAIM #13:**   <u>**Fraudulent Misrepresentation and Fraudulent Inducement**</u>

**(Against Defendants City of New York, Redmond, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. For the reasons that I have presented in this complaint, Defendant Redmond is liable for having made fraudulent misrepresentations to me as he suggested that if I calmed down, I would be permitted to attend that town hall. I calmed down and was illegally ejected instead.

3. Also, the City of New York is liable for having fraudulently misrepresented that members of the public would be able to attend that town hall. I was unable to do so. The City of New York fraudulently induced me to register to attend in advance to attend that town hall and then make the trip from the Bronx to that town hall to try to lawfully attend it.


**CLAIM #14:**      **Violation of New York State General Business Law 349**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, de Blasio, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. Defendant City is a corporation. As such, it's subject to New York State General Business ("GBS") Law §349 that includes the following terms:

   "Deceptive acts and practices unlawful. (a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

3. New York GBS §349(h) allows individuals to pursue a civil action for violations of New York GBS §349 that they experience.

4. The information that I have presented in this pleading confirms that the defendants that I have identified for this claim are liable for violations of New York State General Business

Law 349 that occurred in relation to my efforts to have attended the Mayor's 8/30/17 town

hall.

**CLAIM #15:**                                    <u>**Negligence**</u>

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, O'Neill)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

    forth herein.

2.  The information that I have presented in this pleading confirms that the defendants that I

    have identified for this claim are liable for negligence in relation to my efforts to have

    lawfully attended the Mayor's 8/30/17 town hall.

**CLAIM #16:**                                    <u>**Municipal Liability**</u>

**(Against Defendant City of New York)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

    forth herein.

2.  I have established in this pleading that unofficial illegal policies, customs, and practices that

    had the force of law were maintained against me in relation to my efforts to have attended the

    Mayor's 8/30/17 town hall through the illegal acts and omissions that Defendants City of

    New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, and John

    Doe8-30-17a committed against me individually and as part of a collaborative conspiracy in

    furtherance of an abuse of process that was designed to violate my civil rights by preventing

    me from attending the Mayor's 8/30/17 town hall. I have also established that the unofficial

    illegal policies, customs, and practices that had the force of law and were maintained against

    me in relation to my efforts to have attended the Mayor's 8/30/17 town hall were condoned

by Defendants de Blasio and O'Neill.

3.  The unofficial illegal policies, customs, and practices that had the force of law and were committed against me on 8/30/17 in relation to my efforts to have attended the Mayor's 8/30/17 town hall were inextricably intertwined with the similar illegal acts and omissions that were committed against me that prevented me from attending the Mayor's 4/27/17, 5/23/17, and 6/8/17 town hall and resource fair meetings as well as a publicity stunt that the Mayor conducted on 7/25/17 inside of a subway station.

4.  The fact that though I reported multiple entirely valid complaints to the New York City Civilian Complaint Review Board ("CCRB"), Internal Affairs Bureau of the NYPD ("IAB"), New York City Department of Investigations ("DOI") between 4/27/17 and 8/30/17 about the illegal acts and omissions that were committed against me between those dates 4/27/17 in relation to my efforts to have attended public forums that were conducted partly by the Mayor, no one took appropriate corrective action in response to enable me to attend the Mayor's 8/30/17 town hall is sufficient to establish that the illegal acts and omissions that were committed against me in relation to my efforts to have attended the Mayor's 8/30/17 town hall were illegally condoned by the CCRB, IAB, and DOI.

5.  The preceding facts are sufficient to allow me to prevail with my municipal liability claims that this pleading concerns.


**CLAIM #17:**      **Intentional and Negligent Infliction of Emotional Distress**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, de Blasio, O'Neill)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. Through the illegal acts and omissions that Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, de Blasio, and O'Neill committed against me in relation to my efforts to have attended the Mayor's 8/30/17 town hall, they subjected me to intentional and negligent infliction of emotional distress that I experienced mainly in the form of seething rage, frustration, and stress that I kept in check, stress, and humiliation from having been unjustly stigmatized by their illegal acts and omissions that occurred in full view of members of the general public and others.

