**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------ X

Towaki Komatsu,

<u>Case No. 20-cv-7046</u>

           Plaintiff,

<u>**First Amended Complaint**</u>

      -vs-

**JURY DEMAND**

The City of New York, NYPD Inspector Howard Redmond,
former NYPD Lieutenant Ralph Nieves, NYPD Officer Karl
Pfeffer (Officer ID #: 48458), NYPD Officer Andrew Berkowitz
(badge #: 7141), NYPD Officer Cruz (badge #: 751), NYPD
Officer Hansen (badge #: 4028), NYPD Officer Christopher
Fowler (badge #: 3185), NYPD Officer Lance (badge #: 245),
NYPD Officer John Doe8-30-17a, NYPD Officer Juanita
Holmes, NYPD Lieutenant Richard Mantellino, Bill de Blasio,
former NYPD Commissioner James O'Neill

- All of the defendants listed above who are people are being
  sued in their individual and official capacities,

           Defendants.
------------------------------------------------------ X

# **TABLE OF CONTENTS**

I. Preliminary Remarks ................................................................................................ 3

II. Jurisdiction ............................................................................................................... 9

III. Parties ...................................................................................................................... 10

IV. Legal Standards ....................................................................................................... 13

V. Background Facts ...................................................................................................... 17

VI. Statement of Facts .................................................................................................... 51

VII. Causes of Action ...................................................................................................... 80

VIII. Jury Demand ............................................................................................................. 99

IX. Prayer for Relief ...................................................................................................... 99

Plaintiff Towaki Komatsu (hereinafter referred to in the first-person as "I", "me", and "my"), proceeding pro se in this action, does hereby state and allege all that follows in this pleading.

## PRELIMINARY REMARKS

1.  The following applies throughout this complaint in the interests of brevity:

    a.  Acronyms and aliases in the second column of the following table will be used throughout this pleading instead of the entries in the third column to which they correspond:

| #  | Abbreviation | Corresponds To |
|----|--------------|----------------|
| 1  | CCRB | New York City Civilian Complaint Review Board |
| 2  | City Council | New York City Council |
| 3  | Defendant City | Defendant City of New York |
| 4  | DOE | New York City Department of Education |
| 5  | DOE's 4/27/17 video | The video recording that was recorded between 6:30 pm and 11 pm on 4/27/17 by a video security camera controlled by DOE that was installed by doors marked "Exit 13" by an entrance to the school that hosted the Mayor's 4/27/17 town hall that I received in response to a FOIL demand. That video recording is available on the Internet at https://drive.google.com/open?id=1MbzBrn2ERdkYajn4MVJy3N6AB5ZA5hFu |
| 6  | FOIL | Freedom of Information Law |
| 7  | FRCP | Federal Rule of Civil Procedure |
| 8  | HRA | New York City Human Resources Administration |
| 9  | The Mayor | New York City Mayor Bill de Blasio |
| 10 | Mayor's 4/27/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a mostly traditional public forum on 4/27/17 in Long Island City in Queens that was subject to New York State's Open Meetings Law and was used a campaign event to support the Mayor's re-election interests that I was illegally barred from attending while I had active litigation against HRA. |

| 11 | Mayor's 5/23/17 resource fair | The public resource fair meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a mostly traditional public forum on 5/23/17 inside of the Veterans Memorial Chamber within the Bronx Supreme Court during the U.S. Navy's annual "Fleet Week" event in New York City while I continued to be a U.S. Navy veteran and was upholding my military enlistment oath to protect and defend the U.S. Constitution against all enemies. That public forum was also used as a campaign event to support the Mayor's re-election interests and I was illegally barred from attending it as I continued to have active litigation against HRA. |
|---|---|---|
| 12 | Mayor's 6/8/17 town hall | The public town hall meeting that the Mayor conducted as a public forum on 6/8/17 at 93-29 Queens Boulevard in Rego Park in Queens inside of a building named Lost Battalion Hall Recreation Center |
| 13 | Mayor's 7/25/17 publicity stunt | The public stunt that the Mayor illegally conducted on 7/25/17 in an area of a subway station located next to a staircase, below Broadway, and by Warren Street in Manhattan in a manner and location that was in violation of the MTA's Rules as Defendant Redmond illegally assaulted me in that subway station in front of Defendant Fowler while I was conducting myself lawfully and while that was recorded on video. |
| 14 | Mayor's 8/30/17 town hall | The public town hall meeting that the Mayor conducted as a public forum on 8/30/17 at 195 Graham Avenue in Brooklyn. |
| 15 | Mayor's CAU | The Mayor's Community Affairs Unit |
| 16 | Mr. Banks | HRA Commissioner Steven Banks |
| 17 | My HRA lawsuit | The hybrid lawsuit that I commenced against HRA in January of 2017 that corresponds to *Komatsu v. New York City Human Resources Administration*, No. 100054/2017 (Sup. Ct., New York Cty.) and is pending appeal. I asserted claims in that case that my claims in this case related back to and amplify. |
| 18 | My X1 lawsuit | The lawsuit that I commenced against the City of New York, Defendant Redmond, and others in April of 2018 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) and is about matters that my claims in this case relate back to and amplify. |
| 19 | OCA | New York State Office of Court Administration |
| 20 | Second Circuit | United States Court of Appeals for the Second Circuit |
| 21 | Urban | Urban Pathways, Inc. It is the slumlord for the building in which I reside. |

2.	Every reference that I make in this pleading that concerns my efforts to have attended the Mayor's 8/30/17 town hall concerns those that I made to have lawfully attended it from within the room in which it was conducted as it was conducted, shortly before it began, and shortly after it ended.

3.	The Mayor' office arranged to have the Mayor's 8/30/17 town hall recorded on video. That video recording is available on the Internet at https://www.youtube.com/watch?v=Ia4C4NnrSDo.

4.	The table shown next contains brief information about as well as links to copies of video recordings that I recorded with my cell phone on 8/30/17 while I lawfully conducted myself as I stood outside of and in close proximity to the building that hosted the Mayor's 8/30/17 town hall shortly before it began and as it was conducted. The second table that follows this one includes a description of what appears in those video recordings.

| # | Creation Time | Filename | Link to video |
|---|---|---|---|
| 1 | 6:52 pm | IMG_1546.mov | https://drive.google.com/file/d/1_4itSXOQvPlpHoWinG-FC-fLDM-KulOw/view?usp=sharing |
| 2 | 6:52 pm | IMG_1547.mov | https://drive.google.com/file/d/1FqUWvPNMJPfVDSzx9EEo7dI1XNsw0RWf/view?usp=sharing |
| 3 | 6:52 pm | IMG_1548.mov | https://drive.google.com/file/d/1e-6SzJvHtVbgoDRfa6z1mGDLEfGzGlg3/view?usp=sharing |
| 4 | 7:19 pm | 8-30-17_7-19 pm civil rights crime by NYPD Redmond at Mayor's public town hall meeting in Brooklyn.mov | https://drive.google.com/file/d/1sz8GBkH3lLWtroNqJvOoN9d17akYzt_z/view?usp=sharing |
| 5 | 7:21 pm | IMG_1554.mov | https://drive.google.com/file/d/1iw5npZjS2or0CV1bz3rUv3VDgSepb63M/view?usp=sharing |
| 6 | 7:22 pm | IMG_1556.MOV | https://drive.google.com/file/d/1LpMEZUqpBwDlaJUPKFz2BPosqHEHD4y_/view?usp=sharing |

| 7 | 7:38 pm | IMG_1557.MOV | https://drive.google.com/file/d/1NugJbODhoD l4hBX0W27JceRyr9WQcnFD/view?usp=shari ng |
| 7 | 7:44 pm | 8-30-17 Brooklyn town hall at 7_44 pm.mov | https://drive.google.com/file/d/11Z7blqVvQ1j awqVTfuwa09LMG5lPG9aw/view?usp=shari ng |
| 8 | 8:16 pm | 8-30-17 video of Nieves outside of Mayor's town hall at 8_16 pm.mp4 | https://drive.google.com/file/d/1pmex01ETf5ic 7KNKrShNgvG3hfFPoMRr/view?usp=sharing |

| # | Filename | Description |
|---|---|---|
| 1 | IMG_1546.mov | Pinny Ringel of the Mayor's Community Affairs Unit is shown escorting a female member of the public along a sidewalk in Brooklyn toward the entrance to the building that hosted the Mayor's 8/30/17 town hall. |
| 2 | IMG_1547.mov | Defendants Fowler, Berkowitz, and Lance are shown near the entrance to the building that hosted the Mayor's 8/30/17 town hall while I stood nearby and was being illegally prevented from attending it after I was illegally ejected from it. In this video, Mr. Fowler is wearing a blue suit with his back facing me, Mr. Berkowitz is standing behind and to the left of him with his back facing me as he then had a wire or cable running from his left ear behind and across his neck, and Mr. Lance (he is Black) is wearing a white shirt and hat while facing me |
| 3 | IMG_1548.mov | Dustin Ridener of the Mayor's office is shown as he wore a blue suit and eyeglasses as he leaned against a metal barricade near members of the public who were waiting in line to be granted access to the building that hosted the Mayor's 8/30/17 town hall that I had I already been illegally ejected from. |
| 4 | 8-30-17_7-19 pm civil rights crime by NYPD Redmond at Mayor's public town hall meeting in Brooklyn.mov | Defendant Redmond is shown looking in my direction at the elapsed time of 5 seconds as he stood on a public sidewalk near where he arranged for me to be illegally ejected from the building that hosted the Mayor's 8/30/17 town hall a short time earlier. Defendants Cruz and Hansen appear in this video at the elapsed time of 13 seconds as they stood in the immediate area near where I was illegally ejected from that building through a side exit. |
| 5 | IMG_1554.mov | Defendants Cruz and Hansen appear in this short video as they stood in the immediate area near where I was illegally ejected from that building through a side exit. |

| 6 | IMG_1556.MOV | Defendants NYPD Officer John Doe8-30-17a, Redmond, and Berkowitz are shown from left to right as they stood behind a metal barricade near the entrance to the building that hosted the Mayor's 8/30/17 town hall while I stood nearby and was being illegally prevented from attending it after I was illegally ejected from it. Pinny Ringel also appears in this video near Mr. Redmond. |
|---|---|---|
| 7 | IMG_1557.MOV | Defendant Redmond is shown in this short video as he stood to the side of members of the public who were being allowed t o walk past him to enter the building that hosted the Mayor's 8/30/17 town hall after he arranged for me to be illegally ejected from that building. |
| 7 | 8-30-17 Brooklyn town hall at 7_44 pm.mov | Defendants Redmond, Nieves, and Berkowitz are shown in this video in an area near the entrance to the building that hosted the Mayor's 8/30/17 town hall as I made remarks that I addressed to the U.S. Attorney's office for the Eastern District of New York that wasn't present there then in which I reported that I had been asking Defendants Redmond, Nieves, and Berkowitz about why I was illegally ejected from that building and was not being provided an answer. I also clearly and briefly described the circumstances in which I was illegally ejected from that building on that date as I pointed out that Mr. Redmond illegally put his hands on me while I was in that building before I was ejected from it. Three other uniformed members of the NYPD are also shown in this video whose identities I don't know. They illegally didn't try to intervene on my behalf to enable me to attend that town hall in violation of their affirmative Fourteenth Amendment legal duty after I was illegally ejected from it in spite of the fact that they certainly were within earshot of me as I narrated the circumstances under which I had been illegally ejected from that town hall and building. Mr. Ringel, Mr.Ridener, and Shauna Stribula of the Mayor's office also appear in this video near Defendants Redmond, Nieves, and Berkowitz. |
| 8 | 8-30-17 video of Nieves outside of Mayor's town hall at 8_16 pm.mp4 | Defendants NYPD Officer John Doe8-30-17a and Nieves are shown in this video in an area near the entrance to the building that hosted the Mayor's 8/30/17 town hall as I lawfully asked Mr. Nieves to explain to me why he illegally caused me to be ejected from the building that hosted the Mayor's 8/30/17 town hall. In response, he refused to talk to me. An unknown uniformed member of the NYPD also appears in this video at the elapsed time of 4 seconds as he illegally didn't try to intervene on my behalf to enable me to attend the Mayor's 8/30/17 town hall. |

5.     References to HRA, DHS, and DSS will be used interchangeably in this pleading for

simplicity.

6.      The illegal acts and omissions that were committed against me on 8/30/17 at the site of the Mayor's 8/30/17 town hall were committed in relation to my efforts to have exercised my legal right to have done the following:

   a.   Attended the Mayor's 8/30/17 town hall from within the room in which it was conducted shortly before it began, as it was conducted, and shortly after it ended.

   b.   Exercised the full extent of my rights while attending that town hall partly by engaging in protected whistleblowing about a broad array of matters of public concern and private matters.

7.      This is a civil rights action to vindicate my rights in response to illegal acts and omissions that were committed against me on 8/30/17 at the site of the Mayor's 8/30/17 town hall in relation to my efforts to have lawfully attended that town hall while Defendant Redmond was then the primary defendant in *Sherrard v. City of New York*, No. 15-cv-7318 (MB) (S.D.N.Y. Jun. 13, 2018) and I was aware of his status in that case for months prior to 8/30/17.

   a.   Those who committed such illegal acts and omissions against me on 8/30/17 did so as part of a conspiracy in retaliation mainly for protected whistleblowing activities that I engaged in against Defendant Redmond and other members of the Mayor's NYPD security detail as I was lawfully sitting and otherwise conducting myself on 8/30/17 in the gym in which the Mayor's 8/30/17 town hall was conducted shortly before it began and as I was talking calmly with members of the public who sat near me mostly about the following:

      i.   Defendant Redmond's status as the primary defendant in *Sherrard v. City of New York*, No. 15-cv-7318 (MB) (S.D.N.Y. Jun. 13, 2018).

ii.     Members of the Mayor's NYPD security detail illegally seized literature from people on 6/21/17 at the site of the town hall meeting that the Mayor conducted on that date in Chinatown in Manhattan as members of the public tried to attend that event with such literature.

iii.    The fact that members of the Mayor's NYPD security detail and Mayor's staff I had previously illegally prevented me from attending town hall and public resource fair meetings that the Mayor conducted.

8.      This is also a civil rights action to vindicate my rights in response to illegal acts and omissions that were committed against me on 9/8/17 and thereafter **a)** at City Hall in relation to my efforts to have lawfully attended the public hearing that the Mayor conducted at 2 pm inside of the Blue Room inside of City Hall and **b)** that caused video recordings that were recorded on 9/8/17 at City Hall by video security cameras controlled by the NYPD to not have been provided to me in violation of my First Amendment rights in response to a timely FOIL demand that I submitted to the NYPD on 9/8/17. The NYPD illegally destroyed those video recordings instead.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§1331 and 1343. This action is brought pursuant to 42 U.S.C. §§1983, 1985, 1988 and the First, Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution.

2.      Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§2201 and 2202, FRCP Rules 57 and 65, and the general legal and equitable powers of this Court.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because I reside in the Bronx and New York City Hall's principal place of business is in Manhattan.

4.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

5.      Consistent with the requirements of New York General Municipal Law § 50-e, I filed a timely Notice of Claim with the New York City Comptroller within 90 days of the accrual of my claims under New York law. This Court therefore has supplemental jurisdiction over my claims under New York law because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

6.      My claims have not been adjusted by the New York City Comptroller's Office.

## PARTIES

1.      I am, and was at all times relevant to this action, a resident of Bronx County in the State of New York. I am also a U.S. Navy veteran, who swore to defend the U.S. Constitution against all of its enemies indefinitely and without exceptions. I have honored that oath and continue to do so.

2.      Bill de Blasio is the Mayor of the City of New York.

3.      Defendant City of New York is a municipal corporation duly incorporated and authorized under the laws of the State of New York pursuant to §431 of its Charter. The City of New York is authorized under the laws of the State of New York to maintain a police department, the NYPD, which is supposed to act as its agent in the area of law-enforcement and for which it and the Mayor are ultimately responsible. The City and the Mayor both assume the risks incidental to the maintenance of a police force and the employment of police officers.

4.      Defendants NYPD Inspector Howard Redmond, former NYPD Lieutenant Ralph Nieves, NYPD Officer Karl Pfeffer (Officer ID #: 48458), NYPD Officer Andrew Berkowitz (badge #: 7141), NYPD Officer Cruz (badge #: 751), NYPD Officer Hansen (badge #: 4028), NYPD Officer Christopher Fowler (badge #: 3185), NYPD Officer Lance (badge #: 245), NYPD Officer John Doe8-30-17a, NYPD Lieutenant Richard Mantellino, NYPD Officer Juanita

Holmes, former NYPD Commissioner James O'Neill were at all times relevant herein officers, employees, and agents of the NYPD and the City of New York.

5.      Defendant NYPD Officer John Doe8-30-17a is the man wearing a suit and tie on the far-left in the next screenshot that is from a video recording that I recorded on 8/30/17 at 7:22 pm. I do not know his name.



6.      Defendant Redmond helps to direct the Mayor's NYPD security detail and holds the rank of Inspector in the NYPD.

7.      Defendants Nieves, Pfeffer, Berkowitz, and Fowler, were at all times relevant herein members of the NYPD security detail for New York City Mayor Bill de Blasio that Defendant Redmond directs.

8.      On 9/15/17, Defendant Mantellino worked as a Records Access Officer for the NYPD.

9.      On 8/30/17, both Defendant Bill de Blasio and Defendant James O'Neill were responsible for how the NYPD operated. Prior to that date, I had face-to-face conversations with both of them in June and July or 2017 that were recorded on audio and video about illegal acts and omissions that Defendant Redmond and other members of the NYPD committed against me since 4/27/17 at public forums that the Mayor had conducted. Mr. de Blasio also stood within roughly 20 feet from me as Defendant Redmond was recorded on video on 7/25/17 as he illegally assaulted me in front of many whistleblower news censors in journalism and Defendant Fowler inside of a subway station below Broadway by Murray Street in Manhattan as Mr. Redmond continued to flagrantly violate my constitutional rights at a time and in a location in which the Mayor was illegally conducting a publicity stunt in violation of the MTA's Rules that authorized me to have conducted myself in the manner in which I did so at the time that Mr. Redmond began assaulting me and violating my constitutional rights then.