**CLAIM #18:**                    **Conspiracy to Violate Civil Rights**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, de Blasio, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The information that I have presented in this pleading confirms that the defendants that this claim concerns are liable for having been part of a conspiracy in which its members committed illegal acts and omissions against me in relation to my efforts to have attended the Mayor's 8/30/17 town hall.

**CLAIM #19:**                    **Unjust Enrichment**

**(Against Defendants Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. In spite of the fact that Defendants, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, and O'Neill committed illegal acts

and omissions in relation to my efforts to have attended the Mayor's 8/30/17 town hall, all of

those defendants were enriched at my expense by having received compensation during the

times that they were committing illegal acts and omissions against me in relation to my

efforts to have attended the Mayor's 8/30/17 town hall.

3.   As a result, "equity and good conscience" demand that this Court issue an order to compel

Defendants Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-

30-17a, Holmes, de Blasio, and O'Neill to fully and immediately reimburse their employers

with both pre-judgment and post-judgment interest added for the total amount of pay as well

as the value of all benefits that they received from the specific jobs that they were performing

that covers the entire length of time during which they committed illegal acts and omissions

against me that I have discussed in this pleading that were in relation to my efforts to have

attended the Mayor's 8/30/17 town hall.


**CLAIM #20:**                    **Public and Private Nuisance**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, de Blasio, O'Neill)**

1.   I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

forth herein.

2.   For the reasons that I have discussed in this pleading and are supported by findings in

_Cangemi v. US_, No. 12-cv-3989 (JS)(SIL) (E.D.N.Y. Mar. 31, 2017), Defendants City of

New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-

30-17a, de Blasio, and O'Neill committed both a private nuisance against me and a public

nuisance against both others and I by having committed illegal acts and omissions in relation

to my efforts to have attended the Mayor's 8/30/17 town hall. My claims about the

defendants having committed a public nuisance largely stem from the fact that I sought to

engage in protected whistleblowing during the Mayor's 8/30/17 town hall as a speaker and

by distributing literature containing whistleblowing information, both of which were and

otherwise would have been against the Mayor, Mr. Banks, HRA, HRA's business partners,

the Bronx District Attorney's office, DOI, the New York City Department of Housing,

Preservation and Development, NYPD, judges, the New York State Office of Temporary and

Disability Assistance, Urban, NTT, New York State court officers, and more to directly and

indirectly provide information to large numbers of the public partly through word-of-mouth

advertising to facilitate the public's ability to make informed decisions about why they

should engage in voting and otherwise support the campaigns of the Mayor's rivals in the

2017 New York City government elections to fire the Mayor, the Mayor's administration,

and exert sufficient pressure on the NYPD to have NYPD defendants in this action to be fired

and prosecuted for civil rights crimes that they directly committed against me and indirectly

committed against the public in the process by having illegally prevented me from attending

the Mayor's 4/27/17, 5/23/17, 6/8/17, and 7/12/17 town hall and resource fair meetings that

the Mayor conducted with others as campaign events to bolster his 2017 New York City re-

election prospects.


## DEMAND FOR A JURY TRIAL

1. I demand a trial by jury in this action on each and every one of my damage claims.


## PRAYER FOR RELIEF

WHEREFORE, this Court should accept jurisdiction over this entire matter and grant me

additional relief by:

1. Causing this Court to exercise supplemental jurisdiction over my X1 lawsuit and to consolidate it with this action that will lead this action to control how both of those cases are conducted. This request stems from a common nucleus of operative fact and is pursuant to FRCP Rule 42.

2. Empaneling a jury to hear and decide this case strictly on its merits.

3. Granting me the following additional relief against the defendants individually and jointly:

   a. Compensation for violations of my constitutional rights, defamation, abuse of process, nuisance, unjust enrichment, wire fraud, and fraudulent misrepresentations as well as pain, suffering, mental anguish, and humiliation that I experienced due to the illegal acts and omissions by the defendants.