10.     The individual defendants are being sued herein in their individual and official capacities.

11.     At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD and City of New York. They were acting for and on behalf of the NYPD and Mayor at all times relevant herein. While doing so, the defendants in this action who are members of the NYPD did so with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

12.     The individual defendants' acts hereafter complained of were carried out intentionally, recklessly, and oppressively with malice and egregious, callous, and wanton disregard of plaintiff's rights.

13.     At all relevant times, the individual defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## LEGAL STANDARDS

1.     I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.     The following is a relevant excerpt from *Doe v. City of New York*, No. 18-cv-670 (ARR)(JO) (E.D.N.Y. Jan. 9, 2020) that confirms that I had a right to criticize every member of the NYPD who I interacted with on 8/30/17 in the gym that hosted the Mayor's 8/30/17 town hall and not be retaliated against for doing so:

> ""[t]he right to criticize public officials is at the heart of the First Amendment's right of free speech." *Kaluczky v. City of White Plains,* 57 F.3d 202, 210 (2d Cir. 1995) (citing *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 282 (1964)). Indeed, the "right to criticize the police without reprisal" is "clearly" an "interest protected by the First Amendment," *Kerman v. City of New York,* 261 F.3d 229, 241-42 (2d Cir. 2001), as "[t]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers[,]" *id.* at 242 (quoting *City of Houston v. Hill,* 482 U.S. 451, 461 (1987)). Thus, on summary judgment, the Second Circuit has held that a plaintiff established a First Amendment retaliation claim when he proffered facts showing that police officers retaliated against him for making derogatory comments to the officers and for threatening to sue them. *Kerman,* 261 F.3d at 241-42.[3]""

3.     The following is a relevant excerpt from *Doe v. City of New York*, No. 18-cv-670 (ARR)(JO) (E.D.N.Y. Jan. 9, 2020) that confirms that I had a right to criticize every member of the NYPD who I interacted with on 8/30/17 in the gym that hosted the Mayor's 8/30/17 town hall and not be retaliated against for doing so:

4.     *Elrod v Burns,* 427 US 347 (1976) includes the following finding about First Amendment rights that include the right to lawfully assemble in a public forum that includes a public resource fair meeting:

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

5. _Hansen v. Harris_, 619 F.2d 942 (2d Cir. 1980) includes the following relevant findings

about estoppel:

"The Government may sometimes be estopped from enforcing its rules, based on the conduct of its agents."

6. _Barboza v. D'Agata,_ 151 F. Supp. 3d 363 (S.D.N.Y. 2015) includes the following

relevant findings that confirms that people are permitted to use crude and offensive speech in the

context of complaining about government activity:

"The Court of Appeals found this was in the scope of protected speech because defendant's messages were crude and offensive but made in the context of complaining about government action on a telephone answering machine set up for the purpose, among others, of receiving complaints from the public. Mangano 571. That decision is on all fours with this case. It dealt with offensive language used to express to government employees dissatisfaction with government action"

7. The <u>following</u> excerpt from _Hopper v. City of Pasco_, 241 F.3d 1067 (9th Cir. 2001)

addresses standardless discretion at public forums:

"Courts have also been reluctant to accept policies based on subjective or overly general criteria. "`[S]tandards for inclusion and exclusion' in a limited public forum `must be unambiguous and definite' if the `concept of a designated public forum is to retain any vitality whatever.'" _Christ's Bride,_ 148 F.3d at 251 (quoting _Gregoire v. Centennial Sch. Distr.,_ 907 F.2d 1366, 1375 (3d Cir.1990)). Absent objective standards, government officials may use their discretion to interpret the policy as a pretext for censorship. _See Board of Educ. v. Mergens,_ 496 U.S. 226, 244-45, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (generalized definition of permissible content poses risk of arbitrary application); _Putnam Pit, Inc. v. City of Cookeville,_ 221 F.3d 834, 845-46 (6th Cir.2000) ("broad discretion [given] to city officials [raises] possibility of discriminatory application of the policy based on viewpoint"); _Cinevision Corp. v. City of Burbank,_ 745 F.2d at 560 (9th Cir.1984) (vague standard has "potential for abuse"); _Gregoire,_ 907 F.2d at 1374-75 ("virtually unlimited discretion" granted to city officials raises danger of arbitrary application); _see also City of Lakewood v. Plain Dealer Publ. Co.,_ 486 U.S. 750, 758-59, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (absence of express standards in licensing context raises dual threat of biased administration of policy and self-censorship by licensees). Therefore, "the more subjective the standard used, the more likely that the category will not meet the requirements of the first amendment." _Cinevision,_ 745 F.2d at 575; _see also Christ's Bride,_ 148 F.3d at 251 (suppression of speech under defective

standard requires closer scrutiny)."

8.    The long excerpt shown next from *Hershey v. Kansas City Kansas Community College,* *No. 2: 16-cv-2251-JTM (D. Kan. Feb. 17, 2017)* addresses both standardless discretion and municipal liability really well. What is particularly noteworthy about its findings is that it indicates that instance in which people are denied access to a public forum due to standardless discretion of government officials, a plaintiff doesn't need to show that he was discriminated against based on the content of his First Amendment expression.

As plaintiff points out, he has alleged that he was denied access to a public forum "for unstated reasons, in accordance with no policy, and at the absolute discretion of College officials." Dkt. 1, ¶ 50. He alleges that the College "has no policy to specify any standards by which College officials approve or deny requests," and that the College "vests absolute, standardless discretion in College officials" to allow or deny requests to use facilities for expressive activities. *Id.* ¶¶ 41, 42. Additionally, he alleges that the Board of Trustees and defendants Long and Wynn were acting as policymakers for the College at all relevant times. Finally, plaintiff has spelled out how a municipal policy or custom — in this instance, the *absence* of any standards governing exercise of discretion on requests to use College facilities — caused the deprivation of First Amendment rights alleged in the complaint.

Because plaintiff has alleged that access to the public forum is based on "standardless discretion" of College officials, he need not show that he was discriminated against based on the content of his materials. "A government regulation that allows arbitrary application is `inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Forsyth Cty., Ga. v. Nationalist Movement,* 505 U.S. 123, 130 (1992) (cite omitted). Government regulation of access to a public forum must have definite standards because "if the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of ... First Amendment freedoms is too great to be permitted." *Id.* at 131 (internal quotation marks and citations omitted); *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 649 (1981) (awarding space on a first-come, first-served basis "is not open to the kind of arbitrary application that this Court has condemned as inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.")

Plaintiff has also adequately alleged the existence of a municipal policy or custom giving rise to liability under 42 U.S.C. § 1983. A municipal policy may be shown by an informal custom amounting to a widespread practice that is so permanent and well settled as to

constitute a custom or usage. *See Bryson v. City of Okla. City,* 627 F.3d 784, 788 (10th Cir. 2010). To withstand a motion to dismiss on such a theory, a plaintiff must allege: 1) the existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the municipality's employees; 2) deliberate indifference to or tacit approval of such misconduct by the municipality's policymaking officials after notice to the officials of that particular misconduct; and 3) that the plaintiff was injured by virtue of the unconstitutional acts pursuant to the custom, with the custom being the "moving force" behind the acts. *Gates v. Unif. Sch. Dist. No. 449,* 996 F.2d 1035, 1041 (10th Cir. 1993). Viewed in the light most favorable to plaintiff, the complaint alleges the existence of a persistent custom of vesting absolute discretion in College officials to grant or deny access to the public forum, knowledge of and tacit approval of the impermissible practice by College policymakers, and injury to plaintiff caused by the custom. Defendants' motion to dismiss the claim against the College is therefore denied.

9.  *Regional Economic Community v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002)

includes the following finding that concerns proving discriminatory intent:

> "Discriminatory intent may be inferred from the totality of the circumstances, including ... the historical background of the decision ...; the specific sequence of events leading up to the challenged decision ...; [and] contemporary statements by members of the decisionmaking body"

10.  *Hammock v. Pierce*, No. 15-CV-09052 (NSR) (S.D.N.Y. May 7, 2018) contains the

following findings that addresses proving a retaliatory motive and is from a case that involved

seizure of personal property:

> "retaliatory motive may be inferred from a number of circumstantial factors, including, *inter alia, "(i)* the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter, and (iv) statements by the defendant concerning his motivation." *Burton v. Lynch,* 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)"

11.  According to *Jovanovic v. City of New York*, 04 Civ. 8437 (PAC) (S.D.N.Y. Aug. 17,

2006), "malice may be inferred from the lack of probable cause."

12.  In *Knight First Amendment Inst. Columbia v. Trump*, 928 F.3d 226 (2d Cir. 2019),  the

Second Circuit confirmed that government personnel may not bar people from public forums by

engaging in viewpoint discrimination.

13.     In *Matal v. Tam*, 137 S. Ct. 1744, 582 U.S., 198 L. Ed. 2d 366 (2017), the U.S. Supreme

Court issued the following critically relevant findings:

> "Giving offense is a viewpoint. The "public expression of ideas may not be prohibited
> merely because the ideas are themselves offensive to some of their hearers."

14.     The following is a pertinent excerpt from *Frain v. Baron*, 307 F. Supp. 27 (E.D.N.Y.

1969):

> "Fear of disorder, which the City cites to justify its policy, has been ruled out as a ground
> for limiting peaceful exercise of First Amendment rights. Edwards v. South Carolina, 372
> U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963)."

15.     The following is a relevant excerpt from *Capitol Records, Inc. v. Thomas-Rasset*, 692

F.3d 899 (8th Cir. 2012) that concerns having a court issue an order that restrains acts that may

otherwise be lawful due to a propensity and proclivity to commit unlawful conduct:

> "a district court has authority to issue a broad injunction in cases where "a proclivity for
> unlawful conduct has been shown." *See McComb v. Jacksonville Paper Co.,* 336 U.S.
> 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949). The district court is even permitted to
> "enjoin certain otherwise lawful conduct" where "the defendant's conduct has
> demonstrated that prohibiting only unlawful conduct would not effectively protect the
> plaintiff's rights against future encroachment." *Russian Media Grp., LLC v. Cable
> America, Inc.,* 598 F.3d 302, 307 (7th Cir.2010) (citing authorities). If a party has
> violated the governing statute, then a court may in appropriate circumstances enjoin
> conduct that allowed the prohibited actions to occur, even if that conduct "standing alone,
> would have been unassailable." *EEOC v. Wilson Metal Casket Co.,* 24 F.3d 836, 842 (6th
> Cir.1994) (internal quotation omitted)."

## BACKGROUND FACTS

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

forth herein.

2.      On 6/26/17, I talked with Defendant O'Neill at the New York City Bar Association in the

presence of various whistleblower news censors in journalism during a meeting in which he was

the primary speaker. Information about that meeting is available from the New York City Bar Association's web site at http://www.nycbar.org/media-listing/media/detail/a-conversation-with-new-york-city-police-commissioner-james-p-oneill. The audio recording of that meeting that the New York City Bar Association arranged to be recorded is available on the Internet at http://dts.podtrac.com/redirect.mp3/www2.nycbar.org/mp3/Podcasts/media/police_commissioner_audio_2017-06-26.mp3.

3.      The next screenshot is from a video recording that I recorded on 6/26/17 at 8:35 am at the New York City Bar Association that shows Defendant O'Neill in it as he stood at a podium with microphones that had the names of various New York City news outlets on them.



4.      The fact that no one reported anything in the news about what I discussed with Mr. O'Neill on 6/26/17 confirms that journalism and freedom of the press in New York City just doesn't exist and claims to the contrary are utter lies. That video that I recorded during that meeting confirms that the following so-called news outlets had some of their personnel present at that 6/26/17 meeting:

PIX11News, 1010 WINS, NBC, CBS New York, WCBS 880, and ABC News

5.      The video recording that I recorded of Mr. O'Neill during that meeting that I just

discussed is available on the Internet at the following address:

https://drive.google.com/file/d/1sofOzQmsQy_1_lkIglBTn9iZiGNwGNpL/view?usp=sharing

6.      During that meeting on 6/26/17, I had two face-to-face conversations with Mr. O'Neill.

My first conversation with him during that it extends from the elapsed time of **a)** 32 minutes and

38 seconds from the beginning of the audio recording that the New York City Bar Association

recorded of that meeting to **b)** 33 minutes and 36 seconds in that recording. My second

conversation with him during that meeting extends from the elapsed time of **a)** 47 minutes and 4

seconds from the beginning of that recording to **b)** 49 minutes and 14 seconds.

7.      The following is entirely true and accurate about what Mr. O'Neill and I discussed during

that meeting:

        a.  I told him that I was a military veteran and reminded him that he used the comment of

            "a free and open society" in a speech that he gave during that meeting. I then

            pointedly asked him why members of the NYPD who were inside of the Bronx

            Supreme Court on 5/23/17 illegally directed court officers assigned to that courthouse

            to prevent me from attending the public resource fair meeting that the Mayor

            conducted in that courthouse on that date inside of the Veteran's Memorial Hall

            chamber within it and while members of the NYPD have no jurisdiction in

            courthouses because jurisdiction for law-enforcement in New York State courthouses

            belongs to New York State court officers instead of the NYPD. When he responded

            to that by claiming that he wasn't aware of that situation, I told him that I had a video

            recording that confirmed what I had just apprised him about had occurred and that I

was willing to share that video recording with him if he so desired.

b. I asked him when members of the NYPD would stop violating civil rights by shoving military veterans as such veterans stood legally on empty public sidewalks while Mr. Redmond illegally discriminated against them by preventing them from attending public town hall meetings that the Mayor held. While asking him that question, I was referring to myself as such a military veteran who was illegally shoved and discriminated against as I referred to the public town hall meeting that the Mayor held on 4/27/17 in Long Island City in Queens. In response, Mr. O'Neill was blatantly evasive and deceitful by claiming that different issues applied to that question. When he asked what I was talking about in particular in regards to my question, I told him that I was talking about public meetings, New York State's Open Meetings Law, the U.S. Supreme Court decision that was issued in *Wood v. Moss*, 134 S. Ct. 2056, 572 U.S., 188 L. Ed. 2d 1039 (2014) that concerns viewpoint discrimination, and what was then Mr. Redmond's ongoing status as the primary defendant in *Sherrard v. City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018).

c. I also asked Mr. O'Neill about why Mr. Redmond was still being allowed to be a member of the NYPD since he was violating my civil rights after he had violated Mr. Sherrard's civil rights. Sherrard v. City of New York concerns an incident that occurred on 9/17/12 in which Mr. Redmond flagrantly violated Mr. Sherrard's constitutional rights on video before Mr. Redmond blatantly lied about that during a deposition on 5/19/17 and as he testified in that case in June of 2018. When Mr. O'Neill told me during that meeting that he would need to talk with Mr. Redmond about what I discussed with him (Mr. O'Neill) during it and that he wasn't aware of

*Sherrard v. City of New York*, as he left that meeting, I offered to give him a printout

that I had with me and that contained information shown on its docket sheet that

listed the case number for *Sherrard v. City of New York* and other information about

that case. I believe that I handed that information instead to NYPD Detective James

Byrne as he escorted Mr. O'Neill out of that meeting and gave me his business card

then that appears as follows:



**NEW YORK CITY**
**POLICE DEPARTMENT**
D.C.P.I.

**James T. Byrne**
Detective

Office of the Deputy Commissioner,
Public Information
One Police Plaza, Room 1320
New York, N.Y. 10038

Office: 646.610.6700
Cell: 646.574.1217
jamest.byrne@nypd.org
@NYPDByrne

8.      A critically significant point about my conversation with Mr. O'Neill on 6/26/17 is that I

clearly put him on notice then that members of the Mayor's NYPD security detail were violating

my civil rights at public forums that the Mayor had been conducting and that Mr. O'Neill told

me in response that he would need to talk with Mr. Redmond about what I then discussed with

him about Mr. Redmond. As the NYPD's Commissioner, he certainly had the authority to issue a

standing order to Mr. Redmond to make certain that he and the rest of the Mayor's NYPD

security detail immediately stop violating the civil rights of New Yorkers at public forums.

Hindsight clearly confirms that Mr. O'Neill either didn't issue such an order or that such an

order was violated at my expense repeatedly and flagrantly thereafter by Mr. Redmond and other

members of the Mayor's NYPD security detail and others. On 4/27/17, Mr. Redmond told me at the site of the Mayor's town hall then that he reported to Mr. O'Neill. The preceding discussion is sufficient to establish that this Court's determinations about claims that I am asserting against Mr. O'Neill in this pleading for supervisory liability must be in my favor because additional illegal acts and omissions were committed against me in violation of my civil rights by Mr. Redmond and other members of the Mayor's NYPD security detail after 6/26/17 at public forums that Mr. O'Neill certainly had a realistic opportunity to prevent from occurring.