   b. Declaratory, injunctive, and equitable relief through the issuance of an order that voids the results of the 2017 New York City government elections for the jobs of New York City Mayor, New York City Councilmember, Bronx District Attorney, Queens Borough President, New York City Comptroller, and New York City Public Advocate primarily because it is reasonable to believe that results of those elections were materially tainted by voter fraud, voter suppression, and whistleblower retaliation in violation of 5 U.S.C. §1502 that occurred partly by illegally:

      i. Preventing whistleblowers from attending public forums that the Mayor conducted with them and were partly used as campaign events to attract various types of support from voters and prospective voters.

      ii. Segregating and discriminating against whistleblowers at such public forums.

      iii. Concealing critically significant video recordings that were recorded:

         1) As a result of arrangements that the Mayor's office made for how those public

forums were being conducted from within the rooms in which they were being

conducted. Such concealment was that of a public record and illegally

deprived voters, prospective voters, political rivals, journalists, and those who

finance political campaigns of relevant information that amounted to voter

fraud, voter suppression, and whistleblower retaliation.

    iv.  Causing video recordings that were recorded by DOE's 4/27/17 video prior to 6:30

pm on 4/27/17 and video recordings that were recorded on 5/23/17 inside of the

BSC by a video security camera controlled by OCA to have been illegally not

preserved and provided to me. Both of those video recordings recorded illegal acts

that were committed by members of the Mayor's NYPD security detail and others

that caused me to have been illegally prevented from attending the Mayor's 5/23/17

resource fair and 4/27/17 town hall.

c.  Declaratory, injunctive, and equitable relief in accordance with findings expressed in

*Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899 (8th Cir. 2012) through the

issuance of an order that enjoins Defendant City's personnel and agencies from

continuing to commit illegal acts and omissions against me that violate my rights.

d.  Further declaratory, injunctive, and equitable relief through the immediate issuance of an

order that:

    i.  Prohibits all members of the NYPD from deliberately making any physical

contact with me while I am conducting myself in a lawful manner.

    ii.  Requires all members of the Mayor's NYPD security detail to not come within

10 feet from me while they are on-duty as members of the Mayor's NYPD

security detail and I am conducting myself in a lawful manner, unless I

explicitly grant consent for that to occur.

iii.   Requires all members of the Mayor's CAU to not come within 10 feet from me
       while I am conducting myself in a lawful manner and they are on-duty as
       members of the Mayor's CAU, unless I explicitly grant consent for that to
       occur.

iv.    Prohibits Defendant City's personnel from illegally interfering with my ability
       to attend public forums that the Mayor may conduct from within the room in
       which he does so as he does so.

v.     Prohibits Defendant City's personnel from illegally interfering with the rights
       that other people have to lawfully attend public forums that the Mayor conducts
       that may allow others and I to exercise our First Amendment right to observe,
       hear, and enjoy lawful speech and other expression that such people may
       engage in to criticize the Mayor and others during them.

vi.    Prohibits Defendant City's personnel from illegally interfering with the First
       Amendment and Fifth Amendment rights that people have to **a)** bring literature
       and signs with them into rooms in which the Mayor conducts public forums, **b)**
       lawfully distribute such literature during those meetings without disrupting
       those meetings, **c)** distribute such literature and otherwise show it and signs in
       the rooms in which the Mayor conducts such meetings before they begin and
       after they end, and **d)** Keep such literature and signs with them as the Mayor
       conducts such public forums.

vii.   Requires Defendant City to grant access to public forums that the Mayor
       conducts inside of buildings based on the order in which members of the public

line up directly outside of those buildings shortly before those meetings begin to be granted access to the room in which the Mayor conducts such public forums on those dates.

viii. Prohibits Defendant City from allowing its personnel to prevent members of the public from attending public forums that the Mayor conducts inside of buildings from within the rooms in which he does so while sufficient seating is available in those rooms.

ix. Orders Defendant City to immediately cause all members of the NYPD who are present in areas where the Mayor conducts public town hall meetings, public resource meetings, public hearings, and press conferences that the public may observe to wear body-cameras that are always on and always recording both audio and video recordings.

x. Orders Defendant City of New York to provide all audio and video recordings from such body-cameras in unedited and non-redacted form along with their audit trail records to allow for an independent forensic analysis within 24 hours of any adverse encounter that occurs between **a)** members of the public and **b)** the members of the NYPD wearing those body-cameras.