9.     The following relevant facts apply to what I discussed with Mr. O'Neill during that meeting:

   a.  I later discovered from a written transcript and video recording that the New York City Law Department provided to me that concerned *Sherrard v. City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018) that Mr. Redmond committed perjury on 5/19/17 during a sworn deposition that he gave as he lied about a critically significant fact. The next screenshot shows the questions that were asked and the responses to them that were given that appear between lines 11 and 17 that appear on page 20 within the written transcript that was prepared from the deposition that Defendant Redmond gave on 5/19/17 in connection with *Sherrard v. City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018). That transcript was provided to me by the New York City Law Department in response to a FOIL demand that I submitted to it and is available on the Internet at https://drive.google.com/open?id=12ATFhN0RVkrvlTjpINTPet57K1D4poiz. The answers shown on lines 13, 14, and 17 in that screenshot were answers that Defendant Redmond gave to the questions that are shown in it.

```
11        Q      The question is, why did you stop at
12   that location?
13        A      Because I was blocked by
14   bicyclists.
15        Q      And was Mr. Sherrard any of those
16   bicyclists that were blocking you?
17        A      Yes.
```

b. The New York City Law Department also provided me a critically significant video

recording that is available on the Internet at

https://drive.google.com/open?id=13dteIym5B27WAHrR2b_vrb68X8IDT_Ye in

response to a FOIL demand that I submitted to it that was recorded on 9/17/12 in

Manhattan on Lafayette Street by Leonard Street as Mr. Redmond recklessly drove a

black car with just one hand on its steering wheel in the middle of the roadway in the

direction of New York City Hall by the New York City Civil Court and New York

City Family Court. That video recording was presumably recorded by a member of

the NYPD who with Mr. Redmond and other members of the NYPD were stalking

Kalan Sherrard and other bicyclists. Kalan Sherrard was the plaintiff in *Sherrard v.*

*City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018). The next

screenshot corresponds to what appears in the video that I just discussed at the

elapsed time of 10 seconds and confirms that **a)** Mr. Redmond was reckless driving a

black car with left hand off of its steering wheel in **the middle** of a roadway and **b)**

Mr. Sherrard was lawfully riding a bicycle on the **far-left** side of that roadway ahead

of 4 other bicyclists shown on the left as he appears in the top-left corner in that

screenshot. At that point, the distance between Mr. Redmond's car and the back of

Mr. Sherrard's bicycle clearly exceeded the lengths of 2 cars that appear on the right side of that road as Mr. Sherrard rode his bike directly next to the right of an area in which construction or renovation work was being done and may have endangered his safety as a bicyclists because of debris that may have possibly been in a bicycle lane that he was not required by law to use then. The fact that the sidewalk next to that bicycle lane was closed then because of construction or renovation work suggests that Mr. Sherrard was being courteous to pedestrians by letting them use that bicycle lane to offset the closure of that sidewalk.



c. The next screenshot is from that same video and corresponds to the elapsed time of 18 seconds. The following is shown in it:

    i. Mr. Redmond is shown in the lower-right area as he exited his car with a radio in his left hand.

    ii. Mr. Sherrard is shown sitting on his bicycle while illegally stopped by 2

members of the NYPD on scooters or motorcycles in violation of his constitutional rights. The tires on those scooters or motorcycles were clearly wider than the tires on Mr. Sherrard's bicycle. This is relevant because thin tires on bicycles don't withstand coming in contact with debris on roadways as well as wider and thicker tires. One of the members of the NYPD who illegally stopped Mr. Sherrard drove through the bicycle lane on wide and thick tires to reach him. Also, this screenshot more clearly confirms by the existence of orange netting and barriers next to that bicycle lane that construction or renovation work was then taking place near it.



d.  The next screenshot is from having enlarged the playback of DOE's 4/27/17 video and corresponds to what appears in it at 7:26:43.072 pm on 4/27/17 that corresponds to the elapsed time of 56 minutes and 56 seconds. Defendant Redmond is shown using his right hand to illegally make physical contact with the left side of my body in

that video to add insult to injury to the fact that he was then already illegally preventing me from attending the Mayor's 4/27/17 town hall.



10.     While then working for the Mayor's office on 6/28/17 and engaging in a criminal cover-up of illegal acts and omissions that were committed against me on and after 4/27/17 at public town hall and public resource fair meetings that the Mayor conducted with other government personnel and the public, New York State Senator referred to Defendant Redmond in the next screenshot that shows an e-mail message that she sent about me and town hall meetings on 6/28/17 at 3:27 pm to a whistleblower news censor in journalism named Erin Durkin. Ms. Ramos committed defamation against me in that e-mail message as she lied to Ms. Durkin about me by

fraudulently claiming that I **a)** never RSVP'd to a town hall (totally false), **b)** threatened New York City Human Resources Administration Commissioner Steven Banks (totally false), **c)** made a physical threat (totally false), **d)** made several threats against other members of the Mayor's NYPD security detail (totally false). Ms. Ramos, however, wasn't a complete liar in her remarks about me in that e-mail message because she confirmed that Defendant Redmond touched my arm while talking with me. That occurred on 4/27/17 as I just discussed and showed above. There was absolutely no legal justification for that physical contact and since the NYPD is as trashy as Ms. Ramos, I understandably hate being touched by members of the NYPD.

**From:** Ramos, Jessica
**Sent:** Wednesday, June 28, 2017 3:27 PM
**To:** Erin Durkin
**Cc:** Phillips, Eric
**Subject:** RE: town halls

Hi Erin,

Mr. Komatsu has never RSVP'd to a town hall. He is allowed to enter the overflow room.

Security detail first learned he's threatened Commissioner Steve Banks at the LIC town hall. When approached, Mr. Komatsu made a physical threat against a member of the security detail after one of them lightly touched his arm while speaking. This threat was officially investigated by the NYPD. He has also made several threats against other members of the security detail.

Jessica

11.     The following are relevant excerpts from _Wright v. Musanti_, No. 14-cv-8976 (KBF) (S.D.N.Y. Jan. 20, 2017) that confirm that **a)** an initial aggressor between two people is responsible for all subsequent hostilities that occur between them and **b)** physical contact that is regarded as offensive by the person against whom it is made by another person constitutes assault under New York law:

a. "defendant served as the initial aggressor at the outset of the encounter, rendering her liable to plaintiff for all ensuing assaults and batteries. Cf. <u>People v. Grady, 838 N.Y.S.2d 207, 212 (3d Dep't 2007)</u>"

b. "whether the altercation is viewed as one or several encounters, the Court finds the evidence overwhelming that defendant served as the initial aggressor."

c. "Under New York law, "`[a]n `assault' is an intentional placing of another person in fear of imminent or offensive contact.'""

d. "The plaintiff must show that the defendant intended `either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact.'"

e. "Although a plaintiff "need not prove actual contact, she must allege some physical menace against her body.'""

12. On 7/2/16, I was viciously assaulted by my former roommate where I reside by being punched on my head more than 15 times in the area of my left temple. That occurred following an attempted assault by him on 5/12/16 in the same exact location where he assaulted me on 7/2/16. That attempted assault and actual assault would never have happened if not for HRA and the slumlord of the building in which I reside having not subjected me to an illegal bait-and-switch fraud and forgery concerning a binding and fully-enforceable apartment lease agreement that I signed on 2/16/16 in HRA's offices located at 33 Beaver Street in Manhattan to be issued sole possession of apartment 4C in the building in which I reside without any roommate and in a fully-furnished condition shortly thereafter. HRA thereafter illegally altered my lease within 2 days after I signed it and Urban acted in concert with HRA in doing so. As a result, I was issued a shared apartment on or about 3/7/16 in the building in which with a mentally unstable roommate that I knew was a time bomb on 5/12/16 and exploded at me on 7/2/16 after I had demanded his immediate eviction on 5/12/16 in response to him having tried to assault me on that date in our apartment. My demand for his eviction was refused and I was served his punches instead with a concussion

that sprung from it. This discussion is relevant because I fully intended to engage in protected whistleblowing about this subject during the Mayor's 8/30/17 town hall at the expense of HRA, Urban Pathways, Inc. (the slumlord of the building in which I reside), NYPD, and others as well as whistleblowing about a large array of other subjects that were also of public concern and protected speech. The NYPD unconscionably released my former roommate on the same date (7/11/16) that it arrested him for having assaulted me in spite of the fact that a member of the NYPD's 48th precinct told me on 7/2/16 and less than 30 minutes after that assault ended that she saw a visible head injury that I sustained from that assault. The following excerpts from *Piesco v. City of New York, Dept. of Personnel*, 933 F.2d 1149 (2d Cir. 1991) confirm that the sum and substance of whistleblowing that I sought to lawfully engage in while attending the Mayor's 8/30/17 town hall were of public concern and protected speech partly because it would have otherwise been about the competency of members of the NYPD:

a. "Since the police officer represents the most basic unit of government, one which arguably most affects the day-to-day lives of the citizenry, Dr. Piesco's testimony concerning the competency required to become a police officer clearly is a matter of public concern."

b. "The Supreme Court has recognized that one of the critical purposes of the first amendment is to provide society with a basis to make informed decisions about the government. *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964).

"Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated*, and all such matters relating to political processes."

c. "the first amendment guarantees that debate on public issues is "`uninhibited, robust, and wide open'""

d. "speech on matters of public concern is that speech which lies `at the heart of the First

Amendment's protection"

13.    The following is a link to a video recording that I recorded at 7:27 pm on 4/27/17 at the site of the Mayor's 4/27/17 town hall by the entrance to the school that hosted it and shows Defendant Redmond as he was illegally preventing me from entering that school by using a metal barricade and the positioning of his body for that purpose:

https://drive.google.com/open?id=1rcpbI2ePp7r2k2fzFgp-zAHBGq8nE_J9

14.    The following screenshot is from that video that lasts just 2 seconds and clearly confirms what I just stated as Defendant Redmond demonstrated his incompetency a police officer and those who were near him then did the same by illegally doing nothing to intervene on my behalf against him to enable me to exercise my constitutional right to attend the Mayor's 4/27/17 town hall:



15.    The next screenshot is from DOE's 4/27/17 video and corresponds to what appears in it

at 7:27:24.922 pm on 4/27/17 that corresponds to the elapsed time of 57 minutes and 39 seconds. Defendant Redmond is shown illegally preventing me from entering that school by continuing to use a metal barricade and the positioning of his body for that purpose. What is even more alarming is the number of law-enforcement personnel who were then in that immediate vicinity who certainly aware that was occurring and illegally did nothing to try to intervene on my behalf against Mr. Redmond in violation of their Fourteenth Amendment affirmative legal duty to intervene on my behalf in response to violations of my constitutional rights occurring in their presence. Defendants Berkowitz, Cruz, and Lance are among the law-enforcement personnel shown in that screenshot.



16.    To add insult to injury, NYPD Officer Rafael Beato criminally assaulted me on that same

date roughly 3 hours after I talked with Mr. Redmond as Mr. Beato committed assault and battery against me by shoving me without cause on my chest 3 times as I lawfully stood on an nearly empty public sidewalk that is adjacent to the school in which that town hall was conducted. He did so toward the end of that town hall and after I saw Defendant Nieves appear to direct him to approach where I stood as Mr. Nieves stood by an exit to that school located in its rear. No legal justification existed for me to comply with coercion by Mr. Beato that was designed to have me move from where I then stood on that nearly empty public sidewalk that is a traditional public forum. However, Mr. Beato criminally assaulted me then anyway. Mr. Nieves quickly came to where Mr. Beato and I were then with another member of the Mayor's NYPD security detail named Raymond Gerola as they joined with Mr. Beato and another member of the NYPD named Yu Li. As all of us were then on that public sidewalk, the 4 of them illegally positioned their bodies very closely around me to form a blockade that illegally prevented me from moving back to where I originally stood on that public sidewalk before Mr. Beato shoved me. Their actions against me then also illegally prevented me from having a line of sight to the Mayor as he left that town hall and crossed that sidewalk to allow me to lawfully call out to him from a sufficient distance away and try to have a conversation with him about the fact that I had been and otherwise continued to be illegally **a)** assaulted on that sidewalk by Mr. Beato, **b**) subjected to illegal detention by Mr. Beato, Mr. Li, Mr. Nieves, and Mr. Gerola by virtue of their blockade, and **c**) illegally prevented from attending his 4/27/17 town hall in flagrant violation partly of my constitutional right of access to a public forum.

17.      On a related note, I received critically significant information about a related matter that I discussed with Defendant O'Neill on 6/26/17 on at 9:32 am on 8/28/20 from an attorney named Shawn Kerby. She works for OCA in a role that involves responding to FOIL demands that are

submitted to OCA. The e-mail message that I received from her then was in response to a FOIL

demand that I submitted to OCA on 8/26/20 to obtain copies of all "Unusual Occurrence

Reports" that were completed by New York State court officers in response to my presence on

5/23/17 inside of the Bronx Supreme Court. The following is the text that appears in the

"Details" section of the Unusual Occurrence Report that was assigned the identification number

of 75089:

> "AT ABOVE T/P/O, THE ABOVE UNKNOWN **SUBJECT WAS DENIED
> ENTRY INTO A CITY HALL EVENT BEING HELD IN THE ROTUNDA BY
> CITY HALL STAFF AND MAYOR DEBLASIO'S NYPD DETAIL**. SUBJECT
> WAS ASKED TO VACATE THE AREA HE WAS STANDING IN BECAUSE HE
> WAS BLOCKING PEDESTRIAN TRAFFIC TO BOTH THE EVENT IN THE
> ROTUNDA AND ACCESS TO THE PUBLIC ELEVATORS. AFTER SOME
> RESISTANCE TO THIS REQUEST, SUBJECT DID COMPLY BUT MOVED
> INTO A MAGNETOMETER PROCESSING AREA. SUBJECT WAS ASKED TO
> MOVE FROM THIS AREA, AND ONCE AGAIN COMPLIED AFTER SOME
> INITIAL RESISTANCE."

> (boldface formatting added for emphasis)

18.     That report was submitted on 5/24/17 by New York State court officer Anthony Manzi

(shield # 182) to New York State court officer Ostacio Negron and indicated that New York

State court officers Ramon Dominguez (shield # 508) and Matthew Brunner (shield # 478) were

witnesses about the information it contained. Mr. Manzi holds the rank of "captain" as a court

officer and Mr. Negron holds the rank of "major" as a court officer. Mr. Dominguez and Mr.

Brunner both hold the ranks of "sergeant" as court officers.

19.     The next screenshot from that report is from the top of it and confirms that the nature of

the unusual occurrence that prompted Mr. Manzi to submit that report was because I was

illegally denied access to the Mayor's 5/23/17 resource fair meeting by members of the Mayor's

NYPD security detail on 5/23/17 inside of the Bronx Supreme Court after I had registered in

advance to attend that public forum. The members of the Mayor's NYPD security detail who

were personally involved in having illegally denied me access to the Mayor's 5/23/17 resource fair included Defendants Nieves and Berkowitz as they conspired and maliciously acted in concert with Mr. Manzi, Mr Brunner, Mr. Dominguez, NYPD Detective Raymond Gerola, and Rachel Atcheson to do so.

| DATE OF OCCUR. | TIME | COURT/FACILITY | PLACE OF OCCURRENCE | UNUSUAL NUMBER | | |
|---|---|---|---|---|---|---|
| | | | | LOC. CODE | REP. NO | YEAR |
| 05/23/2017 | 0950 | BRONX SUPREME COURT - GRAND CONCOURSE | MAGNETOMETER POST D | G | 75089 | 2017 |

**NATURE OF UNUSUAL OCCURRENCE**

| | | |
|---|---|---|
| ☐ ARREST | ☐ ATTEMPTED ESCAPE | ☐ BOMB THREAT |
| ☐ DISRUPTIVE PRISONER | ☐ DISRUPTIVE SPECTATOR | ☐ JUDICIAL THREAT |
| ☐ PRISONER ESCAPE | ☐ PROPERTY DAMAGE | ☐ PROPERTY THEFT |
| ☐ REPORT OF CRIME | ☐ SUMMONS | ☒ OTHER (SPECIFY BELOW) |
| | | *DENIED ENTRY* |

20.     The next screenshot is from a video recording that is available on the Internet at

https://drive.google.com/open?id=18oedUwVNFHKhTASxTFeUDm0HFGPO7ztB that I recorded with my cell phone on 5/23/17 at 9:40 am of Mr. Nieves, Mr. Gerola, Mr. Berkowitz, Mr. Brunner, and Mr. Dominguez as Mr. Dominguez left a meeting that they were conducting in front of Room 105 inside of the Bronx Supreme Court near where I had talked with a whistleblower news censor in journalism named Michael Gartland about the fact that I was being illegally prevented from attending the Mayor's 5/23/17 resource fair at the same time that I had ongoing litigation against HRA. Mr. Dominguez, Mr. Nieves, Mr. Berkowitz, Mr. Gerola, and Mr. Brunner appear from left to right in this screenshot.



21.     The next screenshot is from the elapsed time of 16 seconds in that same video and how

Mr. Nieves, Mr. Gerola, Mr. Brunner, and Mr. Berkowitz from left to right..



22.    The next screenshot is from a video recording that is available on the Internet at

https://drive.google.com/open?id=18oedUwVNFHKhTASxTFeUDm0HFGPO7ztB that I

recorded with my cell phone on 5/23/17 at 9:40 am of Mr. Nieves, Mr. Gerola, Mr. Berkowitz,

Mr. Brunner, and Mr. Dominguez as Mr. Dominguez left a meeting that they were conducting in

front of Room 105 inside of the Bronx Supreme Court near where I had talked with a

whistleblower news censor in journalism named Michael Gartland about the fact that I was being

illegally prevented from attending the Mayor's 5/23/17 resource fair at the same time that I had

ongoing litigation against HRA. Mr. Dominguez, Mr. Nieves, Mr. Berkowitz, Mr. Gerola, and

Mr. Brunner appear from left to right in this screenshot.

23.    The following is a link to a video recording that was recorded on 5/23/17 by a video

security camera OCA controls that was then installed above Room 105 on the first floor of the Bronx Supreme Court:

https://drive.google.com/open?id=1FgV971te1pEeMq41KaBNw27slVTiOeYJ

24.     I received that video from OCA in response to a FOIL demand that I submitted to it.

25.     The next screenshot reflects what appears in that video at 9:49:11.163 am and the elapsed time of 49 minutes and 14 seconds. Mr. Manzi, Jeff Lynch of the Mayor's Office, Mr. Dominguez, and Mr. Brunner are shown in this screenshot with an unknown female member of the NYPD (shown on the right and wearing a blue shirt) along with me.



26.     The preceding screenshot shows me as I lawfully and assertively used my right hand to seize back from Mr. Manzi a large white bag that belonged to me and contained legal filings of mine from what was then a sealed and ongoing lawsuit against HRA in which I was the plaintiff. I had to do so after Mr. Manzi illegally seized that bag from me like an ordinary street thug in plain view of Mr. Brunner, Mr. Dominguez, and the unknown female member of the NYPD. All of them had a legal duty to immediately intervene on my behalf against Mr. Manzi and instead

illegally made no effort to do so. Mr. Manzi was clearly then working with the Mayor's NYPD security detail in furtherance of an illegal scheme to try to coerce me to be further away from the entrance to the chamber in that courthouse that hosted the Mayor's 5/23/17 resource fair than I was in flagrant violation of my constitutional rights. That was particularly atrocious because I was then in that courthouse to try to talk with HRA Commissioner Steven Banks and engage in protected whistleblowing against HRA while doing so while attending the Mayor's 5/23/17 resource fair. I sought for that conversation to be partly about my lawsuit against HRA after New York State Supreme Court Judge Nancy Bannon signed an order to show cause application on 5/22/17 that I filed in it on 5/19/17. I also intended to attend the Mayor's 5/23/17 resource fair meeting to engage in protected whistleblowing against Defendants Redmond, Nieves, and others in response to the crimes (such as 18 U.S.C. §245(b)(5)) and civil rights abuse that they and others illegally committed and condoned against me on 4/27/17 at the site of the Mayor's 4/27/17 town hall and were committing against me on 5/23/17 inside of that courthouse.