xi. Orders Defendant City to immediately **a)** cause clear audio recordings to be recorded of all verbal communications that members of the NYPD have while they are on-duty as members of the NYPD and present in areas where the Mayor conducts public town hall meetings, public resource meetings, public hearings, and press conferences that the public may observe.

xii. Orders Defendant City of New York to provide all such audio recordings in

unedited and non-redacted form that includes information that identifies the date and time when those recordings began to be recorded as well as the speakers heard in those communications that are personnel of Defendant City within 24 hours of any adverse encounter that occurs between **a)** members of the public and **b)** the members of the NYPD heard in those audio recordings while they are being recorded.

xiii. Orders Defendant City to immediately cause all other electronic communications (such as e-mail messages, cell phone text messages, and encrypted communications) that are engaged in by those who are part of the Mayor's NYPD security detail to be recorded and preserved for possible use in litigation by people that they commit illegal acts and omissions against.

xiv. Orders Defendant City to provide all such electronic communications within 24 hours in unedited and non-redacted form that includes information that identifies the date and time when those communications occurred and the identities of those who engaged in them to members of the public who have adverse encounters with members of the Mayor's NYPD security detail to the extent that those communications concern those adverse encounters.

xv. Orders Defendant City to provide me copies of all communications that its personnel have had about me since 2/1/16 in unedited and non-redacted form. This includes, but is not limited to all of the following:

    1) All communications that have taken place by using personally-owned devices, personal e-mail accounts, personal encrypted messaging accounts, and personal cell phone plans as well as by using computers

and other devices that are owned or leased by Defendant City and e-mail, cell phone, and encrypted messaging accounts that are administered and/or controlled by Defendant City.

e.  Further declaratory, injunctive, and equitable relief through the immediate issuance of an order that:

   i.  Orders Defendant City to immediately cause the CCRB and DOI to be provided all video recordings within 24 hours after a complaint is reported to them about illegal acts and omissions that are committed by members of the NYPD and other personnel of Defendant City that are recorded by video security cameras that Defendant City controls. This includes, but is not limited to illegal acts that are related to public forums that the Mayor conducts and occur on the dates and at the locations where the Mayor conducts them.

   ii.  Further orders Defendant City to make those video recordings available within 24 hours in unedited and non-redacted form to those who report such illegal acts and omissions to the CCRB and DOI.

   iii.  Orders that the following Defendants are also required to be fired at the earliest possible instead of practical or convenient time from the jobs that they hold with Defendant City of New York largely pursuant to Section 1116 of the New York City Charter in response to the illegal acts and omissions that they committed against me in relation to my efforts to have lawfully attended the Mayor's 8/30/17 town hall and that they are prohibited from being employed by Defendant City again:

   Defendants Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, O'Neill)

iv.  Orders Defendants Defendants Redmond, Nieves, Pfeffer, Berkowitz, Cruz,

Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, and O'Neill to

immediately and fully reimburse those who were their employers on and after

8/30/17 with pre-judgment and post-judgment interest for the total value of pay

and benefits that they received that directly correspond to the length of time

during which they were involved in the illegal acts and omissions that were

committed against me in relation to **a)** my efforts to have attended the Mayor's

8/30/17 town hall.

v.  Restrains Defendant City's personnel and agencies from continuing to commit

illegal acts and omissions against me that violate my rights, especially in all

areas that are public forums.

vi.  Declares that the ban that the Mayor announced that prohibits large gatherings

of people in New York City and protests from being conducted is overly broad,

pretextual, void, and unenforceable largely because it impermissibly violates

core First Amendment rights as well as Fifth Amendment and Fourteenth

Amendment rights that pertain to due process, selective-enforcement, equal

protection, and liberty.

vii.  Further declares that though it may possibly be advisable to wear a face mask

in New York City, no one is required to do so partly because doing so impedes

the flow of oxygen to healthy people and impermissibly infringes upon the First

Amendment rights that people have to engage in freedom of expression, such as

by having people see them smiling, expressing affection by kissing, being able

to yawn without having to wear a face mask, and having other facial

expressions that they make seen by others. Although it is potentially dangerous to one's health to engage in a wide variety of other activities that include driving a car because of the possibility that a drunk driver may pass by and having a drink in a bar because there is a possibility to breathe in second-hand smoke, bans on driving and visiting bars have not been imposed due to such risk factors.