27.     The next screenshot reflects what appears in the video recording that I just discussed and received from OCA at 9:37:31.553 am and the elapsed time of 37 minutes and 34 seconds. In that screenshot, Defendant Nieves is shown violating the Handschu Agreement by briefly spying on the interactions that I was then having with Mr. Gartland as a whistleblower against Mr. Nieves and other members of the Mayor's NYPD security detail, HRA, members of the Mayor's CAU, and more. There is no other plausible reason for why Mr. Nieves turned his head so sharply to his left to have then looked in my direction than the fact that he was then spying on me in conjunction with illegally subjecting me to an abuse of process and selective-enforcement that were in flagrant violation of my due process rights and designed to illegally prevent me from attending the Mayor's 5/23/17 resource fair and otherwise closely monitor my movements and

other lawful activities in that courthouse as I was being illegally prevented from attending that public forum.



28.     On 6/21/17, Defendant Nieves was recorded on video as he stood in front of the building that hosted the town hall meeting that the Mayor conducted in Chinatown in Manhattan and illegally harassed an Asian woman as she was trying to lawfully attend that town hall with literature that she had. That video recording clearly shows Defendant Nieves illegally confiscating literature from her in violation of her First Amendment and Fifth Amendment rights. That video is available on the Internet at https://www.youtube.com/watch?v=KRur-_QvbC0. What follows are a few screenshots from it. The next screenshot shows Mr. Nieves giving that woman a hand signal to have her step toward him at the elapsed time of 32 seconds.



29.     The next screenshot shows that Asian woman standing near Mr. Nieves at the elapsed

time of 35 seconds as what clearly appears to be a press credential hung from her neck.



30.     The next screenshot shows that Asian woman standing near Mr. Nieves at the elapsed time of 1 minute and 6 seconds as she held papers that she had been carrying prior to meeting Mr. Nieves as he also then had his hands on those papers after she met him. She is shown standing next to Jane Meyer of the Mayor's office who was then looking at those papers.



31.     The next screenshot shows Mr. Nieves at the elapsed time of 1 minute and 9 seconds as he carried that Asian woman's papers after she left his wretched company



32.     On 6/23/17, a news organization named DNAInfo published a news article on the Internet at https://www.dnainfo.com/new-york/20170623/lower-east-side/mayor-de-blasio-town-hallmargaret- chin-aaron-foldenauer that is entitled "Security Swiped Political Pamphlets at Mayor's Town Hall, Attendees Say" and was written by a journalist named Allegra Hobbs. That article addressed the fact that multiple people who tried to attend the town hall meeting that the Mayor conducted on 6/21/17 in Chinatown in Manhattan had literature illegally confiscated by members of the NYPD as they underwent a security screening process to enter the building that hosted that town hall.

33.     On 7/18/17, I was recorded on video during the public resource fair meeting that the Mayor conducted in Kew Gardens in Queens with other government officials as I talked with the Mayor face-to-face. That conversation occurred as I stood near Mr. Banks, Jessica Ramos, and in front of a whistleblower news censor in journalism named Gloria Pazmino as well as Mr. Gartland. Although the Mayor's office arranged to have a video recording to be recorded of that public resource fair and that video recording certainly is a public record, the Mayor's office has illegally concealed that video recording. It was only because I submitted a FOIL demand to the Mayor's office that it provided me a link to that video recording on the Internet prior to illegally removing that video recording from the Internet or otherwise disabling access to it. Prior to doing so, I downloaded a short clip from that video. The following is a link to that video clip on the Internet:

        https://drive.google.com/open?id=1-ZUN22r8q4qARLEbMk8FVg4KuLqfTtcc

34.     Everything that I talked with the Mayor and Mr. Banks during that meeting were matters about which I intended to engage in protected whistleblowing against them and others about. The next screenshot is from the elapsed time of 1 minute and 31 seconds in that video and pertains to

a discussion that I had with the Mayor that was about having him cancel the City of New York's business that taxpayers pay for that is with a company named NTT Data, Inc. ("NTT") that still subjects me to illegal wage-theft, fraud, and retaliatory employment blacklisting that dates back to 2012. Instead of cancelling that business, the Mayor's administration has unconscionably opted to extend it that keeps too much money in the wrong hands as people are now mightily struggling to make ends meet in New York City due to the Coronavirus pandemic and shouldn't have to support businesses that commit wage-theft. HRA has contracts with NTT.



35.     The next screenshot from that video corresponds to the elapsed time of 1 minute and 4 seconds in it as I asked the Mayor a question in a poorly phrased way as I meant to ask him if her could direct Mr. Banks to resolve my litigation against HRA in some way that was fair. The Mayor instead stonewalled me as he told me that his administration has a lot of litigation and "that is how we do things". That answer confirmed to me that he and his administration needed to be fired immediately.



36.     The next screenshot from that video corresponds to the elapsed time of 1 minute and 57 seconds in it as I apprised the Mayor that Defendant Redmond illegally prevented me from attending his 4/27/17 town hall meeting and that he was also then defending a federal civil rights lawsuit.  In response, he claimed that he didn't' know anything about that and that he wouldn't talk with me further about lawsuits. That response further confirmed to me that he and his

administration needed to be fired immediately. I was then referring to _Sherrard v. City of New York_. Also, Defendant Juanita Holmes stood nearby in an area to my left as I talked with the Mayor about that.



37.     The next screenshot from that video corresponds to the elapsed time of 2 minute and 10 seconds and clearly shows both the Mayor and an unknown Black male member of his NYPD security detail harassing me and subjecting me to what is known as "simple assault" under applicable law. It shows this as a result of it showing that the Mayor tried to illegally reach over toward me and touch me near my right shoulder as the Black male member of his NYPD security detail put his right hand on my backpack before illegally pushing me away. That push was

assault. Neither of them gave me a reasonable opportunity to first leave their wretched company

without being illegally coerced by them to do so. The Mayor's illegal acts against me then

confirmed that he supports and condones illegal acts by the NYPD. During that meeting, I also

handed him a report again that I previously handed to him on 7/16/17 in Clement Clarke Moore

Park in the Chelsea district in Manhattan in front of Mr. Gartland and other whistleblower news

censors in journalism. That report contained screenshots from video recordings that summarized

illegal acts and omissions that were committed against me partly by members of his NYPD

security detail since 4/27/17 at public forums that he conducted. The Mayor lied to my face on

7/16/17 in that park by fraudulently telling me that he supports civil rights and military veterans

in response to questions that I then asked him about that to put him on the spot in front of

whistleblower news censors in journalism.



38.     The following is a link to the video recording on the Internet that the Mayor's office

arranged to be recorded of the Mayor's 7/25/17 publicity stunt publicity stunt that the Mayor

illegally conducted next to a staircase on 7/25/17 inside of the MTA subway station located in Manhattan below Broadway near City Hall by Warren Street:

 https://www.youtube.com/watch?v=Hq2Q4tPrN2A

39.     On 7/25/17, Mr. Redmond flagrantly and illegally violated my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment in retaliation for my having lawfully engaged in protected whistleblowing activity in the immediate vicinity of a large group of whistleblower news censors in journalists, the Mayor, members of the Mayor's staff, and members of the public inside of the subway station that I have discussed above.

40.     The next screenshot was created from what is shown at the elapsed time of 10 minutes and 18 seconds in the video that I just discussed.



41.     The preceding screenshot shows Mr. Redmond flagrantly assaulting me behind a metal partition near the Mayor and Eric Phillips while Mr. Phillips worked a mouthpiece for the Mayor.

Mr. Redmond assaulted me then by illegally grabbing my left arm and dragging me by it along the subway platform where I had been standing as I was lawfully conducting myself while engaging in whistleblowing near and against the Mayor, his administration, and its business partners. I did so then within earshot of many whistleblower news censors in journalism that quite fittingly were assembled together like rats and snakes. Mr. Redmond's assault against me then occurred behind the vertical metal partition shown in that screenshot. By deliberately making physical contact with me and dragging me in that subway station on 7/25/17, Mr. Redmond violated 18 U.S.C. 245(b)(5), NYPL §240.26, NYPL §240.20, and NYPL §195.00 in the process of causing irreparable harm to my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and the MTA's Rules of Conduct to continue to lawfully engage in protected whistleblowing near the Mayor from where I had been standing on that subway platform. The MTA's Rules clearly prohibited the Mayor from conducting his publicity stunt in that subway station because it was conducted next to a staircase, involved the use of a microphone, and impeded the movements of those in that subway station. Those same MTA Rules authorize public speaking in subway stations however and that is exactly what I was doing when Defendant Redmond illegally seized my left arm and criminally assaulted me by doing so. By doing so then and so publicly, he caused me enormous embarrassment and justifiable rage. Upon leaving that subway station, I received an unexpected telephone call from a civil rights attorney named Norman Siegel. He immediately told me during that call that I had a legal right to scream and shout in that subway station. In response, I told him that I hadn't done so and had instead merely projected my voice with my lungs in that subway station. I did so then to compete against the Mayor's use of a microphone during his illegal publicity stunt and noise from subway trains.

42.     It stands to reason that if I had been permitted to attend the Mayor's 8/30/17 town hall for its duration from within the room in which it was conducted, I could have possibly beaten a

leader named David Rem to the punch by properly pointing out to the Mayor during that 8/30/17 town hall while in full view of everyone who attended it and watched the video recording that the Mayor's office arranged to be recorded of it that was broadcast live over the Internet that Bill de Blasio was New York City's worst Mayor ever prior to immediately exercising the full extent of my legal self-defense rights if someone initiated physical contact with me that I wouldn't like in response to and retaliation for that truthful remark.

43.    Mr. Rem brilliantly told the Mayor that he was New York City's worst Mayor ever on 2/19/20 during the town hall meeting that the Mayor conducted in Forest Hills in Queens while that public forum was recorded on video as a result of arrangements that the Mayor's office made. That video is available on the Internet at https://www.youtube.com/watch?v=5le6DCaxiG8. Mr. Rem certainly demonstrated leadership by assassinating the Mayor's character that is an entirely lawful activity. He did so by reminding the Mayor that he was the worst Mayor ever at the elapsed time of 1 hour, 37 minutes, and 55 seconds in that video. The next screenshot is from the elapsed time of 1 hour, 37 minutes, and 58 seconds in that video and shows Mr. Rem as he pointed at the Mayor while he finished that particular outstanding criticism and received well-deserved applause from someone who stood up from his seat to pay respect to Mr. Rem for his leadership and outspokenness by taking off the gloves and showing the Mayor up in such a refreshing way during that public forum. This proves that the finding in _Cohen v. California_, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) that states that "it is nevertheless often true that one man's vulgarity is another's lyric" is true during public forums that the Mayor conducts.



44.     The next screenshot is from the elapsed time of 1 hour, 38 minutes, and 25 seconds in that video and shows Defendant Redmond near the center as he exhibited an irritated facial expression and was about to illegally coerce Mr. Rem with others to leave that town hall in retaliation for Mr. Rem's protected First Amendment speech against the Mayor for the sake of optics and protecting the Mayor's reputation.



45.     How vocal Mr. Rem was in his remarks to the Mayor during that 2/19/20 town hall

confirms that I had a Fourteenth Amendment due process and equal protection right that is

applicable to similarly-circumstanced people to be just as vocal and perhaps offensive to some

that could possibly be welcome by others as him on 8/30/17 while I attending the Mayor's

8/30/17 town hall and interacted with government personnel while doing so.


## STATEMENT OF FACTS

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

    forth herein.

2.     The following shows an e-mail message that I sent on 8/27/17 at 9:40 pm to RSVP for

the Mayor's 8/30/17 town hall:

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** RSVP for 8/30/17 public Town Hall meeting with New York City's Mayor
> **Date:** August 27, 2017 at 9:40:17 PM EDT
> **To:** townhallrsvp@cityhall.nyc.gov
>
> My name is Towaki Komatsu
>
> This e-mail serves as my RSVP for the 8/30/17 public Town Hall meeting New York
> City's Mayor will hold.
>
> Pursuant to New York State's Open Meetings Law, I have a legal right to attend that
> public town hall meeting.
>
> Any attempt to hinder my ability to attend it will constitute a violation of both that law
> and the federal criminal statute that concerns obstruction of justice, specifically 18 U.S.C.
> 1512.
>
> Any such attempt to hinder my ability to attend that public meeting will be severely dealt
> with from a legal standpoint.

3.     Prior to trying to attend the Mayor's 8/30/17 town hall in Brooklyn, I attended a public

meeting that the Mayor conducted in Manhattan on 8/30/17 that was about reforms for tenants. Defendant Pfeffer was at that meeting and no problem occurred that involved me during that meeting. I recorded video recordings during that meeting that confirm my presence at that meeting. This is important because it establishes that I proved that I was in relatively close proximity to the Mayor on that date without causing a disruption. In fact, I mostly ignored the Mayor during that meeting.

4.    Long after the Mayor's 8/30/17 town hall, I sent an e-mail message to Mr. Banks, HRA's General Counsel (Martha Calhoun), and HRA's Deputy General Counsel (Ann Marie Scalia) on 8/3/20 at 1:27 pm on behalf of a disabled and elderly military veteran named Robert Vargas who was then living in the building in which I reside. Prior to that date, I had a conversation with Mr. Vargas on 8/2/20 that I recorded part of on audio as he told me that he urgently needed to have an air conditioner to be installed in his apartment and that he was gravely concerned about how his health would continue to suffer if he continued to be deprived of an air conditioner in his apartment. The building in which I reside is publicly-subsidized housing for military veterans. A contract exists between HRA and Urban that allows Urban to be that landlord. HRA provided me that contract in response to a FOIL demand that I submitted to it. That contract allows HRA to fire Urban as the landlord of the building in which I reside in less than 90 days and charge Urban for additional costs that the City of New York incurs to do so. The following shows the e-mail message that I sent to Mr. Banks and others on 8/3/20 at 1:27 pm:

> **From:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Question about helping a disabled military veteran in my building
> **Date:** August 3, 2020 at 1:27:32 PM EDT
> **To:** "Scalia, Ann Marie" <scaliaa@dss.nyc.gov>
> **Cc:** "banksst@dss.nyc.gov" <banksst@dss.nyc.gov>, "Calhoun, Martha" <calhounm@dss.nyc.gov>
>
> Ms. Scalia,

I'm sending you this to find out what you, Mr. Banks, and HRA is willing to do to help the disabled military veteran who lives in apartment 1D in the building in which I reside who needs an air conditioner to be installed in his living room.

He told me yesterday that Urban Pathways, Inc.'s personnel told him that though it has an air conditioner to install that is located in the basement of that building, it will take 2 weeks from when he was told last week for bars to be cut outside of his living room window to install that air conditioner.

I previously talked with you and Mr. Banks on his behalf and i also testified on his behalf during a City Council public hearing.

The person I'm talking about has had several strokes and can barely move.

It is unconscionable for HRA to allow him to have to sweat in his apartment only because Urban's personnel, its contractors, and HRA won't get off of their fat ass to abide by applicable health and safety laws in the middle of Summer.

I'm not anticipating a response to this e-mail and will likely use it in my federal lawsuit to further establish that HRA is blatantly disregarding its legal duties with its business partners.

From,

Towaki Komatsu

5.      Mr. Vargas never received an air conditioner for his apartment due to criminal negligence by both HRA's personnel and those of Urban. He instead received a stretcher and a body-bag on and in which his body was rolled out of the building in which I reside on 8/11/20 by workers for the New York City Chief Medical Examiner's office. That happened as I watched that occur after I had earlier watched as members of the New York City Fire Department broke open the front door to Mr. Vargas' apartment on that date because he was no longer responding to people who periodically checked-up on him to see how he was doing.

6.      What I just discussed is relevant partly because I sought to attend the Mayor's 8/30/17 town hall largely to try to engage in word-of-mouth advertising through whistleblowing against

the Mayor's administration and its business partners that I hoped would spread quickly, widely, and sufficiently enough as I hoped its sum and substance would persuade enough people to fire the Mayor in the 2017 New York City government elections that would give New Yorkers leadership instead all that the Mayor and his administration represent that terrorism by the NYPD in recent months against protesters confirms. By having New Yorkers throw out Bill de Blasio and his administration like a disease by the power of their votes, I hoped that new management at the Mayor's office would clean house across New York City's government and with its business partners to usher in proper governance. This would require Urban's contract with HRA to be cancelled.

7.      On 8/30/17, I was initially given an admission ticket that allowed me to enter the building and gym that hosted the Mayor's 8/30/17 town hall after I arrived early to the site of that town hall to lawfully line up next to that building and wait for that to be issued an admission ticket for that purpose. Upon entering that gym, I took a seat in the lower-left area in the second screenshot that follows that is from the video recording of that meeting and corresponds to the elapsed time of 4 seconds. In particular, the area where I sat was slightly to the left of the woman who has this shown over the back of her shirt:





8.　　After taking my seat in that gym, I talked with the woman to whom I just referred as well as the woman who is shown standing in the preceding screenshot on the right as she then wore what appears to be a purple or pink dress and had long brown hair. Matters that I talked with them and another woman who sat near us and behind me partly concerned the following matters:

    a.　Mr. Redmond's status as the Defendant in Sherrard v. City of New York.

    b.　Illegal acts that members of the NYPD and members of the Mayor's staff committed against me at earlier public forums that the Mayor conducted.

    c.　Literature that was illegally confiscated by members of the NYPD at the Mayor's 6/21/17 town hall as I discussed earlier. A woman who sat behind me at the Mayor's

8/30/17 town hall brought literature with her that I believe she intended to distribute during it. This is why my remark to her about what happened at the Mayor's 6/21/17 town hall was relevant.