viii.   Similarly declares that the social-distancing restrictions in New York State are overly broad, void, and unenforceable for the same reasons just discussed and declares that those restrictions have been selectively-enforced by the NYPD in violation of the Fourteenth Amendment.

f.   Declaratory relief by declaring that the Mayor's 8/30/17 town hall was a public forum that was subject to New York State's Open Meetings Law and that all actions that were taken as a result of that public forum having been conducted are void pursuant to Section 107 of New York State's Public Officer Law because the Mayor's 8/30/17 town hall was conducted in violation of New York State's Open Meetings Law.

g.   Injunctive and equitable relief by ordering Defendant City to immediately provide me the following in unedited and non-redacted form:

i.   Copies of all video recordings and photographs that were recorded and otherwise taken by Defendant City's personnel inside of the building that hosted the Mayor's 8/30/17 town hall between the time when **a)** the first member of the public entered that building on 8/30/17 in relation to attending that town hall and **b)** everyone who attended the Mayor's 8/30/17 town hall exited that building.

ii.   Copies of all records that have been in the possession of Defendant City's personnel that pertain to the deliberations, planning, coordination, execution, and cover-up that took place in regards to my having been illegally prevented from attending the Mayor's 8/30/17 town hall.

iii.   Copies of all records that have been in the possession of Defendant City's personnel that describe staff assignments that were issued for the Mayor's 8/30/17 town hall.

iv.   Copies of all records that have been in the possession of Defendant City's personnel that consist of the names and contact information for the members of the public who registered to attend the Mayor's 8/30/17 town hall as well as the names and contact information for the journalists who attended the Mayor's 8/30/17 town hall.

h.   Injunctive and equitable relief by ordering Defendant City of New York to immediately provide me all video recordings as an ".avi", ".mp4", or ".mov" computer file that were recorded on 2/19/20 by all video security cameras that were installed in the school and are controlled by DOE that hosted the town hall meeting that the Mayor conducted on that date between the times when the first member of the public was allowed into that school for the purpose of attending that town hall until everyone who attended that town hall exited that school.

i.   Compensation for all costs and attorney fees that are related to my pursuit of this civil action.

j.   Equitable and injunctive relief that authorizes me and others that I may ask to help me to paint, write, or draw any message or image of any size indefinitely throughout New York

City without needing pre-approval from anyone on any public street, sidewalk, public passageway, concourse, and park indefinitely by using resources that will be provided to me by the City of New York for that purpose.

k.  Equitable and injunctive relief that orders the City of New York to cause its NYPD to accord whatever messages and images , that I may paint, write, or draw in public areas throughout New York City to receive equal law-enforcement protection that is accorded to Black Lives Matter signs on streets in New York City, especially the one located in front of Trump Tower in Manhattan.

l.  any message or image of any size indefinitely without needing pre-approval from anyone on any public street, sidewalk, public passageway, concourse, and park indefinitely by using resources that will be provided to me by the City of New York for that purpose.

m.  An award of damages against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, de Blasio, and O'Neill pursuant to 18 U.S.C. §1986 for having not intervened on my behalf in relation to my effort to have attended the Mayor's 8/30/17 town hall.

n.  An award of damages against defendants Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, and O'Neill pursuant to New York State General Business Law §349 for deception in relation to my efforts to have attended the Mayor's 8/30/17 town hall and how those defendants conducted themselves as criminal accomplices instead of the law-enforcement personnel that they technically were throughout August of 2017.

o.  An award of punitive damages for all of my claims set forth in this pleading.

p.  An award of pre-judgment and post-judgment interest.

q.  Such other, further, and different relief as the interests of justice and equity may require.

Dated:          New York, New York
                August 29, 2020

                                              From,


                                              s_/Towaki Komatsu

                                              *Plaintiff, Pro Se*
                                              802 Fairmount Pl., Apt. 4B
                                              Bronx, NY 10460
                                              (347) 872-1205
                                              Towaki_Komatsu@yahoo.com