9.      In the preceding screenshot, Defendant Redmond is clearly shown smiling. That could quite possibly because he was pleased with himself for having illegally caused me to have been ejected from that public forum a short time earlier after he and Defendant Nieves assaulted me in that gym while I was seated and conducting myself in a lawful manner in contrast to them. Juanita Holmes also appears in the preceding screenshot. After I was illegally ejected from that gym by multiple members of the NYPD who illegally coerced me to exit it through a side exit that led to an area near a sidewalk, I briefly talked with Ms. Holmes on that sidewalk and apprised her that I had just been illegally ejected from that gym. In response, she suggested that I try to re-enter that building to attend that town hall. I replied to her by telling her that I knew that it would be futile for me to try that. Although she had a Fourteenth Amendment legal duty to have intervened on my behalf to try to cause me to be granted access to that town hall, she didn't make any effort to do so other than giving me that suggestion.

10.      When I first encountered Mr. Redmond in that gym on 8/30/17, he was about to walk past where I was calmly sitting as I teased him about his status as the defendant in *Sherrard* that I had a First Amendment right to do. In response, he cut his stride short and approached me while promptly initiating and making physical contact with my body that I immediately and vociferously objected to while I pointed out to him that he had no legal justification to touch me that would serve to only escalate matters between him and I. In response, he lied to me by fraudulently claiming that he could touch me without my consent in instances in which no legal justification existed for such contact. He further lied to me by claiming that touching me was part

of having a social interaction with me. His stubbornness and arrogance fueled my justifiable

anger as I promptly ordered him to leave me alone, get away from me, and continue to go about

his business. However, he continued to hover over me instead allowing matters to cool down by

having him quickly depart. That led me to clearly explain to him that he should have realized by

then that I hated him because of the illegal acts that he had been committing against me as I

pointed out that he really needed to leave me alone. Mr. Pfeffer was in Mr. Redmond's company

at that time. I also believe that I appropriately likened Mr. Redmond's behavior toward me at

public forums to behavior that has been exhibited by members of the KKK that have a tradition

of discriminating against people as well.

11.    Eventually, Mr. Redmond walked away from me after urging me to calm down.

Following his departure, I quickly calmed down and resumed conversations that I was having

with the three women who were seated near me about and against Mr. Redmond.

12.    Shortly thereafter, Mr. Nieves came up to me as I continued to lawfully conduct myself

as I remained seated. He told me then that he would like to have a word with me outside and

asked me to join him. I responded to him that he and I could instead have whatever conversation

he wanted to have with me right where we then were in front of everyone else. That would

certainly have been in the public's interest of government transparency and accountability. Since

I knew what he intended to do next, I refused to get up from my seat and instead lawfully

exercised my right to remain seated in a public forum where I had a clear legal First Amendment,

Fifth Amendment, and Fourteenth Amendment right, to remain without interference by him and

other members of the NYPD. As a result, Mr. Nieves quickly made contact with my body as he

illegally seized my backpack from the ground that caused me to seize it back from him as he then

proceeded with other members of the NYPD to illegally coerce me to leave that gym through a

side exit. When I exited that gym, it was still mostly empty of people.

13.        Members of the NYPD who were personally involved in coercing me to leave that gym include Mr. Nieves, Mr. Fowler, Mr. Pfeffer, and roughly 2 others that I believe were Mr. Hansen, and Mr. Cruz. I can't say for certain because a few people walked behind me and pushed me from behind in a way that didn't let me get a clear look at them then.

14.        Immediately after I was out of that gym, I met Mr. Redmond again and he told me that he had ordered other people to cause me to be ejected from that gym. Although I pointed out to him that I complied with his order to calm down and asked why he caused me to be ejected from that town hall, he refused to answer my question. His refusal to answer that sufficiently established that he illegally retaliated against me for engaging in whistleblowing against him while I was inside of that gym.  I thereafter briefly talked with Mr. Pfeffer on that night to try to get clarification about that by reminding him that I had attended a public meeting that the Mayor conducted earlier that day that he also attended and that there was no issue then with my attendance at that earlier meeting.  However, Mr. Pfeffer didn't' have any explanation for me.

15.        I thereafter apprised other members of the NYPD that I had been illegally ejected from that town hall to have them perform their legal duty to intervene on my behalf to allow me to again attend that town hall from within that gym. I also otherwise have reason to believe that other members of the NYPD were aware that I had been ejected from that town hall and didn't bother to intervene on my behalf. Those who I apprised about having been ejected from that town hall or who I have reason to believe were aware of it and didn't try to intervene on my behalf include the following defendants:

Defendants Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, and Holmes

16.     Also, both before and after I was illegally ejected from the Mayor's 8/30/17 town hall, I distributed literature that I prepared that contained protected whistleblowing information about a variety of subjects to members of the public who attended it as they waited in line to be granted access to that town hall. I came prepared in this regard because of how I was illegally treated at earlier public forums that the Mayor conducted.

**Facts About My 9/8/17 Claims**:

17.     On 9/8/17, Defendants Cruz and Nieves were personally involved with unknown others in illegally preventing me from attending a public hearing that the Mayor conducted at 2 pm inside of the Blue Room inside of City Hall that concerned proposed legislation that was partly "in relation to the evaluation of civil actions, claims, complaints, and investigations alleging improper police conduct". The video recording that the Mayor's office arranged to be recorded of that hearing is available on the Internet at https://www.youtube.com/watch?v=UrGcTV3n2Jc and confirms that it was a public hearing.

18.     The Mayor's office issued a public notice on 9/1/17 for that public hearing that described the agenda for the matters that would be discussed during that hearing. Members of the public who attended that hearing had the opportunity to testify in it about the matters that were on the agenda for that hearing that was a limited public forum and subject to New York State's Open Meetings Law. The public notice for that hearing is available in an official New York City government report named "The City Record". That public notice is shown in that report on the Internet at the following address:

        https://a856-cityrecord.nyc.gov/RequestDetail/20170831103

19.     What follows shows an e-mail message that I received on 9/7/17 at 4:24 pm from an investigator for the CCRB named Judith Lê as well as an earlier one that I sent to her on 9/1/17

at 4:21 pm. In her e-mail message to me on 9/7/17 at 4:24 pm, she informed me that complaints

that I reported to her on 9/1/17 against Defendants Redmond and Nieves in response to illegal

acts that they and others committed against me on 8/30/17 in relation to my efforts to have

lawfully attended the Mayor's 8/30/17 town hall was being referred by the CCRB to the NYPD's

Internal Affairs Bureau ("IAB"). By referring that information to the IAB, Defendants Redmond

and Nieves likely were able to be apprised of my complaints against them about 8/30/17 due to

leaks within the NYPD and how members of the NYPD illegally cover-up misconduct by other

members of the NYPD.

> **From:** "Le, Judith (CCRB)" <JLe@ccrb.nyc.gov>
> **Subject:** RE: New viewpoint discrimination by NYPD's Howard Redmond & Lt. Nieves at Mayor's 8/30 town hall in Brooklyn
> **Date:** September 7, 2017 at 4:24:57 PM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
>
> Hi Mr. Komatsu,
>
> Thank you for sending this over. I have consulted with my supervisor, and as your complaint focuses on an unlawful ejection from an event, we are referring it to Internal Affairs. The CCRB spin-off case # is 201707345. You should hear from Internal Affairs in a week or two.
>
> Best,
>
> Judith Lê
>
> Investigator, Squad 8
> Civilian Complaint Review Board
> 100 Church Street, 10th Floor
> New York, NY 10007
> (212) 912-2081
>
> _____
>
> **From:** Towaki Komatsu [towaki_komatsu@yahoo.com]
> **Sent:** Friday, September 01, 2017 4:21 PM
> **To:** Le, Judith (CCRB)
> **Subject:** Re: New viewpoint discrimination by NYPD's Howard Redmond & Lt. Nieves at Mayor's 8/30 town hall in Brooklyn
> Ms. Le,

Unfortunately, the Mayor's head of security (Howard Redmond), Lieutenant Nieves, and a few other regular NYPD officers subjected me to viewpoint discrimination on 8/30/17 inside of the Mayor's public town hall meeting he held at 195 Graham Avenue in Brooklyn.

The circumstances in which it occurred were as follows:

1. After being issued an admission ticket, I was sitting calmly and lawfully shortly after 6 pm inside of the gym where the meeting was held and as people continued to arrive to the meeting.

2. When I noticed Mr. Redmond walking by the area where I was sitting, I casually asked him how the federal civil rights lawsuit against him was going in light of the fact that my last experience with him on July 25th had him violate my civil rights inside of the subway station next to City Hall that I briefed you about.

3. He responded to my question by illegally and deliberately making physical contact with me by putting a hand on me by me left shoulder that caused me immediate alarm, due to my prior history with him.

4. I next proceeded without hesitation to demand that he immediately explain precisely what gave him a legal basis to make physical contact with me while I was seated and acting lawfully. He responded by fraudulently insisting that he could do so without my permission and told me I had to calm down. Following several additional remarks between us that included me telling him that **a)** he should be aware by now that he and I don't get along, **b)** I hate him, and **c)** to leave me alone and just go about his business, he eventually and briefly walked away.

5. At about that time, I resumed talking to 2 women who were seated in the row of seats directly behind me about the fact that members of the NYPD illegally seized literature at the Chinatown town hall in June and subjected me to viewpoint discrimination repeatedly at similar public meetings held by the Mayor.

6. Shortly thereafter, Lieutenant Nieves approached me with several other members of the NYPD and asked me if he could talk to me outside. In response, I told him that I would prefer to talk to him where I was. I stated this because I don't trust the NYPD due to my experiences with them and there were plenty of witnesses in the gym by then….roughly 50 people. At that point, Mr. Nieves picked up my backpack and forced me to get up with the assistance of the other NYPD officers, who escorted me while pushing me lightly out of the gym through its rear exit. Upon exiting that building, Mr. Redmond was waiting for me and immediately told me that he had kicked me out in spite of the fact that I had not done anything wrong. At no point then nor thereafter was I threatened with being arrested nor was I ever given an explanation for why I was forced to leave that public meeting

7. After being kicked out of that meeting that I had somewhat expected beforehand, I distributed numerous copies of literature I brought with me about previous acts of viewpoint discrimination to which the NYPD has subjected me to people who were entering and leaving that meeting. I also briefed both Sal Albanese and David Eisenbach (candidate for Public Advocate) about this after I was kicked out. I had previously met both of them at other events.

The following video of that town hall meeting has been very useful to identify witnesses at the 8/30/17 town hall before I was kicked out of it, others who attended it that I later briefed about having been illegally kicked out of it, and yet others who previously subjected me to similar viewpoint discrimination at similar public meetings pertaining to the Mayor that I have briefed you about.

https://www.youtube.com/watch?v=Ia4C4NnrSDo

Regards,

Towaki

20.     I intended for some of my testimony during the Mayor's 9/8/17 2 pm public hearing in the Blue Room in City Hall to have been about the e-mail message that I received from and sent to Ms. Le on 9/7/17 and 9/1/17 that I just discussed.

21.     The next screenshot is from a video recording that I recorded with my cell phone on 9/8/17 at 1:20 pm as I lawfully stood in a public passageway located directly behind City Hall that shows me holding up a printed copy of the order that U.S. Chief Judge Colleen McMahon issued on 7/19/17 in the case of _Sherrard v. City of New York_, No. 15-cv-7318 (MB) (S.D.N.Y. Jun. 13, 2018) that was among matters that I intended to engage in whistleblowing about to the detriment of Defendant Redmond and the Mayor while testifying and otherwise attending the Mayor's 9/8/17 public hearing. A copy of the short video from that screenshot was created is available on the Internet at

https://drive.google.com/file/d/1Q_BO0irYUnhAeZaovT33Uc5aQ_DtVIQG/view?usp=sharing. A NYPD guardhouse and the rear of City Hall are shown in this screenshot.



22.     That order indicated that Judge McMahon would conduct a hearing on 9/22/17 at 11 am in courtroom 24A in the Daniel Patrick Moynihan federal courthouse. While testifying in the Mayor's 9/8/17 public hearing, among other things, I intended to ask the Mayor, everyone else who attended that hearing and those who would be watching the video recording that was recorded of that public hearing if they would attend that 9/22/17 hearing that Judge McMahon would conduct with me to learn more about NYPD garbage that the Mayor was keeping by his side that violates the civil rights of New Yorkers while I would have then been referring to Defendant Redmond as that garbage in regards to that particular remark. Additional remarks that

I would have stated while testifying in that hearing and otherwise attending it while lawfully talking with those seated near me would likely have been about the following:

a.   Entirely valid complaints that I reported to and otherwise in close proximity of **a)** the Mayor on 7/16/17 and 7/18/17, **b)** former NYPD Commissioner James O'Neill on 6/26/17, the **c)** CCRB, **d)** the City Council, and **e)** others that include the U.S. Department of Justice, the New York State Attorney General's office, the NYPD's Internal Affairs Bureau, and many whistleblower news censors in journalism that include Michael Gartland, Erin Durkin, Graham Rayman, Courtney Gross, Matthew Chayes, Mara Gay, Jillian Jorgensen, Ben Max, and Jessica Layton that were against Defendant Redmond and other members of the NYPD in response to illegal acts and omissions that they had been committing against me since 4/27/17 and as recently as 8/30/17 as I lawfully sat in the gym that hosted the Mayor's 8/30/17 town hall in Brooklyn that were mostly in relation to efforts that I undertook to lawfully attend public town hall and public resource fair meetings that members of the public had been conducting in a collaborative manner with the Mayor, members of the City Council, and other government officials while the Mayor and other government officials used those public forums as campaign events to bolster their re-election prospects.

b.   Urging the Mayor, everyone else who attended that hearing, and all who would be watching the video recording of it to promptly fire the Mayor and his administration by voting against the Mayor, engaging in widespread word-of-mouth advertising against him and his administration, and otherwise supporting the Mayor's opponents I his 2017 re-election race as an effective way to usher in new and proper leadership

into City Hall that would properly reform the NYPD and not condone further civil rights abuse by its mob.

c. Litigation activity that I had been involved in since 5/19/17 and as recently as 9/5/17 through my HRA lawsuit to pursue my claims against Defendants Redmond, Nieves, and additional members of the NYPD and Mayor's staff in response to illegal acts and omissions that they had been committing against me since 4/27/17 that were mostly in relation to efforts that I undertook to lawfully attend public forums that the Mayor had been conducting while their illegal acts and omissions against me constituted voter suppression, voter fraud, and whistleblower retaliation to steal the 2017 New York City government elections in violation of my constitutional rights, those of others, the Hatch Act, New York State's Open Meetings Law, and other applicable laws.

d. Pressuring the Mayor to cause his staff to immediately stop illegally concealing from the public the video recording that his office arranged to be recorded of the public resource fair meeting that he conducted on 7/18/17 with other government officials by making that complete video recording to be publicly available on the Internet within 24 hours to help New Yorkers to make informed and independent decisions about how soon and overwhelmingly they needed to fire him and his administration by watching the conversation that he and I had during that public forum that was recorded by that video while we stood in front of whistleblower news censors in journalism that included Michael Gartland and Gloria Pazmino.

23. The next screenshot is from a video recording that I recorded with my cell phone on 9/8/17 at 1:50 pm as I stood outside of and within roughly 10 feet from the NYPD guardhouse

that is located just inside of the entrance to City Hall's property by its entrance by Park Row. At that time, I stood on property that was part of City Hall's grounds in an area that is located a short distance inside of its visitor's entrance in that area.



24.     A copy of the short video from which the preceding screenshot was created is available on the Internet at

https://drive.google.com/file/d/1bGntltEQ_JXAfZRwxry8mtnj6oX6W1si/view?usp=sharing.

25.     When I arrived to that location at roughly 1:50 pm on 9/8/17, I met Defendant Cruz as he stood next to or inside of the NYPD guardhouse that is located in the immediate area of where I stood as I recorded the video that I just discussed as I recorded that video largely to confirm the location where I then stood for later use in valid litigation that I would commence in the event that my attempt to lawfully attend and testify in the public hearing that the Mayor's would

conduct at 2 pm on that date was illegally interfered with. Upon meeting Mr. Cruz then and there, I clearly told him that I was there to attend the Mayor's 2 pm public hearing in the Blue Room inside of City Hall. In response, he told me that he wasn't aware of any public hearing that the Mayor would then be conducting and that he would check with someone to find out if there was such a public hearing that the Mayor would be conducting then. I then observed him as he held a telephone near one of his ears while he was in that NYPD guardhouse. He shortly thereafter told me that he checked with someone inside of City Hall about that public hearing and was told that no public hearing was being conducted by the Mayor at 2 pm inside of the Blue Room inside of City Hall. When I then promptly directed him to substantiate his claim by telling me the name of the person who told him that, he told me that someone named Sophia Cruz had told him so. However, I thereafter made a telephone call to Harold Miller of the Mayor's Community Affairs Unit that I believe was within one week of 9/8/17 to ask him to check to find out who Sophia Cruz was within the Mayor's administration. In response, he told me that no one named Sophia Cruz worked for the Mayor's administration. That clearly suggests that Defendant Cruz either lied to me on 9/8/17 about the name of the person or people who told him that the Mayor would not be conducting a public hearing on that date at 2 pm in the Blue Room or he lied to me then by having told me that someone had told him then that the Mayor would not be conducting a public hearing on that date at 2 pm in the Blue Room.

26.     Concerning what I just discussed, the next screenshot shows a draft e-mail message that I created and saved at 1:51 pm on 9/8/17 in which I recorded information about Defendant Cruz's NYPD badge number and the name of Sophia Cruz that he had just told me had told him during a telephone call that the Mayor's 9/8/17 2 pm public hearing was not open to the public.

Towaki Komatsu <towaki_komatsu@yahoo.com>    📁 Drafts – Yahoo!    September 8, 2017 at 1:51 PM

(No Subject)

2 pm meeting
Sophia cruz
Badge # 751 Cruz

27.    By having illegally prevented me from attending and testifying in the Mayor's 2 pm public hearing on 9/8/17 in the Blue Room in City Hall, Mr. Cruz and everyone else who were personally involved in having caused that to occur flagrantly violated my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and New York State's Open Meetings Law to have attended and testified in that public forum partly against him for having illegally interfered with my right to have done so. I believe that Mr. Cruz knew that the Mayor would conduct a public hearing at 2 pm in the Blue Room on that date and that he deliberately prevented from attending it to prevent me from engaging in protected whistleblowing against him and other members of the NYPD in relation to illegal acts and omissions that they had been committing against me since 4/27/17 at the sites of public town hall and public resource fair meetings that the Mayor conducted in relation to efforts that I undertook to lawfully attend them in accordance with my constitutional rights.

28.    The following additional relevant and related facts apply to all who illegally prevented me from attending and testifying in the Mayor's 2 pm public hearing on 9/8/17 in the Blue Room in City Hall and otherwise condoned that:

    a.    They imposed a patently illegal prior restraint on my First Amendment right to lawfully assemble, attend, and testify in a public forum by doing so.

    b.    They willfully and wantonly caused substantial and irreparable harm to my First

Amendment right to engage in protected activity by testifying about matters of public concern during that public hearing. Testimony of mine that would then have been about matters of public concern during that hearing would have addressed the following subjects:

i.   Illegal acts and omissions by members of the Mayor's NYPD security detail, other members of the NYPD, and members of the Mayor's staff at public forums and other public areas in New York City since 4/27/17 that the Mayor conducted with other government officials while the Mayor and members of the City Council were running for re-election and using such public forums as campaign events.

ii.  The fact that those illegal acts and omissions that were committed against me at such public forums and other public areas violated the Hatch Act and were voter suppression, voter fraud, and whistleblower retaliation.

iii. The fact that the Mayor illegally condoned those illegal acts on 7/18/17 as I talked with him about that then.

iv.  The fact that those illegal acts and omissions against me at public forums and in other public areas continued to be illegally committed against me at public forums that the Mayor conducted and in other public areas where he was present after I talked with Defendant O'Neill about them on 6/26/17 and talked with the Mayor about them on 7/16/17 and 7/18/17.

v.   Defendant Redmond's track record of violating my civil rights and those of others in New York City and in Newark Airport that included violating the rights of **a)** both Kalan Sherrard and a journalist named Christopher

Faraone in September of 2012 in lower Manhattan during the Occupy

Wall Street demonstrations and **b)** a journalist named Nathan Tempey in

Newark Airport in July of 2016.

c.      They subjected me to an illegal abuse of process, discrimination, and segregation

by doing so.

d.      They subjected me to an unofficial arrest through a show of authority in violation

of my Fourth Amendment rights with respect to my ability and legal right to have

lawfully proceeded past that NYPD guardhouse to a NYPD security screening

area and then into City Hall to attend that public forum.

e.      They illegally deprived me of my liberty and property interests without due

process with respect to the Fifth Amendment by having violated **a)** my liberty

interests by preventing me from attending that 2 pm public hearing with the

Mayor on 9/8/17 and **b)** my property interests by having prevented me from

attending that public hearing that would have involved my use of real property

and access to public records that were available during that public hearing that

partly included registration forms to sign-up to testify in that public hearing.

f.      They illegally prevented me from being able to lawfully exercise my First

Amendment right to have taken photographs and recorded video recordings inside

of City Hall on 9/8/17 both inside and outside of the Blue Room before, during,

and after the Mayor's 2 pm public hearing on that date.

g.      They illegally prevented me from being able to exercise my First Amendment

right to use the Mayor's 9/8/17 2 pm public hearing to petition for redress of

grievances.

h.      They illegally subjected me to viewpoint discrimination because it was objectively reasonable that I would use the Mayor's 9/8/17 2 pm public hearing to engage in entirely valid whistleblowing against Mr. Cruz and other members of the NYPD that include members of the Mayor's NYPD security detail in response to illegal acts and omissions that they had been committing against me since 4/27/17.

i.      They illegally failed to intervene on my behalf in accordance with their Fourteenth Amendment affirmative legal duty to uphold my constitutional right to attend and testify in the Mayor's 9/8/17 2 pm public hearing.

j.      They illegally prevented me from being able to engage in networking and expressive association with those who attended the Mayor's 2 pm public hearing on that date and were otherwise in City Hall on that date after 1:50 pm.

k.      They illegally prevented me from being able to distribute literature both **a)** while attending the Mayor's 2 pm public hearing on that date shortly before it began and as it was conducted in a non-disruptive manner to those who attended it that was critical of and otherwise embarrassing to the Mayor, his administration, and the NYPD and **b)** while I would have otherwise been in City Hall on 9/8/17 after 1:50 pm.

l.      They illegally prevented me from being able to expose whistleblower news censors in journalism that have been complicit by their censorship in allowing terrorism and other crimes and abuse by the NYPD to persist thanks to the NYPD's apparent addiction to committing terrorism and other crimes under the color of law while disguised as law-enforcement on dates that aren't limited to

Halloween and during times when no pandemic exists in New York City that requires the NYPD to wear masks.

m.       They willfully and wantonly violated my Fourteenth Amendment due process and equal protection right to have attended and testified in the Mayor's 2 pm 9/8/17 public hearing without unreasonable interference.

n.       They illegally subjected me to selective-enforcement by not allowing me to attend the Mayor's 2 pm 9/8/17 public hearing that corresponds to the class-of-one legal theory that is tied to an illegitimate animus.

o.       They illegally caused the Mayor's 9/8/17 2 pm public hearing to have been conducted in violation of New York State's Open Meetings Law.

p.       They illegally engaged in witness tampering and violated 18 U.S.C. §245(b)(5), 18 U.S.C. §1985, 18 U.S.C. §1986, 18 U.S.C. §241, 18 U.S.C. §1513(e), NYPL §240.20, NYPL §240.26, NYPL §195.00, New York City Charter §1116, New York General Business Law §349 in regards to me by having prevented me from attending the Mayor's 9/8/17 2 pm public hearing.

29.     Although I didn't record additional video recordings on 9/8/17 as I stood near the NYPD guardhouse located just inside of the entrance to City Hall by Park Row, that was due to the fact that I knew then that there were numerous NYPD video security cameras in that area that were likely recording both Mr. Cruz and I while we were then near one another that I could submit FOIL demands to the NYPD to receive the video recordings from all of those video security cameras. However, the NYPD thereafter illegally engaged in spoliation of evidence by having allowed those video recordings from its video security cameras to be overwritten in response to timely a FOIL demand that I submitted to the NYPD on 9/8/17 for those video recordings. The

following e-mail message that I sent to the NYPD on 9/8/17 confirms that I submitted a timely

FOIL demand for those public records as well as all telephone calls that Mr. Cruz made and

received while he was in the NYPD guardhouse near me on 9/8/17 that I discussed above:

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Re: FOIL demand
> **Date:** September 8, 2017 at 9:29:01 PM EDT
> **To:** FOIL@nypd.org
>
> NYPD FOIL Team,
>
> I'm sending you this message to demand that the NYPD immediately provide me with all
> security camera video recordings that shows me talking with NYPD Officer Cruz (badge
> #: 751) between 1:45 pm and 2 pm just inside of the visitor's entrance to City Hall
> located by Park Row and while he was stationed in the guardhouse there.
>
> In addition, I further demand to be provided with the telephone numbers for calls he
> made and received from the telephone in that guardhouse while I stood outside of it and
> was waiting for him to let me proceed to the security area in order to attend a public 2 pm
> located in the Blue Room in City Hall that had been scheduled.
>
> Pursuant to New York State's Open Meetings Law that I explained to Officer Cruz today,
> I had a right to attend that public meeting. However, I was illegally deprived of my
> ability to exercise that right by being denied access to it.
>
>
> From,
>
> Towaki Komatsu

30.     The following excerpt from *Capital Newspapers v. Whalen*, 69 N.Y.2d 246, 513

N.Y.S.2d 367, 505 N.E.2d 932 (1987) confirms that the NYPD had a legal duty to provide me

the entirety of the public records that I discussed in the preceding e-mail message that I sent to

the NYPD on 9/8/17 at 9:29 pm:

> "**It is settled that FOIL is based on the overriding policy consideration that "the**
> **public is vested with an inherent right to know and that official secrecy is**
> **anathematic to our form of government" (*Matter of Fink v Lefkowitz*, 47 N.Y.2d 567,**
> **571). Indeed, in enacting FOIL the Legislature specifically declared: "that**
> **government is the public's business and that the public, individually and collectively**

**and represented by a free press, should have access to the records of government in accordance with the provisions of this article.**" (Public Officers Law § 84.) We have held, therefore, that FOIL is to be liberally construed and its exemptions narrowly interpreted so that the public is granted maximum access to the records of government (*see*, *Matter of* <u>*Washington Post Co. v New York State Ins. Dept.*</u>, 61 N.Y.2d 557, 564, citing *Matter of* <u>*Fink v Lefkowitz*, *supra*,</u> at p 571). It is evident that the narrow construction respondents urge is contrary to these decisions and antagonistic to the important public policy underlying FOIL."

(boldface formatting added for emphasis)

31.     The following excerpt from <u>*Trump v. Vance*, 591 S. Ct. (U.S. 2020)</u> clearly reinforces

this point:

> "In our judicial system, "the public has a right to everyman's evidence.""

32.     The following shows an e-mail message that I received from the NYPD's FOIL

department on 9/15/17 at 8:52 am in response to the FOIL demand that I submitted to it on

9/8/17 at 9:29 pm via e-mail that I discussed above.



```
From: FOIL <FOIL@nypd.org>
Subject: 2017-PL-11992
Date: September 15, 2017 at 8:52:28 AM EDT
To: "towaki_komatsu@yahoo.com" <towaki_komatsu@yahoo.com>


      PDF


Scanned from a Xerox
Multifuncti...Printer.pdf
      24 KB
```

33.     The next screenshot shows a relevant excerpt from the PDF file that was attached to the

NYPD's 9/15/17 response to my 9/8/17 FOIL demand.

This is in response to your letter dated 09/08/17, which was received by this office on 09/08/17, in which you requested access to certain records under the New York State Freedom of Information Law (FOIL).

The Freedom of Information Law allows access to existing documents and does not necessitate the creation of a document. I am unable to provide access to these documents on the basis that your request does not reasonably describe a record in a manner that would enable a search to be conducted by the New York City Police Department.

You may appeal this decision or any portion thereof. Such an appeal must be made in writing within thirty (30) days of the date of this letter and must be forwarded to: Sergeant Jordan S. Mazur, Records Access Appeals Officer, New York City Police Department, One Police Plaza, Room 1406, New York, NY 10038. Your appeal may also be submitted via email to FOILAppeals@NYPD.org. Please include copies of the FOIL request and this letter with your appeal.

Very truly yours,

Richard Mantellino
Lieutenant
Records Access Officer

34.     In short, Richard Mantellino of the NYPD lied in that letter by fraudulently claiming that the NYPD couldn't provide me the FOIL materials that I requested with the information that I submitted to it on 9/8/17. He also then had a legal duty to have arranged for the NYPD to preserve the FOIL materials that I had directed the NYPD to provide to me on 9/8/17.

35.     On a related note, the following remarks that U.S. Magistrate Judge Gabriel Gorenstein stated on page 2 of the order that he issued on 9/14/18 in Komatsu v. City of New York, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) confirms that the NYPD was legally required to have preserved all video recordings that were recorded by video security cameras it controls on 9/8/17 throughout the entire period during which I was in the area of City Hall by its Park Row entrance between 1:45 pm and 2 pm:

"To the extent plaintiff seeks to have the City of New York preserve evidence relating to the claims in the Second Amended Complaint, the Court notes that the City already has a

duty as a legal matter to take reasonable steps to preserve evidence in its control relating to the claims in the complaint. See, e.g., Kronisch v. United States, 150 F.3d 1126, 126 (2d Cir. 1998) ("obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation – most commonly when suit has already been filed.")"

36.     By having illegally not provided me the video recordings that I timely directed the NYPD to provide to me that I discussed in my 9/8/17 9:29 pm e-mail message to the NYPD's FOIL department, those who are responsible for having illegally caused me to have been deprived of those video recordings flagrantly violated my due process right of access to the courts as part of a conspiracy to cover-up the illegal acts that were committed against me on 9/8/17 that caused me to have been prevented from attending the Mayor's 2 pm public hearing on that date. The following excerpt from *Jutrowski v. TP. of Riverdale*, 904 F.3d 280 (3d Cir. 2018) confirms this:

> "where a plaintiff adduces sufficient evidence of an after-the-fact conspiracy to cover up misconduct, even of an unidentified officer, he may be able to state a claim under § 1983 for the violation of a different constitutional right: the due process right of access to the courts."

37.     After it quickly became clear that Defendant Cruz wouldn't allow me to exercise my constitutional right to attend the Mayor's 9/8/17 2 pm public hearing in the Blue Room in City Hall, I left that area and walked around City Hall's property to the area by City Hall's entrance on Broadway to try to talk with journalists and members of the City Council who may have attended that public hearing as they left it and City Hall's property through that entrance to City Hall to apprise them of the fact that I had been illegally prevented from attending that public hearing by the Mayor. While doing so, I believe that I distributed literature that I prepared and brought with me that was critical of the Mayor's administration about various matters that were of public concern and amounted to protected speech that I had intended to similarly and lawfully distribute to people who attended the Mayor's 2 pm public hearing on that date. *Paulsen v. County of Nassau*, 925 F.2d 65 (2d Cir. 1991) and *Schneider v. State (Town of Irvington)*, 308

U.S. 147, 60 S. Ct. 146, 84 L. Ed. 155 (1939) confirm that people have a First Amendment right

to distribute literature in a public forum.

38.    Also, the following excerpt from *Matal v. Tam*, 137 S. Ct. 1744, 582 U.S., 198 L. Ed. 2d

366 (2017) supports my claim that Defendant Cruz and whoever else were responsible for

causing me to have been prevented from attending the Mayor's 9/8/17 2 pm public hearing

illegally subjected me to viewpoint discrimination then:

> Giving offense is a viewpoint. The "public expression of ideas may not be prohibited
> merely because the ideas are themselves offensive to some of their hearers." *Street v.
> New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572."

39.    The next screenshot is from a video recording that I recorded with my cell phone on

9/8/17 at 2:14 pm as I stood next to the NYPD guardhouse that is located just inside of the

entrance to City Hall's property by Broadway. Defendant Nieves is shown in that screenshot as

he stood in an open area behind that guardhouse's door and appeared to be having a telephone

conversation as it appeared that he then held a cell phone next to his right ear while he wore a

suit, tie, and eyeglasses. I recall that as I waited near that area close to that time, Mr. Nieves

walked over to me to ask me to show him the literature that was critical of the Mayor's

administration that I prepared and was lawfully distributing to people who passed me I

accordance with my First Amendment rights as he made no effort to try to enable me to attend

the Mayor's 9/8/17 2 pm public hearing. Shortly after that 2 pm hearing eventually ended, New

York City Councilman Robert Cornegy, Jr. and I had a brief conversation by the Broadway

entrance to City Hall. During that conversation, I told him that I hadn't been allowed to attend

that hearing and asked him if he had attended it. He told me then both that he had attended it and

that it was a public hearing.



40.     A copy of the short video from which the preceding screenshot was created is available

on the Internet at

https://drive.google.com/file/d/1uXPGUW86qM7NBLhjTouv3XJmdbQtlKHb/view?usp=sharing.

41.     I believe that Defendant Nieves may have ordered Defendant Cruz on 9/8/17 to illegally

prevent me from walking past him by the NYPD guardhouse located by the Park Row entrance

to City Hall to attend the Mayor's 9/8/17 2 pm public hearing partly to prevent me from

testifying against him (Mr. Nieves) and other members of the NYPD and members of the

Mayor's office in response to illegal acts and omissions that they had been committing against me at other public forums that the Mayor had been conducting as recently as 8/30/17 and as far back as 4/27/17. Mr. Nieves was personally involved in those 4/27/17 and 8/30/17 incidents. My belief about Mr. Nieves having possibly ordered Mr. Cruz in this way on 9/8/17 was one of the reasons why I directed the NYPD's FOIL department on 9/8/17 to provide me the telephone records for all telephone calls that Mr. Cruz made and received while I stood in close proximity to him on 9/8/17 by the NYPD guardhouse located just inside of the entrance to City Hall by Park Row after 1:45 pm.

42.     At 9:39 pm on 9/8/17, I saved an online complaint as a PDF file that I had just reported to the New York City Department of Investigations ("DOI") against Defendant Cruz in response to his involvement in having illegally prevented me from attending the Mayor's 9/8/17 2 pm public hearing. The following is a relevant screenshot from that complaint.



43.     Although the complaint information that PDF file saved was truncated in it, DOI certainly must have a copy of the entire complaint that I had just submitted to it.

44. Throughout the entire time that I was in the vicinity of City Hall on 9/8/17, I was conducting myself in a lawful manner in contrast to Defendant Cruz.

45. To close out this section, it is worth pointing out that the New York City 2017 primary elections were held on 9/12/17 and likely heavily factored into the decisions to commit the illegal acts and omissions against me on 8/30/17 and 9/8/17 that I have discussed in this complaint in order to protect the Mayor's re-election interests in violation of the Hatch Act. The timing of those illegal acts truly matters.

## CAUSES OF ACTION

**CLAIM #1:** **Violations of the First Amendment right of access to a public forum, to protest in a public forum, to record audio and video recordings in a public forum, to take photographs in a public forum, to receive information in a public forum, to have the opportunity to talk with journalists in a public forum, to distribute whistleblowing literature in a public forum, to engage in lawful assembly in a public forum, to engage in freedom of expression in a public forum, to otherwise engage in whistleblowing and criticism of government officials in a public forum, to engage in expressive association, and to petition government officials in a public forum for redress of grievances**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. I also incorporate by reference as though fully set forth herein the decision that was issued on 5/19/20 in *Dunn v. City of Fort Valley,* No. 19-cv-287(TES) (M.D. Ga. May 19, 2020) due to relevant findings it contains about First Amendment rights in public forums, supervisory liability, and other pertinent things.

3. By not trying to intervene on my behalf to allow me to again attend the Mayor's 8/30/17 town hall from within the gym in which it was conducted after I was illegally ejected from it, the

defendants listed above are as liable as those who caused me to be ejected from it.

4.      More importantly, my right to lawfully protest in a public forum in a manner that doesn't disrupt how that public forum is conducted while valid time, place, and manner restrictions do not exist to prohibit such protest in a public forum was confirmed by the following excerpt from _Occupy Nashville v. Haslam_, 949 F. Supp. 2d 777 (M.D. Tenn. 2013):

> "a state may not restrict First Amendment rights, absent valid time, place, or manner restriction. _See Dean_, 354 F.3d at 551; _Galvin v. Hay,_ 374 F.3d 739, 751 (9th Cir.2004) (**"As speakers may generally control the presentation of their message by choosing a location for its importance to the meaning of their speech, speakers may ordinarily— absent a valid time, place and manner restriction—do so in a public forum."); _Childs v. Dekalb Cnty., Ga.,_ 286 Fed.Appx. 687, 693-94 (11th Cir.2008)** (denying qualified immunity and stating that, based on Supreme Court precedent, "police officers have known for decades that protestors present on public property have a First Amendment right to peacefully express their view, in the absence of narrowly tailored ordinances restricting the time, place, or manner of the speech")."

> (boldface formatting added for emphasis)

5.      Through the facts and circumstances that I have sufficiently presented in this complaint, I have established that the Defendants identified above were personally involved in having willfully, callously, oppressively, wantonly, and illegally violating my First Amendment rights in relation to my efforts to have attended the Mayor's 8/30/17 town hall.

6.      Due to the violations of my First Amendment rights on 8/30/17 that occurred inside and outside of the building that hosted the Mayor's 8/30/17 town hall in close proximity to it, the Defendants' illegal acts and omissions against me that caused those violations to occur and maintained those acts and omissions against me caused me irreparable harm, chilled my speech, and imposed illegal prior restraints on the entirety of what my First Amendment rights were while I was in the building in which that town hall was conducted on 8/30/17.

7.      The illegal acts and omissions that prevented me from being able to attend the Mayor's 8/30/17 town hall were driven by a desire to subject me to illegal viewpoint discrimination based

upon an invidious discriminatory animus for the reasons that I have discussed in this complaint.

8.  Defendants Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, and John Doe8-30-17a are also liable for this cause of action due to their role as co-conspirators in a conspiracy as they condoned and otherwise actively participated in the illegal acts that caused me to be ejected from the Mayor's 8/30/17 town hall. Relevant findings that support this assertion exist in the decisions that were issued in *US v. Blackmon*, 839 F.2d 900 (2d Cir. 1988), *Escalera v. Samaritan Village Men's Shelter*, No. 17-cv-4691 (CM) (S.D.N.Y. Sept. 27, 2019), *US v. Basey*, 816 F.2d 980 (5th Cir. 1987), *Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995), *Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999), and *Dunn v. City of Fort Valley,* No. 19-cv-287(TES) (M.D. Ga. May 19, 2020).

9.  In addition, Defendants City of New York, Cruz and Nieves are also liable for this cause of action in regards to the illegal acts and omissions that they committed against me on 9/8/17 in relation to my efforts to have lawfully attended and testified in the Mayor's 2 pm public hearing on that date in the Blue Room in City Hall on account of the facts that I discussed in this complaint.


**CLAIM #2:** **First Amendment Retaliation and Viewpoint Discrimination**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Cruz)**

1.  I incorporate by reference the information presented in the preceding paragraphs and attached exhibits as though fully set forth herein.

2.  The defendants that I have identified above for this claim are liable for it in regards to my 8/30/17 claims for the reasons that I have stated in this complaint.

3.  In addition, Defendants City of New York, Cruz and Nieves are also liable for this cause of action in regards to the illegal acts and omissions that they committed against me on 9/8/17

in relation to my efforts to have lawfully attended and testified in the Mayor's 2 pm public hearing on that date in the Blue Room in City Hall on account of the facts that I discussed in this complaint.

**CLAIM #3:** **Violations of the Fourth Amendment**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that I have identified above for this claim are liable for it in regards to my 8/30/17 claims for the reasons that I have stated in this complaint. Through their acts and omissions against me on 8/30/17 at the site of the Mayor's 8/30/17 town hall, they either illegally seized me, seized property of mine, directed that to occur, and impeded my movements by a show of authority toward me, and condoned that and extended that condition by not allowing me to again attend the Mayor's 8/30/17 town hall from within the room in which it was conducted.

3. What I just discussed is supported by findings in _Dotson v. Farrugia_, No. Civ. 1126 (PAE) (S.D.N.Y. Mar. 26, 2012) and _People v. Alba_, 81 A.D.2d 345, 440 N.Y.S.2d 230 (App. Div. 1981).

4. In addition, Defendants City of New York, Cruz and Nieves are also liable for this cause of action in regards to the illegal acts and omissions that they committed against me on 9/8/17 in relation to my efforts to have lawfully attended and testified in the Mayor's 2 pm public hearing on that date in the Blue Room in City Hall on account of the facts that I discussed in this complaint.

**CLAIM #4:**                        **<u>Violations of the Fifth Amendment</u>**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. What I just discussed in claim #4 also applies to this claim.

**CLAIM #5:**                      **<u>Violations of the Fourteenth Amendment</u>**
                                             **<u>Substantive Due Process Rights</u>**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. By having illegally committed acts and omissions that caused and otherwise enabled me to have been prevented me from attending the Mayor's 8/30/17 town hall, the defendants that I identified for this claim violated my Fourteenth Amendment substantive due process rights that are discussed in <u>*Calicchio v. Sachem Central School District*, No. 14-cv-5958 (DRH)(SIL) (E.D.N.Y. Jan. 17, 2020)</u>.

3. In addition, Defendants City of New York, Cruz and Nieves are also liable for this cause of action in regards to the illegal acts and omissions that they committed against me on 9/8/17 in relation to my efforts to have lawfully attended and testified in the Mayor's 2 pm public hearing on that date in the Blue Room in City Hall on account of the facts that I discussed in this complaint.

**CLAIM #6:**                        **<u>Violations of Procedural Due Process</u>**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. What I just discussed in claim #5 also applies to this claim.

**CLAIM #7:**        <u>Violations of the Fourteenth Amendment</u>
<u>Equal Protection Rights</u>

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The information that I have presented in this complaint confirms that the defendants this claim concerns are liable for the violations of my Fourteenth Amendment equal protection rights in regards to both my 8/30/17 an 9/8/17 claims that apply to similarly-circumstanced members of the general public who:

   a. Attended the Mayor's 8/30/17 town hall.

   b. Attended the Mayor's 2/19/20 town hall from within the room in which it was conducted as it was conducted, shortly before it began, and shortly after it ended.

   c. Criticized and otherwise booed the Mayor and Melinda Katz during the Mayor's 2/19/20 town hall from within the room in which it was conducted.

   d. Were cheered and applauded during the Mayor's 2/19/20 hall by members of the public who were in the same room as those who criticized and booed the Mayor and Ms. Katz during that 2/19/20 hall.

**CLAIM #8:**        <u>Violations of the Fourteenth Amendment</u>

## Prohibitions Against Selective-Enforcement

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The information that I have discussed in this pleading confirms that the defendants that I have identified that this claim concerns are liable for illegal acts and omissions that were committed against me in relation to my efforts to have attended the Mayor's 8/30/17 town hall that violated my Fourteenth Amendment right to not be subjected to selective-enforcement that corresponds to the class-of-one legal theory and is based upon an illegitimate animus.

3. In addition, Defendants City of New York, Cruz and Nieves are also liable for this cause of action in regards to the illegal acts and omissions that they committed against me on 9/8/17 in relation to my efforts to have lawfully attended and testified in the Mayor's 2 pm public hearing on that date in the Blue Room in City Hall on account of the facts that I discussed in this complaint.


**CLAIM #9:**          **Failure to Intervene in Violation of the Fourteenth Amendment**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. Since the illegal acts and omissions by defendant Redmond and other defendants were both foreseeable and preventable following my conversations with Mr. O'Neill in June of 2017

and with the Mayor on 7/16/17 and 7/18/17, they're liable with the other defendants that this claim concerns for having failed to intervene on my behalf to prevent the illegal acts and omissions that were committed against me on 8/30/17 at the site of the Mayor's town hall from occurring.

3. In addition, Defendants Cruz and Nieves are also liable for this cause of action in regards to the illegal acts and omissions that they committed against me on 9/8/17 in relation to my efforts to have lawfully attended and testified in the Mayor's 2 pm public hearing on that date in the Blue Room in City Hall on account of the facts that I discussed in this complaint.

**CLAIM #10:** <u>**Failure to Train and Supervise**</u>

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. What I just discussed in claim #10 also applies to this claim.

3. Section 435 of the New York City Charter states the following about some of the legal duties that members of the NYPD have:

> "a. **The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages** and assemblages **which obstruct the free passage of public** streets, sidewalks, parks and **places; protect the rights of persons and property**, guard the public health, **preserve order at** elections and **all public meetings and assemblages**; subject to the provisions of law and the rules and regulations of the commissioner of traffic,* regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; **remove all nuisances in the public** streets, parks and **places**; arrest all street mendicants and beggars; provide proper police attendance at fires; inspect and observe all places of public amusement, all places of business having excise or other licenses to carry on any business; **enforce and prevent the violation of all laws and ordinances in force in the city**; and for these purposes to **arrest all persons guilty of violating any law or**

**ordinance for the suppression or punishment of crimes or offenses**."

(boldface formatting added for emphasis)

## CLAIM #11:    Violation of the New York State's Open Meetings Law

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The next screenshot is from the video that was recorded of the Mayor's 8/30/17 town hall as the Mayor was making remarks to inform the audience that they could walk up to the heads and other senior officials of the various New York City government agencies that comprise his administration to talk with them about whatever was on their (the public's) mind at the end of that town hall. That screenshot is from the elapsed time of 18 minutes and 8 seconds in that video. Those remarks by the Mayor sufficiently confirm that town hall was subject to New York State's Open Meetings Law.



3. In addition, Defendants City of New York, Cruz and Nieves are also liable for this cause of action in regards to the illegal acts and omissions that they committed against me on 9/8/17 in relation to my efforts to have lawfully attended and testified in the Mayor's 2 pm public hearing on that date in the Blue Room in City Hall on account of the facts that I discussed in this complaint.

**CLAIM #12:**                                  **Abuse of Process**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Mantellino)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. Through their acts and omissions against me on 8/30/17 at the site of the Mayor's 8/30/17 town hall, the defendants that this claim applies to are liable for having subjected me to an illegal abuse of process in relation to my efforts to have lawfully attended that town hall.

3. In addition, Defendants City of New York, Cruz and Nieves are also liable for this cause of action in regards to the illegal acts and omissions that they committed against me on 9/8/17 in relation to my efforts to have lawfully attended and testified in the Mayor's 2 pm public hearing on that date in the Blue Room in City Hall on account of the facts that I discussed in this complaint.

4. Defendants City of New York and Mantellino are also liable for this claim by having subjected me to an abuse of process that caused me to not be provided the FOIL materials that I directed the NYPD to provide to me through the FOIL demand that I submitted to it on that date.

**CLAIM #13:**     **Fraudulent Misrepresentation and Fraudulent Inducement**

**(Against Defendants City of New York, Redmond, O'Neill)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  For the reasons that I have presented in this complaint, Defendant Redmond is liable for having made fraudulent misrepresentations to me as he suggested that if I calmed down, I would be permitted to attend that town hall. I calmed down and was illegally ejected instead.

3.  Also, the City of New York is liable for having fraudulently misrepresented that members of the public would be able to attend that town hall. I was unable to do so. The City of New York fraudulently induced me to register to attend in advance to attend that town hall and then make the trip from the Bronx to that town hall to try to lawfully attend it.

4.  Defendant City of New York is also liable for this claim by having fraudulently induced me to try to lawfully attend the Mayor's 9/8/17 2 pm public hearing by having claimed in a public notice that it would be a public hearing.

5.  Defendant Cruz is liable for this claim in regards to my 9/8/17 claims by having fraudulently claimed that to me on 9/8/17 that the Mayor's 2 pm public hearing wasn't a public hearing.

6.  Defendant Mantellino is liable for this claim in regards to my 9/8/17 claims by having fraudulently claimed to me in an e-mail message that I received from the NYPD on 9/15/17 that the NYPD couldn't use the information that I provided to it on 9/8/17 to provide me the FOIL materials that I directed it on 9/8/17 to provide to me through a FOIL demand that I submitted to it on that date.

**CLAIM #14:**      **Violation of New York State General Business Law 349**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, de Blasio, O'Neill, Mantellino)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. Defendant City is a corporation. As such, it's subject to New York State General Business ("GBS") Law §349 that includes the following terms:

   "Deceptive acts and practices unlawful. (a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

3. New York GBS §349(h) allows individuals to pursue a civil action for violations of New York GBS §349 that they experience.

4. The information that I have presented in this pleading confirms that the defendants that I have identified for this claim are liable for violations of New York State General Business Law 349 that occurred in relation to my efforts to have attended the Mayor's 8/30/17 town hall.

5. In addition, Defendants City of New York, Cruz, and Nieves are also liable for this cause of action in regards to the illegal acts and omissions that they committed against me on 9/8/17 in relation to my efforts to have lawfully attended and testified in the Mayor's 2 pm public hearing on that date in the Blue Room in City Hall on account of the facts that I discussed in this complaint.

6. Defendant Mantellino is also iable for this claim in regards to my 9/8/17 claims by having fraudulently claimed to me in an e-mail message that I received from the NYPD on 9/15/17 that the NYPD couldn't use the information that I provided to it on 9/8/17 to provide me the FOIL materials that I directed it on 9/8/17 to provide to me through a FOIL demand that I submitted to it on that date.

**CLAIM #15:**                            **<u>Negligence</u>**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, O'Neill, Mantellino)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The information that I have presented in this pleading confirms that the defendants that I have identified for this claim are liable for negligence in relation to my efforts to have lawfully attended the Mayor's 8/30/17 town hall.

3. In addition, Defendants City of New York, Cruz, and Nieves are also liable for this cause of action in regards to the illegal acts and omissions that they committed against me on 9/8/17 in relation to my efforts to have lawfully attended and testified in the Mayor's 2 pm public hearing on that date in the Blue Room in City Hall on account of the facts that I discussed in this complaint.

4. Defendant Mantellino is liable for this claim by virtue of the fact that negligence by him is responsible for having materially caused me to not be provided the FOIL materials that I directed the NYPD on 9/8/17 to provide to me.


**CLAIM #16:**                            **<u>Municipal Liability</u>**

**(Against Defendant City of New York)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. I have established in this pleading that unofficial illegal policies, customs, and practices that had the force of law were maintained against me in relation to my efforts to have attended the Mayor's 8/30/17 town hall through the illegal acts and omissions that Defendants City of

New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, and John Doe8-30-17a committed against me individually and as part of a collaborative conspiracy in furtherance of an abuse of process that was designed to violate my civil rights by preventing me from attending the Mayor's 8/30/17 town hall. I have also established that the unofficial illegal policies, customs, and practices that had the force of law and were maintained against me in relation to my efforts to have attended the Mayor's 8/30/17 town hall were condoned by Defendants de Blasio and O'Neill.

3. The unofficial illegal policies, customs, and practices that had the force of law and were committed against me on 8/30/17 in relation to my efforts to have attended the Mayor's 8/30/17 town hall were inextricably intertwined with the similar illegal acts and omissions that were committed against me that prevented me from attending the Mayor's 4/27/17, 5/23/17, and 6/8/17 town hall and resource fair meetings as well as a publicity stunt that the Mayor conducted on 7/25/17 inside of a subway station.

4. The fact that though I reported multiple entirely valid complaints to the New York City Civilian Complaint Review Board ("CCRB"), Internal Affairs Bureau of the NYPD ("IAB"), New York City Department of Investigations ("DOI") between 4/27/17 and 8/30/17 about the illegal acts and omissions that were committed against me between those dates 4/27/17 in relation to my efforts to have attended public forums that were conducted partly by the Mayor, no one took appropriate corrective action in response to enable me to attend the Mayor's 8/30/17 town hall is sufficient to establish that the illegal acts and omissions that were committed against me in relation to my efforts to have attended the Mayor's 8/30/17 town hall were illegally condoned by the CCRB, IAB, and DOI.

5. In addition, Defendant City of New York is liable for this cause of action in regards to the

illegal acts and omissions that were committed against me on 9/8/17 in relation to my efforts to have lawfully attended and testified in the Mayor's 2 pm public hearing on that date in the Blue Room in City Hall on account of the facts that I discussed in this complaint.

6. Municipal liability also applies to the fact that I wasn't provided the FOIL materials that I directed the NYPD to provide to me in response to my 9/8/17 FOIL demand to it.

7. The preceding facts are sufficient to allow me to prevail with my municipal liability claims that this pleading concerns.


**CLAIM #17:**      **Intentional and Negligent Infliction of Emotional Distress**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, de Blasio, O'Neill, Mantellino)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. Through the illegal acts and omissions that Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, de Blasio, and O'Neill committed against me in relation to my efforts to have attended the Mayor's 8/30/17 town hall, they subjected me to intentional and negligent infliction of emotional distress that I experienced mainly in the form of seething rage, frustration, and stress that I kept in check, stress, and humiliation from having been unjustly stigmatized by their illegal acts and omissions that occurred in full view of members of the general public and others.

3. In addition, Defendants City of New York, Cruz, and Nieves are also liable for this cause of action in regards to the illegal acts and omissions that they committed against me on 9/8/17 in relation to my efforts to have lawfully attended and testified in the Mayor's 2 pm public hearing on that date in the Blue Room in City Hall on account of the facts that I discussed in

this complaint.

4. Also, Defendant Mantellino is liable for this claim by virtue of the fact that he is responsible for having materially caused me to not be provided the FOIL materials that I directed the NYPD on 9/8/17 to provide to me.

**CLAIM #18:**                    **Conspiracy to Violate Civil Rights**

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, de Blasio, O'Neill, Mantellino)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The information that I have presented in this pleading confirms that the defendants that this claim concerns are liable for having been part of a conspiracy in which its members committed illegal acts and omissions against me in relation to my efforts to have attended the Mayor's 8/30/17 town hall and the Mayor's 9/8/17 2 pm public hearing.

3. The City of New York and Defendant Mantellino also were part of a conspiracy that illegally caused me to be deprived of FOIIL records that I sought. In addition to having illegally not being provided the FOIL materials that I directed the NYPD to provide to me in response to my 9/8/17 FOIL demand, I was also illegally not provided the entire video recording that was recorded on 4/27/17 at the site of the Mayor's 4/27/17 town hall by a video security camera controlled by the New York City Department of Education that was then installed by an entrance to that school that was used to grant the public access into it to enable them to observe how the Mayor's 4/27/17 town hall was conducted in it. The Mayor's office also illegally revoked my access to a video recording that it made available on the Internet that was recorded of the Mayor's 7/18/17 public resource fair meeting. Following 9/15/17, the

NYPD continued to illegally deprive me of video recordings that it was required to provide to me in response to FOIL demands that I submitted to it.

**CLAIM #19:** <u>**Unjust Enrichment**</u>

**(Against Defendants Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, O'Neill, Mantellino)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. In spite of the fact that Defendants, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, and O'Neill committed illegal acts and omissions in relation to my efforts to have attended the Mayor's 8/30/17 town hall and/or 9/8/17 2 pm public hearing, all of those defendants were enriched at my expense by having received compensation during the times that they were committing illegal acts and omissions against me in relation to my efforts to have attended the Mayor's 8/30/17 town hall and/or the Mayor's 9/8/17 2 pm public hearing.

3. As a result, "equity and good conscience" demand that this Court issue an order to compel Defendants Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, and O'Neill to fully and immediately reimburse their employers with both pre-judgment and post-judgment interest added for the total amount of pay as well as the value of all benefits that they received from the specific jobs that they were performing that covers the entire length of time during which they committed illegal acts and omissions against me that I have discussed in this pleading that were in relation to my efforts to have attended the Mayor's 8/30/17 town hall and/or the Mayor's 9/8/17 2 pm public hearing.

4. "Equity and good conscience" also demand that this Court issue an order to compel

Defendant Mantellino to fully and immediately reimburse his employer with both pre-judgment and post-judgment interest added for the total amount of pay as well as the value of all benefits that he received from the specific job that he performed that covers the entire length of time during which he committed illegal acts and omissions against me that I have discussed in this pleading that caused me to be deprived of FOIL materials that I directed the NYPD on 9/8/17 to provide to me.

**CLAIM #20:**                    <u>**Public and Private Nuisance**</u>

**(Against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, de Blasio, O'Neill, Mantellino)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  For the reasons that I have discussed in this pleading and are supported by findings in *Cangemi v. US*, No. 12-cv-3989 (JS)(SIL) (E.D.N.Y. Mar. 31, 2017), Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, de Blasio, and O'Neill committed both a private nuisance against me and a public nuisance against both others and I by having committed illegal acts and omissions in relation to my efforts to have attended the Mayor's 8/30/17 town hall. My claims about the defendants having committed a public nuisance largely stem from the fact that I sought to engage in protected whistleblowing during the Mayor's 8/30/17 town hall as a speaker and by distributing literature containing whistleblowing information, both of which were and otherwise would have been against the Mayor, Mr. Banks, HRA, HRA's business partners, the Bronx District Attorney's office, DOI, the New York City Department of Housing, Preservation and Development, NYPD, judges, the New York State Office of Temporary and

Disability Assistance, Urban, NTT, New York State court officers, and more to directly and indirectly provide information to large numbers of the public partly through word-of-mouth advertising to facilitate the public's ability to make informed decisions about why they should engage in voting and otherwise support the campaigns of the Mayor's rivals in the 2017 New York City government elections to fire the Mayor, the Mayor's administration, and exert sufficient pressure on the NYPD to have NYPD defendants in this action to be fired and prosecuted for civil rights crimes that they directly committed against me and indirectly committed against the public in the process by having illegally prevented me from attending the Mayor's 4/27/17, 5/23/17, 6/8/17, and 7/12/17 town hall and resource fair meetings that the Mayor conducted with others as campaign events to bolster his 2017 New York City re-election prospects.

3. For similar reasons, Defendants Cruz and Nieves are liable for this claim in regards to the Mayor's 9/8/17 2 pm public hearing.

4. For similar reasons, Defendant Mantellino is liable for this claim by having caused me to be deprived of the FOIL materials that I directed the NYPD on 9/8/17 to provide to me.

**CLAIM #21:** <u>**Spoliation of Evidence**</u>

**(Against Defendants City of New York and Mantellino)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. For the reasons that I have discussed in this complaint, Defendants City of New York and Mantellino are liable for spoliation of evidence that corresponds to the FOIL materials that I directed the NYPD on 9/8/17 to provide to me.

## DEMAND FOR A JURY TRIAL

1. I demand a trial by jury in this action on each and every one of my damage claims.

## PRAYER FOR RELIEF

WHEREFORE, this Court should accept jurisdiction over this entire matter and grant me additional relief by:

1. Causing this Court to exercise supplemental jurisdiction over my X1 lawsuit and to consolidate it with this action that will lead this action to control how both of those cases are conducted. This request stems from a common nucleus of operative fact and is pursuant to FRCP Rule 42.

2. Empaneling a jury to hear and decide this case strictly on its merits.

3. Granting me the following additional relief against the defendants individually and jointly:

   a. Compensation for violations of my constitutional rights, defamation, abuse of process, nuisance, unjust enrichment, wire fraud, and fraudulent misrepresentations as well as pain, suffering, mental anguish, and humiliation that I experienced due to the illegal acts and omissions by the defendants.

   b. Declaratory, injunctive, and equitable relief through the issuance of an order that voids the results of the 2017 New York City government elections for the jobs of New York City Mayor, New York City Councilmember, Bronx District Attorney, Queens Borough President, New York City Comptroller, and New York City Public Advocate primarily because it is reasonable to believe that results of those elections were materially tainted by voter fraud, voter suppression, and whistleblower retaliation in violation of 5 U.S.C. §1502 that occurred partly by illegally:

i.  Preventing whistleblowers from attending public forums that the Mayor conducted with them and were partly used as campaign events to attract various types of support from voters and prospective voters.

ii.  Segregating and discriminating against whistleblowers at such public forums.

iii.  Concealing critically significant video recordings that were recorded:

1) As a result of arrangements that the Mayor's office made for how those public forums were being conducted from within the rooms in which they were being conducted. Such concealment was that of a public record and illegally deprived voters, prospective voters, political rivals, journalists, and those who finance political campaigns of relevant information that amounted to voter fraud, voter suppression, and whistleblower retaliation.

iv.  Causing video recordings that were recorded by DOE's 4/27/17 video prior to 6:30 pm on 4/27/17 and video recordings that were recorded on 5/23/17 inside of the BSC by a video security camera controlled by OCA to have been illegally not preserved and provided to me. Both of those video recordings recorded illegal acts that were committed by members of the Mayor's NYPD security detail and others that caused me to have been illegally prevented from attending the Mayor's 5/23/17 resource fair and 4/27/17 town hall.

c.  Declaratory, injunctive, and equitable relief in accordance with findings expressed in *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899 (8th Cir. 2012) through the issuance of an order that enjoins Defendant City's personnel and agencies from continuing to commit illegal acts and omissions against me that violate my rights.

d.  Further declaratory, injunctive, and equitable relief through the immediate issuance of an

order that:

    i.    Prohibits all members of the NYPD from deliberately making any physical contact with me while I am conducting myself in a lawful manner.

   ii.    Requires all members of the Mayor's NYPD security detail to not come within 10 feet from me while they are on-duty as members of the Mayor's NYPD security detail and I am conducting myself in a lawful manner, unless I explicitly grant consent for that to occur.

  iii.    Requires all members of the Mayor's CAU to not come within 10 feet from me while I am conducting myself in a lawful manner and they are on-duty as members of the Mayor's CAU, unless I explicitly grant consent for that to occur.

  iv.    Prohibits Defendant City's personnel from illegally interfering with my ability to attend public forums that the Mayor may conduct from within the room in which he does so as he does so.

   v.    Prohibits Defendant City's personnel from illegally interfering with the rights that other people have to lawfully attend public forums that the Mayor conducts that may allow others and I to exercise our First Amendment right to observe, hear, and enjoy lawful speech and other expression that such people may engage in to criticize the Mayor and others during them.

  vi.    Prohibits Defendant City's personnel from illegally interfering with the First Amendment and Fifth Amendment rights that people have to **a)** bring literature and signs with them into rooms in which the Mayor conducts public forums, **b)** lawfully distribute such literature during those meetings without disrupting

those meetings, **c)** distribute such literature and otherwise show it and signs in the rooms in which the Mayor conducts such meetings before they begin and after they end, and **d)** Keep such literature and signs with them as the Mayor conducts such public forums.

vii. Requires Defendant City to grant access to public forums that the Mayor conducts inside of buildings based on the order in which members of the public line up directly outside of those buildings shortly before those meetings begin to be granted access to the room in which the Mayor conducts such public forums on those dates.

viii. Prohibits Defendant City from allowing its personnel to prevent members of the public from attending public forums that the Mayor conducts inside of buildings from within the rooms in which he does so while sufficient seating is available in those rooms.

ix. Orders Defendant City to immediately cause all members of the NYPD who are present in areas where the Mayor conducts public town hall meetings, public resource meetings, public hearings, and press conferences that the public may observe to wear body-cameras that are always on and always recording both audio and video recordings.

x. Orders Defendant City of New York to provide all audio and video recordings from such body-cameras in unedited and non-redacted form along with their audit trail records to allow for an independent forensic analysis within 24 hours of any adverse encounter that occurs between **a)** members of the public and **b)** the members of the NYPD wearing those body-cameras.

xi. Orders Defendant City to immediately **a)** cause clear audio recordings to be recorded of all verbal communications that members of the NYPD have while they are on-duty as members of the NYPD and present in areas where the Mayor conducts public town hall meetings, public resource meetings, public hearings, and press conferences that the public may observe.

xii. Orders Defendant City of New York to provide all such audio recordings in unedited and non-redacted form that includes information that identifies the date and time when those recordings began to be recorded as well as the speakers heard in those communications that are personnel of Defendant City within 24 hours of any adverse encounter that occurs between **a)** members of the public and **b)** the members of the NYPD heard in those audio recordings while they are being recorded.

xiii. Orders Defendant City to immediately cause all other electronic communications (such as e-mail messages, cell phone text messages, and encrypted communications) that are engaged in by those who are part of the Mayor's NYPD security detail to be recorded and preserved for possible use in litigation by people that they commit illegal acts and omissions against.

xiv. Orders Defendant City to provide all such electronic communications within 24 hours in unedited and non-redacted form that includes information that identifies the date and time when those communications occurred and the identities of those who engaged in them to members of the public who have adverse encounters with members of the Mayor's NYPD security detail to the extent that those communications concern those adverse encounters.

xv. Orders Defendant City to provide me copies of all communications that its personnel have had about me since 2/1/16 in unedited and non-redacted form. This includes, but is not limited to all of the following:

1) All communications that have taken place by using personally-owned devices, personal e-mail accounts, personal encrypted messaging accounts, and personal cell phone plans as well as by using computers and other devices that are owned or leased by Defendant City and e-mail, cell phone, and encrypted messaging accounts that are administered and/or controlled by Defendant City.

e. Further declaratory, injunctive, and equitable relief through the immediate issuance of an order that:

i. Orders Defendant City to immediately cause the CCRB and DOI to be provided all video recordings within 24 hours after a complaint is reported to them about illegal acts and omissions that are committed by members of the NYPD and other personnel of Defendant City that are recorded by video security cameras that Defendant City controls. This includes, but is not limited to illegal acts that are related to public forums that the Mayor conducts and occur on the dates and at the locations where the Mayor conducts them.

ii. Further orders Defendant City to make those video recordings available within 24 hours in unedited and non-redacted form to those who report such illegal acts and omissions to the CCRB and DOI.

iii. Orders that the following Defendants are also required to be fired at the earliest possible instead of practical or convenient time from the jobs that they hold

with Defendant City of New York largely pursuant to Section 1116 of the New York City Charter in response to the illegal acts and omissions that they committed against me in relation to my efforts to have lawfully attended the Mayor's 8/30/17 town hall and that they are prohibited from being employed by Defendant City again:

> Defendants Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, O'Neill, and Mantellino

iv. Orders Defendants Defendants Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, Holmes, de Blasio, and O'Neill to immediately and fully reimburse those who were their employers on and after 8/30/17 with pre-judgment and post-judgment interest for the total value of pay and benefits that they received that directly correspond to the length of time during which they were involved in the illegal acts and omissions that were committed against me in relation to **a)** my efforts to have attended the Mayor's 8/30/17 town hall and the Mayor's 9/8/17 2 pm public hearing and **b)** depriving me of the FOIL materials that I directed the NYPD on 9/8/17 to provide to me.

v. Restrains Defendant City's personnel and agencies from continuing to commit illegal acts and omissions against me that violate my rights, especially in all areas that are public forums.

vi. Declares that the ban that the Mayor announced that prohibits large gatherings of people in New York City and protests from being conducted is overly broad, pretextual, void, and unenforceable largely because it impermissibly violates core First Amendment rights as well as Fifth Amendment and Fourteenth Amendment rights that pertain to due process, selective-enforcement, equal

protection, and liberty.

    vii.   Further declares that though it may possibly be advisable to wear a face mask in New York City, no one is required to do so partly because doing so impedes the flow of oxygen to healthy people and impermissibly infringes upon the First Amendment rights that people have to engage in freedom of expression, such as by having people see them smiling, expressing affection by kissing, being able to yawn without having to wear a face mask, and having other facial expressions that they make seen by others. Although it is potentially dangerous to one's health to engage in a wide variety of other activities that include driving a car because of the possibility that a drunk driver may pass by and having a drink in a bar because there is a possibility to breathe in second-hand smoke, bans on driving and visiting bars have not been imposed due to such risk factors.

    viii.  Similarly declares that the social-distancing restrictions in New York State are overly broad, void, and unenforceable for the same reasons just discussed and declares that those restrictions have been selectively-enforced by the NYPD in violation of the Fourteenth Amendment.

f.  Declaratory relief by declaring that the Mayor's 8/30/17 town hall and the Mayor's 9/8/17 2 pm public hearings were public forums that were subject to New York State's Open Meetings Law and that all actions that were taken as a result of those public forums having been conducted are void pursuant to Section 107 of New York State's Public Officer Law because those public forums were conducted in violation of New York State's Open Meetings Law.

g. Injunctive and equitable relief by ordering Defendant City to immediately provide me the following in unedited and non-redacted form:

    i. Copies of all video recordings and photographs that were recorded and otherwise taken by Defendant City's personnel inside of the building that hosted the Mayor's 8/30/17 town hall between the time when **a)** the first member of the public entered that building on 8/30/17 in relation to attending that town hall and **b)** everyone who attended the Mayor's 8/30/17 town hall exited that building.

    ii. Copies of all records that have been in the possession of Defendant City's personnel that pertain to the deliberations, planning, coordination, execution, and cover-up that took place in regards to my having been illegally prevented from attending the Mayor's 8/30/17 town hall and the Mayor's 9/8/17 2 pm public hearing.

    iii. Copies of all records that have been in the possession of Defendant City's personnel that describe staff assignments that were issued for the Mayor's 8/30/17 town hall and the Mayor's 9/8/17 2 pm public hearing.

    iv. Copies of all records that have been in the possession of Defendant City's personnel that consist of the names and contact information for the members of the public who registered to attend the Mayor's 8/30/17 town hall as well as the names and contact information for the journalists who attended the Mayor's 8/30/17 town hall.

h. Injunctive and equitable relief by ordering Defendant City of New York to immediately provide me all video recordings as an ".avi", ".mp4", or ".mov" computer file that were

recorded on 2/19/20 by all video security cameras that were installed in the school and are controlled by DOE that hosted the town hall meeting that the Mayor conducted on that date between the times when the first member of the public was allowed into that school for the purpose of attending that town hall until everyone who attended that town hall exited that school.

i. Compensation for all costs and attorney fees that are related to my pursuit of this civil action.

j. Equitable and injunctive relief that authorizes me and others that I may ask to help me to paint, write, or draw any message or image of any size indefinitely throughout New York City without needing pre-approval from anyone on any public street, sidewalk, public passageway, concourse, and park indefinitely by using resources that will be provided to me by the City of New York for that purpose.

k. Equitable and injunctive relief that orders the City of New York to cause its NYPD to accord whatever messages and images that I may paint, write, or draw in public areas throughout New York City to receive equal law-enforcement protection that is accorded to Black Lives Matter signs on streets in New York City, especially the one located in front of Trump Tower in Manhattan.

l. An award of damages against Defendants City of New York, Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, de Blasio, and O'Neill pursuant to 18 U.S.C. §1986 for having not intervened on my behalf in relation to my effort to have attended the Mayor's 8/30/17 town hall and the Mayor's 9/8/17 2 pm public hearing.

m. An award of damages against Defendant Mantellino pursuant to 18 U.S.C. §1986 for

having not intervened on my behalf to have caused me to be provided the FOIL materials that I directed the NYPD on 9/8/17 to provide to me.

n.  An award of damages against defendants Redmond, Nieves, Pfeffer, Berkowitz, Cruz, Hansen, Fowler, Lance, John Doe8-30-17a, and O'Neill pursuant to New York State General Business Law §349 for deception in relation to my efforts to have attended the Mayor's 8/30/17 town hall and the Mayor's 9/8/17 2 pm public hearing and how those defendants conducted themselves as criminal accomplices instead of the law-enforcement personnel that they technically were throughout August of 2017 and September of 2017.

o.  An award of punitive damages for all of my claims set forth in this pleading.

p.  An award of pre-judgment and post-judgment interest.

q.  Such other, further, and different relief as the interests of justice and equity may require.

Dated:      New York, New York
            September 7, 2020

                                              From,

                                              s_/Towaki Komatsu

                                              *Plaintiff, Pro Se*
                                              802 Fairmount Pl., Apt. 4B
                                              Bronx, NY 10460
                                              (347) 872-1205
                                              Towaki_Komatsu@yahoo.com